# Exhibit G

Case 1:26-ap-00037-HWV    Doc 1-7    Filed 04/10/26    Entered 04/10/26 11:51:56    Desc
Exhibit G    Page 1 of 228

FILED
ADAMS COUNTY, PA
PROTHONOTARY
2021 SEP -7 AM 11: 21

*OBERMAYER, REBMANN, MAXWELL & HIPPEL LLP*
*Paige Macdonald-Matthes, Esquire*
*Pa Supreme Court ID 66266*
*Elizabeth K. Lilienthal, Esquire*
*Pa Supreme Court ID 327248*
*200 Locust Street, Suite 400*
*Harrisburg, PA 17101*
*(717) 234-9730 Telephone*
*(717) 236-2485 Facsimile*
*Email PMM@obermayer.com and Elizabeth.Lilienthal@obermayer.com*
*Attorneys for H&M Holdings Group, LLC, Hauser Family Farms, LLC, Melinda H. Davis and Hannah M. Hauser*

| | |
|---|---|
| H&M HOLDINGS GROUP, LLC, HAUSER FAMILY FARMS, LLC, MELINDA H. DAVIS, and HANNAH M. HAUSER | IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA |
| Plaintiff, | No. 2018-SU-1293 |
| v. | Civil Division |
| ALAN K. PATRONO, JONATHAN ALAN PATRONO, JANE HAUSER PATRONO, POLLY E. PATRONO a/k/a POLLY E. PATRONO-CARLSON, JOHN J. MURPHY, III, PATRONO & MURPHY, LLC, APPLE LEAF ABSTRACTING & SETTLEMENT COMPANY and JOHN DOE(S)/JANE DOE(S) | |
| Defendants. | |

| NOTICE | AVISO |
|---|---|
| YOU HAVE BEEN SUED IN COURT. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) días de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparecencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las |

1

4813-0364-6201

| | |
|---|---|
| against you. You are warned that if you fail to do so, the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.<br><br>    YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.<br>    IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.<br><br>Lawyer Referral Service<br>**COURT ADMINISTRATOR**<br>**ADAMS COUNTY COURTHOUSE**<br>**111-117 BALTIMORE STREET**<br>**GETTYSBURG, PA 17325**<br>**TELEPHONE: (717) 337-9846** | demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.<br><br>    USTED DEBE LLEVAR ESTE DOCUMENTO A SU ABOGADO INMEDIATAMENTE. SI USTED NO TIENE UN ABOGADO, LLAME O VAYA A LA SIGUIENTE OFICINA. ESTA OFICINA PUEDE PROVEERLE INFORMACIÓN ACERCA DE COMO CONSEGUIR UN ABOGADO.<br>    SI USTED NO PUEDE PAGAR POR LOS SERVICIOS DE UN ABOGADO, ES POSIBLE QUE ESTA OFICINA LE PUEDA PROVEER INFORMATION SOBRE AGENCIAS QUE OFREZCAN SERVICIOS LEGALES SIN CARGO O BAJO COSTO A PERSONAS QUE CUALIFICAN<br><br>Lawyer Referral Service<br>**COURT ADMINISTRATOR**<br>**ADAMS COUNTY COURTHOUSE**<br>**111-117 BALTIMORE STREET**<br>**GETTYSBURG, PA 17325**<br>**TELEPHONE: (717) 337-9846** |

## THIRD AMENDED COMPLAINT[1]

AND NOW, comes Plaintiffs, H&M Holdings Group, LLC ("H&M Holdings")

---

[1] Pursuant to the August 6, 2021 Order of Court (filed August 16, 2021).

2

4813-0364-6201

Hauser Family Farms, LLC ("HFF"), Melinda H. Davis, and Hannah M. Hauser, by and through their counsel, *Obermayer Rebmann Maxwell & Hippel LLP*, and files this Third Amended Complaint and aver as follows:

**PARTIES**

1.      Plaintiff, H&M Holdings is a limited liability company formed under the laws of the Commonwealth of Pennsylvania with a registered place of business located at 210 Ridgewood Dr., Gettysburg, PA 17325.

2.      Plaintiff, HFF is a limited liability company formed under the laws of the Commonwealth of Pennsylvania with a registered place of business located at 30 W. Middle St., Gettysburg, PA 17325.

3.      Non-party Hauser Estate, Inc. ("Hauser Estate") is a corporation formed under the laws of the Commonwealth of Pennsylvania with a registered place of business located at 30 W. Middle St., Gettysburg, PA. Hauser Estate filed a voluntary bankruptcy petition in the United States Bankruptcy Court for the Middle District of Pennsylvania and is not a party to this litigation. Although Hauser Estate is not a party to this action, as described in greater detail below, many of the facts at issue in this case concern the mis-management of Hauser Estate by certain of the Defendants. The Chapter 7 Trustee appointed for Hauser Estate in the bankruptcy proceeding was contacted by Plaintiffs and, after extensive discussions, declined to pursue the claims which are partially the subject of this action. Moreover, the Office of the United States Trustee, a subdivision of the U.S. Department of Justice and which has supervisory functions over the Chapter 7 Trustee, was contacted by Plaintiffs and supported the Chapter 7 Trustee's determination not to pursue such claims.

3

4. Plaintiff Melinda Davis is an adult individual, a shareholder of Hauser Estate, and an owner and the managing member of Plaintiff HFF. Plaintiff resides at 48 Beechwood Dr., Fairfield, PA 17320. Plaintiff Melinda Davis is the sister of Defendant Jane Patrono, the sister-in-law of Defendant Kim Patrono, and the aunt of Defendants Jonathan Patrono and Polly E. Patrono a/k/a Polly E. Patrono – Carlson ("Polly Patrono").

5. Plaintiff Hannah Hauser is an adult individual, a shareholder of Hauser Estate and an owner of Plaintiff HFF. Plaintiff resides at 210 Ridgewood Dr., Fairfield, PA 17325. Plaintiff Hannah M. Hauser is the sister of Plaintiff Melinda Davis and Defendant Jane Patrono, the sister-in-law of Defendant Kim Patrono, and the aunt of Defendants Jonathan Patrono and Polly Patrono.

6. Defendant Alan Kim Patrono ("Kim Patrono") is an adult individual and, at all relevant times, owner of Defendants Patrono & Murphy, LLC and Apple Leaf Abstracting & Settlement Company. Defendant Kim Patrono is an attorney licensed to practice in the Commonwealth of Pennsylvania, and at all relevant times, practiced as a partner at Defendant Patrono & Murphy, LLC. Defendant Kim Patrono resides at 98 East Broadway, Gettysburg, Pennsylvania 17325. Defendant Kim Patrono is the father of the Defendants Jonathan Patrono and Polly Patrono, and the husband of Defendant Jane Hauser Patrono ("Jane Patrono").

7. Defendant Jane Patrono is an individual and owner of Plaintiff HFF. Defendant Jane Patrono resides at 98 East Broadway, Gettysburg, Pennsylvania 17325. Defendant Jane Patrono is the wife of Defendant Kim Patrono and the mother of Defendants Jonathan Patrono and Polly Patrono.

8. Defendant Jonathan Patrono is an adult individual and, at all relevant times, was an owner and President of Hauser Estate and, as described in greater detail below, for many years Defendant Jonathan Patrono controlled Plaintiff HFF. Additionally, Jonathan Patrono is a practicing

4

4813-0364-6201

attorney licensed in the Commonwealth of Pennsylvania and, at all relevant times, practiced as a partner at the law firm of Defendant Patrono & Murphy, LLC. Defendant Jonathan Patrono resides at 2795 Biglerville Road, Gettysburg, Pennsylvania 17325. Jonathan Patrono is the son of Defendants Kim Patrono and Jane Patrono, and the brother of Defendant Polly Patrono.

9. Defendant Polly E. Patrono a/k/a Polly E. Patrono-Carlson is an individual who resides at 120 Montclair Road, Gettysburg, Pennsylvania 17325. Defendant Polly Patrono is the daughter of Defendants Kim Patrono and Jane Patrono and the sister of Defendant Jonathan Patrono.

10. Defendant John Murphy is an adult individual and owner of Defendant Patrono & Murphy, LLC. Additionally, Jonathan Patrono is a practicing attorney licensed in the Commonwealth of Pennsylvania and, at all relevant times, practiced as a partner at the law firm of Defendant Patrono & Murphy, LLC. Defendant John Murphy resides at 954 Barlow Drive, Gettysburg, PA 17325.

11. Defendant Patrono & Murphy, LLC is a limited liability company formed under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 30 W. Middle St., Gettysburg, PA 17325.

12. Defendant Apple Leaf Abstracting & Settlement Company ("Apple Leaf"), according to its website, is "an attorney owned and operated abstracting and settlement company" with a principal place of business located at 28 W. Middle St., Gettysburg, PA 17325. Per its website, the attorneys who "own and operate" Apple Leaf are Defendants Kim Patrono, John Murphy, and Jonathan Patrono. *See* Exhibit "A". In its contact information posted on its website, Apple Leaf includes the name and contact information for Patrono and Murphy, LLC.

5

4813-0364-6201

13. Defendants, John Doe(s)/Jane Doe(s) are certain persons or entities who participated with Defendants in the claims asserted below. Plaintiffs aver that a reasonable search to determine the actual name of this/these defendant(s) has been conducted.

## JURISDICTION AND VENUE

14. The amount in controversy exceeds the local arbitration limits set forth in Local Rule 1301(a) and Plaintiff demands a jury trial.

15. Venue is proper pursuant to Pa. R.C.P. 1006.

16. A transaction or occurrence out of which a cause of action arose occurred in Adams County.

## GENERAL FACTUAL ALLEGATIONS

### I. Formation of Hauser Estate and HFF

17. This action stems from the failure of Hauser Estate. Hauser Estate was a wine and cider business formed and controlled by Defendants Jonathan and Kim Patrono but capitalized by Defendant Jane Patrono along with Plaintiffs Hannah Hauser and Melinda Davis.

18. Plaintiffs Hannah Hauser and Melinda Davis and Defendant Jane Patrono are sisters and the business of Hauser Estate was initially established using approximately $6 million inherited by them, and, upon the advice and counsel of Defendants Kim Patrono and Jonathan Patrono, invested into Hauser Estate.

19. Defendants Kim Patrono, Jonathan Patrono, John Murphy, and/or Patrono & Murphy, LLC formed and structured Hauser Estate, Inc. (hereinafter "Hauser Estate") in 2006 including, but not limited, drafting articles of incorporation, operating agreements, and/or other legal documents.

6

4813-0364-6201

20.     Defendants Kim Patrono, Jonathan Patrono, John Murphy, and/or Patrono & Murphy, LLC formed and structured Hauser Estate despite that they, at all relevant times, simultaneously served as attorneys to each individual Hauser Estate shareholder and to the entity itself.

21.     Contemporaneous with the establishment of Hauser Estate, and under the advice and counsel of Defendants Kim Patrono, Jonathan Patrono, John Murphy, and/or Patrono & Murphy, HFF was created to hold title to 410 Cashtown Road, Biglerville, Adams County, PA, a property that was to be used by Hauser Estate as its main operating premises ("Winery Premises").

22.     The transfer of the Winery Premises to HFF was effected and facilitated by Apple Leaf, yet another entity owned and/or controlled by Defendant Kim Patrono.

23.     Defendants Kim Patrono, Jonathan Patrono, John Murphy, and/or Patrono & Murphy, LLC established and structured Plaintiff HFF including, but not limited, drafting articles of organization, operating agreements, and/or other legal documents.

24.     The operating agreement for HFF drafted by Defendants Kim Patrono, Jonathan Patrono, John Murphy, and/or Patrono & Murphy, LLC named Plaintiff Melinda Davis as the manager of Plaintiff HFF.  However, pursuant to that operating agreement drafted by Defendants Kim Patrono, Jonathan Patrono, John Murphy, and/or Patrono & Murphy, LLC, if Plaintiff Melinda Davis was unwilling or unable to perform her obligations as manager, the operating agreement drafted by Defendants Kim Patrono, Jonathan Patrono, John Murphy, and/or Patrono & Murphy, LLC provided that Defendant Jonathan Patrono would serve as manager of Plaintiff HFF. A true and correct copy of the Operating agreement is attached hereto as Exhibit "B".

4813-0364-6201

25. Defendants Kim Patrono, Jonathan Patrono, John Murphy, and/or Patrono & Murphy, LLC established and structured Plaintiff HFF despite that they, at all relevant times, simultaneously served as attorneys to each individual Hauser Estate shareholder and HFF owner investing in the business and to the entity itself.

26. Defendants, Kim Patrono, Jonathan Patrono and John Murphy, as the attorney owners of Apple Leaf, prepared and filed all documents conveying the Winery Premises to HFF.

27. The operating agreement of Plaintiff HFF was executed on, or about, July 20, 2007. Although this operating agreement dealt with an entity owned by Plaintiffs Melinda Davis and Hannah Hauser, Defendants Kim Patrono, Jonathan Patrono, John Murphy, and/or Patrono & Murphy, LLC never provided a copy of the Plaintiff HFF operating agreement to either of Plaintiffs Melinda Davis and Hannah Hauser.[2]

28. Notwithstanding Defendants Kim Patrono and Jonathan Patrono being Melinda Davis' attorney at the time, Defendants Kim Patrono and Jonathan Patrono did not review the operating agreement with Melinda Davis, but, nonetheless, directed her to execute the document as part of a stack of documents that Defendant Kim Patrono presented to her in summary fashion. Melinda Davis was not provided with a copy of the document after execution and, for years, was unaware that she had been designated as manager of Hauser Family Farms.

29. Even though Defendants Kim Patrono and Jonathan Patrono represented Plaintiffs Melinda Davis and Hannah Hauser in matters and transactions in which Defendants Kim Patrono and Jonathan Patrono and other clients of Defendants Kim Patrono and Jonathan Patrono were involved and in which such other clients were counterparties, and in which such matters and

---

[2] Indeed, Plaintiffs were never actually provided with a copy of the Operating Agreement until such time as the Bankruptcy filing of Hauser Estate discussed herein in greater detail, when the Court appointed Trustee provided a copy to Plaintiffs.

8

transactions Defendants Kim Patrono and Jonathan Patrono were themselves involved and counterparties, Defendants Kim Patrono and Jonathan Patrono did not explain or identify any conflicts of interest to Melinda Davis, Hannah Hauser, or other represented parties.

30. Defendants Kim Patrono and Jonathan Patrono did not obtain any written waivers of conflicts of interest from Plaintiffs Melinda Davis and Hannah Hauser, or other represented parties.

31. Through Defendant Kim Patrono and Jonathan Patrono's improper machinations, Melinda Davis was left ignorant of her role as manager of HFF so that Defendant Jonathan Patrono could effectively serve as the acting manager of HFF.

32. While Plaintiff Melinda Davis was never "unable or unwilling" to serve as the managing member of HFF, but was never informed that she was legally the managing member while Defendants Jonathan Patrono and Kim Patrono made all of the operational decisions for HFF from its formation through and including October 2018 when Plaintiff Melinda Davis learned for the first time, that she was the managing member of HFF. Indeed, upon information and belief, employees of HFF were likewise unaware of her designation as managing member of HFF until around October 2018.

33. The lines between Hauser Estate and HFF became blurred through a series of agreements executed and/or business decisions or transactions effectuated pursuant to the advice and counsel of Defendants Kim Patrono and Jonathan Patrono.

34. On or about October 5, 2006, Defendants Kim Patrono, Jonathan Patrono, John Murphy, and/or Patrono & Murphy, LLC counseled Hauser Estate and its shareholders, Plaintiffs Melinda Davis and Hannah Hauser and Defendants Jonathan Patrono, Polly Patrono, and Jane

9

Patrono and non-party Lee Wagner, to enter into a certain Agreement of Shareholders of Hauser Estate, Inc. (the "Original Shareholders Agreement").

35. The Original Shareholders Agreement was drafted by Defendants Kim Patrono, Jonathan Patrono, John Murphy, and/or Patrono & Murphy, LLC. A true and correct copy of the Original Shareholders Agreement is attached hereto as Exhibit "C".

36. Defendants Kim Patrono, Jonathan Patrono, John Murphy, and/or Patrono & Murphy, LLC, at all relevant times, simultaneously represented Hauser Estate and its shareholders and HFF and its owners.

37. Jonathan Patrono was (and continues to be upon information and belief) a licensed attorney in the Commonwealth of Pennsylvania prior to being named President of Hauser Estate.

38. Defendants Kim Patrono, Jonathan Patrono, John Murphy and/or Patrono & Murphy structured Hauser Estate so that Defendant Jonathan Patrono controlled 51% of the voting shares. The non-voting shares were owned 30% each by Plaintiffs Hannah Hauser, Melinda Davis and Defendant Jane Patrono's children, Defendants Polly and Jonathan Patrono. The remaining 10% was held by Farm Manager, Lee Wagner.

39. The Original Shareholders Agreement provided that Jonathan Patrono was the President of Hauser Estate and that he would control a majority of the voting shares of Hauser Estate. The Original Shareholders Agreement, drafted by *inter alia*, Defendant Kim Patrono and Defendant Jonathan Patrono, essentially made it impossible for any shareholder or group of shareholders of Hauser Estate to remove Jonathan Patrono from his position as President without his consent.

10

4813-0364-6201

40.     Although he was the President of Hauser Estate, upon information and belief, Jonathan Patrono made few, if any, decisions without consulting with and following the direction of his father, Defendant Kim Patrono.

41.     On or about July 23, 2007, Defendants Kim Patrono, Jonathan Patrono, John Murphy, and/or Patrono & Murphy, LLC counseled the shareholders of Hauser Estate – Plaintiffs Melinda Davis and Hannah Hauser and Defendants Jonathan Patrono, Polly Patrono, and Jane Patrono – and all of the owners of HFF – Plaintiffs Melinda Davis and Hannah Hauser and Defendant Jane Patrono – to enter into a certain Shareholder/Member Agreement (the "Second Shareholders Agreement"). A copy of the Second Shareholders Agreement is attached hereto as Exhibit "D".

42.     The Second Shareholders Agreement was drafted by Defendants Kim Patrono, Jonathan Patrono, John Murphy, and/or Patrono & Murphy, LLC.

43.     Defendants Kim Patrono, Jonathan Patrono, John Murphy, and/or Patrono & Murphy, LLC, at all relevant times, simultaneously represented Hauser Estate and its shareholders along with Plaintiff HFF and its owners.

44.     The Second Shareholders Agreement supplemented and modified the Original Shareholders Agreement. It, among other things, provided that any shareholder of Hauser Estate or owner of HFF who desired to transfer his or her ownership interest must first either obtain the consent of all the other owners or offer to sell such ownership interest to either Hauser Estate or HFF for a price established pursuant to a procedure set forth in the Second Shareholders Agreement.

45.     From the 2006 implementation of this structure whereby Jonathan Patrono was named Hauser Estate's President until the Bankruptcy Court appointed a trustee to take control of

11

the business in September 2018, Jonathan Patrono was nominally the sole person in control of Hauser Estate.

46. The convoluted structure of Hauser Estate and HFF coupled with Defendant Kim Patrono's status as an attorney licensed to practice law in the Commonwealth of Pennsylvania, allowed Defendant Kim Patrono to exert undue influence over the control and operation of both Hauser Estate and HFF. Upon information and belief, Defendant Kim Patrono was involved in virtually every business decision made with respect to Hauser Estate and HFF from the founding of these companies up until the appointment of a bankruptcy trustee in September 2018.

47. While Hauser Estate was able to establish itself as a producer of cider under the "Jack's Hard Cider" brand, the internal operations of Hauser Estate, upon information and belief, were managed by Defendants Jonathan Patrono and Kim Patrono so ineffectively that the business was never profitable on any consistent or regular basis. Particularly during the several years immediately preceding the July 2018 bankruptcy filing, Defendants Jonathan Patrono and Kim Patrono controlled and managed the business in a way that created substantial debts and left regular vendors and substantial ordinary course obligations, including excise taxes, unpaid.

48. By managing and controlling the finances of both Hauser Estate and HFF, Defendants Jonathan Patrono and Kim Patrono were able to manipulate the profits from HFF operations to the exclusive benefit of Hauser Estate but failed to exercise the same duty of care to HFF. Indeed, Defendants Kim Patrono and Jonathan Patrono knowingly and intentionally diverted profits from HFF to Hauser Estate such that when it came time to pay the financial obligations to HFF, there was no money and consequently Plaintiffs Hannah Hauser and Melinda Davis had to put their own money into HFF to pay these expenses.

12

4813-0364-6201

## II. Misappropriation of Receivables from Property Owned by Plaintiffs, Melinda Davis, Hannah Hauser, and from HFF to Hauser Estate

49. Upon information and belief, Defendants Kim Patrono and Jonathan Patrono diverted valuable produce generated on certain real property owned jointly by Plaintiffs Melinda Davis and Hannah Hauser consisting of 364 acres on Heckenluber Road, Biglerville, Adams County, PA, known as "Farm 1" (hereinafter "Farm 1"), which they inherited the same from their late mother, Helen Hauser in 2012.

50. Although Hauser Estate had no contractual, possessory, or other interest in Farm 1, upon information and belief, every year starting from 2008 and continuing through the commencement of bankruptcy proceedings by Hauser Estate in late July 2018, Defendants Kim Patrono and Jonathan Patrono caused personnel hired by Hauser Estate to harvest apples from Farm 1 which would, in part, be brought back to Hauser Estate and used in the production of cider.

51. Defendants Kim Patrono and Jonathan Patrono never caused Hauser Estate (or any other person or entity) to pay anything to the owners of Farm 1 for the diverted apples.

52. While Defendants Kim Patrono and Jonathan Patrono never provided Plaintiffs Melinda Davis and Hannah Hauser with a formal, written accounting of the Farm 1 apples diverted to Hauser Estate, it is believed that the value of these diverted apples was in excess of $100,000 per year between 2012 and 2018.

53. Accordingly, Kim Patrono and Jonathan Patrono caused Hauser Estate to wrongfully divert apples valued in excess of $600,000.00 from real property in which Hauser Estate had no interest or rights and without paying any compensation whatsoever to the owners

4813-0364-6201

of that real property. The actual amount of apples diverted by Defendants Kim Patrono and Jonathan Patrono from Farm 1 to the Hauser Estate will be determined in discovery in this case.

54. In addition to diverting apples from Farm 1 to Hauser Estate, upon information and belief, Defendants Kim Patrono and Jonathan Patrono also diverted cash proceeds from the sale of produce from Plaintiff HFF to Hauser Estate.

55. Defendant Jonathan Patrono, on behalf of Plaintiff HFF, entered into a Marketing Agreement with Knouse Foods.

56. Pursuant to the Marketing Agreement with Knouse Foods, some of the apples grown on Farm 1 were purchased by Knouse Foods during harvest season.

57. Defendant Jonathan Patrono directed Knouse Foods to send payments under the Marketing Agreement to 28 West Middle Street, Gettysburg, Pennsylvania, which is the address of Patrono & Murphy, LLC.

58. Upon information and belief, from approximately 2008 through the filing of the Hauser Estate bankruptcy case in late July 2018, Defendants Kim Patrono and Jonathan Patrono received the proceeds of Plaintiff HFF's apple sales to Knouse Foods under the Marketing Agreement in the form of checks issued by Knouse Foods, endorsed those Knouse Foods checks made out to Plaintiff HFF over to Hauser Estate, and then deposited them into Hauser Estate's bank account.

59. Defendants Kim Patrono and Jonathan Patrono did not provide Plaintiffs HFF, Melinda Davis, or Hannah Hauser with an accounting of the payments received from Knouse Foods.

60. However, 2018 payments from Knouse Foods to Plaintiff HFF approximated $260,000. Assuming a similar volume of proceeds from prior years, it appears, upon information

14

and belief, that Defendants Kim Patrono and Jonathan Patrono diverted in excess of $2.5 million from Plaintiff HFF to Hauser Estate without the consent of Plaintiff HFF. The actual amount of cash proceeds diverted by Defendants Kim Patrono and Jonathan Patrono from Plaintiff HFF to Hauser Estate will be determined in discovery in this case. A copy of the 2018 payments are attached hereto and marked as Exhibit "E".

**III. Hauser Estate Lines of Credit, and the Debt Owed to H&M Holdings Group Credit**

61. In June 2011, due to cash flow problems, Hauser Estate obtained a $300,000.00 revolving credit facility from Members 1st Federal Credit Union ("Members 1st"). Ultimately, the revolving credit facility was expanded by a promissory note for $500,000.00 (as subsequently amended and/or restated) ("Promissory Note 1").

62. Defendants Kim Patrono, Jonathan Patrono, and Jane Patrono, along with Melinda Davis and Hannah Hauser, executed unconditional guarantees for Promissory Note 1, which were secured by each party, individually, by way of a Commercial Guaranty.

63. Pursuant to the terms of each of the Commercial Guaranty Agreements, Defendants, as individual Guarantors, represented and warranted, *inter alia*, that they "ha[d] not and will not, without the prior consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein." *See* Exhibit "F" attached hereto. *Emphasis added.*

64. In 2011, one of Defendant Jonathan Patrono's assets was his residence located at 2795 Biglerville Road, Gettysburg, PA 17325 ("JP Property").

65. Upon information and belief, at the time Defendant Jonathan Patrono executed the Commercial Guaranty for Promissory Note 1, Defendant Jonathan Patrono's had reported to Members 1st via loan application documents that his only source of income was from Hauser

4813-0364-6201

Estate as its purported "President" under the Shareholder Agreement. Such information and belief is further supported by the facts that five (5) years after this loan, Defendant Jonathan Patrono was still reporting to Members 1st that his only source of income was from Hauser Estate starting October 22, 2008. *See* Exhibit "G" attached hereto.

66. At the time Defendant Jonathan Patrono executed the Commercial Guaranty for Promissory Note 1, Member's 1st had already perfected a mortgage lien against the JP Property by way of a Mortgage and Note signed by both Defendant Jonathan Patrono and his wife, Melisa Patrono. *See* Exhibit "H".

67. As Hauser Estate was his only source of income at the time Promissory Note 1 was executed, Defendant Jonathan Patrono had the power to pledge his residence as security for the Commercial Guaranty on behalf of himself and his wife, Melisa Patrono because the revolving line of credit to Hauser Estate would provide Defendant Jonathan Patrono with the income he required to, *inter alia*, pay his mortgage to Member's 1st, and thus his action in executing the required loan documents for Promissory Note 1 created a benefit that inured to both Defendant Jonathan Patrono and his wife, Melisa Patrono.

68. Thereafter, pursuant to an October 26, 2011 Promissory Note (as subsequently amended and/or restated) ("Promissory Note 2"), Members 1st loaned $1,475,000.00 to HFF and Hauser Estate, jointly and severally, which were secured by each party, individually. Defendants Kim Patrono, Jonathan Patrono, and Jane Patrono, along with Melinda Davis and Hannah Hauser, executed unconditional guarantees, which were secured by each party individually by way of a Commercial Guaranty for Promissory Note 2.

69. Pursuant to the terms of the Commercial Guaranty, Defendants, as individual Guarantors, once again agreed, *inter alia*, that they "ha[d] not and will not, without the prior

16

consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein." *Emphasis added. See* Exhibit "I" attached hereto.

70. At the time Defendant Jonathan Patrono executed the Commercial Guaranty for Promissory Note 2, Defendant Jonathan Patrono's only source of income was from Hauser Estate as its purported "President" under the Shareholder Agreement. *See* Exhibit "G".

71. At the time Defendant Jonathan Patrono executed the Commercial Guaranty for Promissory Note 2, Member's 1st had already perfected mortgage lien against the JP Property by way of a Mortgage and Note signed by both Defendant Jonathan Patrono and his wife, Melisa Patrono.

72. As Hauser Estate was his only source of income at the time Promissory Note 2 was executed, Defendant Jonathan Patrono had the power to pledge his Jonathan Patrono's residence as security for the Commercial Guaranty on behalf of himself and his wife, Melisa Patrono because the revolving line of credit to Hauser Estate would provide Defendant Jonathan Patrono with the income he required to, *inter alia*, pay his mortgage to Member's 1st, and thus his action in executing the required loan documents for Promissory Note 2 created a benefit that inured to both Defendant Jonathan Patrono and his wife, Melisa Patrono. *See* Exhibit "G".

73. As of December 21, 2016, Promissory Note 1 and Promissory Note 2 were in default.

74. H&M Holdings was created by Melinda Davis and Hannah Hauser, upon the advice of counsel, to, *inter alia*, purchase Promissory Note 1 and Promissory Note 2 along with, *inter alia*, the unconditional guarantees associated with those Promissory Note 1 and Promissory Note 2.

17

4813-0364-6201

75. H&M Holdings was a fully funded business venture and remains a separate and distinct legal entity from its principals Melinda Davis and Hannah Hauser. The assets of H&M Holdings have not been comingled with those of its principals. H&M Holdings has observed the legal formalities required in connection with the operation of a limited liability company throughout its existence.

76. By Agreement dated July 18, 2018, Members 1st, in exchange for good and valuable consideration, and not at a discount, sold and assigned Promissory Note 1 and Promissory Note 2 to H&M Holdings along with, *inter alia*, the unconditional guarantees. In other words, H&M Holdings purchased Promissory Note 1, Promissory Note 2, and, *inter alia*, the unconditional guarantees for full value.

77. On July 17, 2018, the literal eve of H&M Holdings' acquisition of Promissory Note 1 and Promissory Note 2 from Members 1st, legal counsel for Defendants Kim Patrono, Jonathan Patrono, and Jane Patrono contacted counsel for Melinda Davis and Hannah Hauser and advised them of, *inter alia*, an impending collection action with respect to Promissory Note 1 and Promissory Note 2 and the unconditional guarantees.

78. On July 27, 2018 and August 23, 2018, H&M Holdings instituted two separate confessed judgment proceedings in the Court of Common Pleas of Adams County, Pennsylvania against Defendants Jane Patrono, Kim Patrono, and Jonathan Patrono.

79. The confessed judgments filed in Adams County against Defendants Jane Patrono, Kim Patrono, and Jonathan Patrono, were stricken on procedural grounds and without prejudice to such confessed judgments being re-filed. Confessed judgments were subsequently re-filed against Defendants Jane Patrono, Kim Patrono, and Jonathan Patrono in the Court of Common

18

Case 1:26-ap-00037-HWV    Doc 1-7    Filed 04/10/26    Entered 04/10/26 11:51:56    Desc
Exhibit G    Page 19 of 228

Pleas of Cumberland County on November 27, 2019 and docketed to numbers 2019-12302 Civil, 2019-12301 Civil, and 2019-12300 Civil, respectively.

80. On May 3, 2021, the confession of judgment actions were transferred to the Adams County Court of Common Pleas and are docketed at 2018-SU-1293.

81. As a result of the confessed judgment actions, H&M Holdings holds judgments in the aggregate amount of $2,209,414.44 against Defendants Jane Patrono, Kim Patrono, and Jonathan Patrono.

**IV. Misappropriation and Improper Diversion of Funds to Hauser Estate by Kim Patrono and Jane Patrono**

82. Plaintiffs Melinda Davis and Hannah Hauser and Defendant Jane Patrono jointly own commercial real property in downtown Gettysburg located at 17 Lincoln Square ("17 On The Square").

83. Plaintiffs Melinda Davis and Hannah Hauser and Defendant Jane Patrono lease 17 On The Square to residential and commercial tenants and, in order to facilitate that business, they obtained a $50,000.00 commercial line of credit from PNC Bank ("LOC") – the same bank that 17 On the Square had its business operating agreement.

84. Plaintiffs Melinda Davis and Hannah Hauser and Defendant Jane Patrono had an oral agreement between themselves that the LOC associated with 17 On The Square would only be drawn on for purposes solely related to the operation of 17 On The Square.

85. Notwithstanding the sisters' agreement, upon information and belief, Defendant Jane Patrono, repeatedly and improperly drew against the LOC associated with 17 On The Square and took the proceeds of such draws for the benefit of herself and her husband, Defendant Kim Patrono, and/or diverted them to Hauser Estate.

4813-0364-6201

86. In 2012, Plaintiff Melinda Davis advised Plaintiff Hannah Hauser and Defendant Jane Patrono of her intent to pay off the LOC and close the same.

87. Upon learning of Plaintiff's Hannah Hauser intent to close the LOC, Defendant Kim Patrono specifically advised Plaintiff Hannah Hauser not to close the LOC because "he might need the LOC for Hauser Estate." Plaintiff Melinda Davis agreed not to close the account, but did pay off the existing balance on the LOC in an approximate sum of $20,000.00.

88. Within two (2) weeks of Plaintiff Melinda Davis paying off the existing LOC, Defendant Jane Patrono drew against the entire $50,000 LOC and diverted the money withdrawn from the LOC into Hauser Estate. Upon information and belief, such withdrawal was made by Defendant Jane Patrono at the special insistence of Defendant Kim Patrono.

89. The amounts withdrawn by Defendant Jane Patrono from the 17 On the Square bank account and/or LOC, at the special insistence and request of Defendant Kim Patrono are as follows:

a. Since 2012 the entire sum of the LOC $50,000 was diverted to Hauser Estate;

b. In May 2017, Defendant Jane Patrono secretly withdrew the sum of $20,000 from the 17 On the Square business account that was used for purported "payroll expenses" of Hauser Estate. She never repaid this amount;

c. Starting June 2019 and continuing every month thereafter until December 2020, Defendant Jane Patrono simply withdrew between $1000 and $2000 per month from the account over the express objection of Plaintiffs Hannah Hauser and Melinda Davis.

90. Plaintiff Melinda Davis had to infuse her own money to replace the HVAC unit at 17 On the Square because Defendant Jane Patrono had depleted the $50,000 LOC. The amount paid by Plaintiff Melinda Davis to replace the HVAC unit was $15,000.00.

20

4813-0364-6201

91.	Plaintiffs Hannah Hauser and Melinda Davis continued to receive interest statements on the entire $50,000 LOC at a rate of 5.5% and 17 On the Square continued to pay the principal and interest until December 2020.

92.	In December 2020, Plaintiff Melinda Davis paid off the $50,000 LOC and closed the LOC account, over the objection of Defendant Jane Patrono but with the consent of Plaintiff Hannah Hauser.

93.	Defendant Jane Patrono and Defendant Kim Patrono have failed and otherwise refused to repay the $50,000, as well as all the interest paid on the same, and have likewise failed to repay the $20,000 that Defendant Jane Patrono took from the business account to pay Hauser Estate payroll.

**V. Breach of Fiduciary Duties by Defendant Kim Patrono and Jonathan Patrono**

94.	From 2006 until the appointment of a Trustee by the Bankruptcy Court to take control of the assets and operations of Hauser Estate in September 2018, Defendant Jonathan Patrono served as the President of Hauser Estate and was, therefore, an officer of Hauser Estate.

95.	From the formation of Hauser Estate until the appointment of the Trustee, Defendant Kim Patrono, upon information and belief, was involved in virtually every material business decision made by or affecting the operations of Hauser Estate and thereby exercised a high level of control over Hauser Estate.

96.	To the extent that Defendant Kim Patrono's involvement in the operations of Hauser Estate was exercised in his role as an attorney to Hauser Estate, its owners, and/or officers, Defendants Jonathan Patrono, John Murphy, Apple Leaf, and Patrono & Murphy, LLC

21

y

y

4813-0364-6201

shared any responsibility Defendant Kim Patrono had with respect to Hauser Estate, including, without limitation, any fiduciary duty to Hauser Estate.

97. Jonathan Patrono, as an officer and/or director of Hauser Estate, and Defendants Kim Patrono, Jonathan Patrono, John Murphy, and/or Patrono & Murphy, LLC as counsel to Hauser Estate each had a fiduciary duty of good faith and fair dealing and a fiduciary duty of care to Hauser Estate and its owners.

98. Upon information and belief, Defendants Kim Patrono, Jonathan Patrono, John Murphy, and/or Patrono & Murphy, LLC violated their fiduciary duties to Hauser Estate and its owners in various ways, including, without limitation, the following:

a. Directing Hauser Estate to convert produce owned by another entity for use in its operations;

b. Directing Hauser Estate to convert proceeds from the sale of produce of another entity;

c. Causing Hauser Estate to incur substantial debt obligations in violation of the terms of the operations documents, including, but not limited to the Original Shareholders Agreement and the Second Shareholders Agreement;

d. Causing Hauser Estate to incur debt obligations for the benefit of John and/or Jane Doe and not Hauser Estate;

e. Intermingling and commingling of debt and income between Hauser Estate, Plaintiff HFF, and/or other entities;

f. Negligent and/or intentionally inaccurate recordkeeping of Hauser Estate, Plaintiff HFF, and/or John and/or Jane Doe;

g. Negligent and/or intentionally improper management of the operations of Hauser Estate, Plaintiff HFF, and/or John and/or Jane Doe; and

h. Other conduct detrimental to Hauser Estate, Plaintiff HFF, and their owners and shareholders as determined through additional discovery.

22

4813-0364-6201

99.     The breaches of fiduciary duty by Defendant Jonathan Patrono, as an officer and/or director of Hauser Estate, and Defendants Kim Patrono, Jonathan Patrono, John Murphy, and/or Patrono & Murphy, LLC as counsel to Hauser Estate have resulted in damages to Hauser Estate, Plaintiff HFF, and their owners and shareholders including, but not limited, lost profits, reduced goodwill, and increased capital investment.

## VI. Defendants Kim Patrono and Jonathan Patrono Fail to Abide By Hauser Estate Shareholders' Request to Commence a Lawsuit For Breach of Fiduciary Duty, etc.

100.     As stated above, the breaches of fiduciary duty by Defendant Jonathan Patrono, as an officer and/or director of Hauser Estate, and Defendants Kim Patrono, Jonathan Patrono, John Murphy, and/or Patrono & Murphy, LLC as counsel to Hauser Estate have resulted in damages to Hauser Estate, Plaintiff HFF, and their owners and shareholders including, but not limited, lost profits, reduced goodwill, and increased capital investment.

101.     On February 27, 2018, Plaintiffs, Hannah Hauser, Melinda H. Davis, and The Melinda Hauser Davis Hauser Estate Trust, as stockholders of Hauser Estate, Inc., sent a written demand to Defendant Jonathan Patrono, in his capacity of President of Hauser Estate, demanding that Hauser Estate and HFF commence a lawsuit against Defendants Kim and Jonathan Patrono for breach of fiduciary duty, breach of duty of due care, breach of duty of loyalty, negligent management, waste of corporate assets, corporate insolvency, aiding and abetting, and legal malpractice.  A true and correct copy of the February 27, 2018 letter is attached hereto as Exhibit "J".

102.     At the time the February 27, 2018 letter was drafted and delivered to Defendants Kim Patrono and Jonathan Patrono, Hauser Estate did not have a functioning board of directors and was under the sole dominion and control of Defendants Kim and Jonathan Patrono.

<div align="center">23</div>

4813-0364-6201

103. Defendants Kim Patrono and Jonathan Patrono failed to abide by the Stockholders' request to commence litigation in accordance with the demands outlined in the February 27, 2018 letter.

104. Because Defendants Kim Patrono and Jonathan Patrono failed to prosecute the requested actions and/or take corrective measures, Plaintiffs were then individually permitted to bring, *inter alia*, their derivative claims against the Hauser Estate. *See*, Cuker v. Mikalauskas, 692 A.2d 1042 (Pa. 1997).

### VII. The Bankruptcy of Hauser Estate

105. In spring 2018, Defendants Kim Patrono and Jonathan Patrono advised Plaintiffs Melinda Davis and Hannah Hauser that an unidentified investor was interested in acquiring the assets of Hauser Estate, which at that time had been significantly devalued due to the effects of the various breaches of fiduciary duty perpetrated by Defendants Kim Patrono, Jonathan Patrono, John Murphy, and/or Patrono & Murphy, LLC.

106. Upon information and belief, the unidentified investor was Pennsylvania Hard Cider, LLC, an entity formed by Defendants Kim Patrono and Jonathan Patrono for the purposes of acquiring the assets of Hauser Estate which had been significantly devalued due to various breaches of fiduciary duty.

107. However, Plaintiffs Melinda Davis and Hannah Hauser refused to approve the proposed transaction based on Defendant Kim Patrono and Defendant Jonathan Patrono's refusal to provide basic information about the proposed transaction, including even the names or identities of any proposed investor.

108. Thereafter, Defendants Jonathan Patrono, as President of Hauser Estate, with the counsel of and/or at the direction of Defendants Kim Patrono, John Murphy, Apple Leaf, and/or

24

4813-0364-6201

Patrono & Murphy, LLC as legal counsel to Hauser Estate, approved and agreed to the initiation of bankruptcy proceedings on behalf of Hauser Estate.

109.    On July 31, 2018, Defendants Kim Patrono and Jonathan Patrono caused Hauser Estate to file a voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Middle District of Pennsylvania.  Melinda Davis and Hannah Hauser did not consent to Hauser Estate being put into a bankruptcy case and Defendants Kim Patrono and Jonathan Patrono, with full knowledge of Melinda Davis' and Hannah Hauser's refusal to consent to the bankruptcy filing, called a company meeting for a day and time when Defendants Kim Patrono and Jonathan Patrono knew, or should have known, Melinda Davis and Hannah Hauser would be unavailable and, at that meeting, voted in favor of the bankruptcy filing. *See* Exhibit "K" attached hereto.

110.    Defendant Jonathan Patrono prepared and signed, under penalty of perjury, the bankruptcy petition and schedules, and on Schedule D listed H&M Holdings no less than two (2) times as a secured creditor of Hauser Estate. *See* Exhibit "K".

111.    Upon the initiation of the bankruptcy, all causes of action that belonged to the Hauser Estate became the property of the bankruptcy estate, to be acted upon by the Trustee.

112.    Upon information and belief, Defendants Kim Patrono and Jonathan Patrono believed that putting Hauser Estate into a bankruptcy case would enable them to sell the valuable assets of Hauser Estate and Hauser Family Farms to an affiliate friendly to or controlled by Defendants Kim Patrono and Jonathan Patrono, leaving Melinda Davis and  Hannah Hauser liable for the substantial indebtedness Defendants Kim Patrono and Jonathan Patrono had caused Hauser Estate and Hauser Family Farms to incur over the years preceding the bankruptcy

4813-0364-6201

113. Defendants Kim Patrono and Jonathan Patrono's impropriety and breaches of fiduciary duty continued unabated after the bankruptcy filing. Notably, the Schedules of Assets and Liabilities, Unexpired Leases, Executory Contracts, and Statement of Financial Affairs filed on behalf of Hauser Estate, which upon information and belief were prepared by Defendants Kim Patrono, Jonathan Patrono, John Murphy, and/or Patrono & Murphy, LLC, included extensive material misrepresentations including, *inter alia*, failure to list assets and listing of assets from other entities.

114. As a secured creditor of Hauser Estate, H&M Holdings was paid $490,311.07 in January 2020 and additional funds later.

115. Defendants Kim Patrono, Jane Patrono, and Jonathan Patrono never objected to H&M Holdings' status as a secured creditor to H&M Holdings or receipt of the payments approved by the Bankruptcy Court. Indeed, Defendants had until May 5, 2021 to object to the Bankruptcy Court's final payment of $78,055.04 to H&M Holdings but did not.

116. Ultimately, the Bankruptcy Trustee sold Hauser Estate's assets to Donald Hoffman and, his designee, Atomic Dog, LLC on or about October 1, 2018 for $1.2 million.

117. The Chapter 7 Trustee appointed for Hauser Estate, after several months of discussions with the Plaintiffs regarding their conversion claims against Defendants Kim Patrono and Jonathan Patrono declined to pursue those claims, and in doing so, abandoned that property of the estate pursuant to 11 U.S.C. §554.

118. The Office of the United States Trustee, a subdivision of the U.S. Department of Justice and which has supervisory functions over the Chapter 7 Trustee, was likewise contacted by Plaintiffs to discuss their conversion claims and Assistant U.S. Trustee, Anne K. Fiorenza

4813-0364-6201

supported the Chapter 7 Trustee's determination not to pursue the conversion claims, by letter dated September 24, 2019, a copy of which is attached hereto as Exhibit "L".

119. By virtue of the Trustee's words and actions, the conversion claims against the Defendants were abandoned and thus are no longer property of the Hauser Estate bankruptcy such that Plaintiffs have standing to assert their conversion claim against Defendants.

## VIII. Fraudulent Transfers by the Patronos Prior to Filing the Hauser Estate Bankruptcy Case.

120. On July 17, 2018, the literal eve of H&M Holdings' acquisition of the Promissory Note 1 and Promissory Note 2 from Members 1st, legal counsel for Defendants Kim Patrono, Jonathan Patrono, and Jane Patrono contacted counsel for Plaintiffs Melinda Davis and Hannah Hauser and advised that they were aware of a transaction involving Promissory Note 1 and Promissory Note 2 and the potential of an impending collection action with respect to the Promissory Notes and unconditional guarantees.

121. On July 18, 2018, the very date of H&M Holdings' acquisition of the Members 1st indebtedness, six (6) separate improper real property transfers were effectuated by Defendants Jonathan Patrono, Kim Patrono and Jane Patrono.

122. Upon information and belief, each transfer was accomplished by an Indenture prepared and filed by Defendant Kim Patrono, who was acting in his capacity as an owner, partner, employee, and/or agent of Defendants Patrono & Murphy, LLC and/or Apple Leaf.

123. Defendant Apple Leaf, by and through its attorney owners, to wit: Defendants Kim Patrono, Jonathan Patrono, and John Murphy (who all knew or should have known that the transfers of real estate were fraudulent, and were made with the actual or constructive intent to

4813-0364-6201

hinder, delay, or defraud creditors), conducted and/or transacted the fraudulent conveyances of real property.

124. Each transfer was to an insider transferee. One (1) transferee was Defendant Jonathan Patrono's in-laws, and the transferee on the remaining five (5) transfers was Defendant Polly Patrono, Defendants Kim Patrono and Jane Patrono's daughter and Defendant Jonathan Patrono's sister.

125. The stated consideration for each transfer was $1.00, for an aggregate consideration of $6.00. Notwithstanding these transactions having been made for an aggregate consideration of $6.00, which may not even have been paid, it is believed and therefore alleged that the aggregate value of all real property transferred exceeded $2,000,000.00.

126. The transfers were as follows:

a. The first transfer ("Fraudulent Transfer No. 1") was made by Indenture, dated July 18, 2018, by Defendant Jonathan Patrono and his wife, Melisa Patrono, who transferred real property believed to be their residence to Melisa Patrono's parents and Defendant Jonathan Patrono's in-laws, Alejandro Nakahodo and Rosa Nakahodo. The Indenture was recorded on July 18, 2018 among the Land Records of Adams County, Pennsylvania at Book 6399 Page 361, Instrument No. 201800007856. A true and correct copy of the Indenture evidencing Transfer No. 1 is attached hereto as Exhibit "M" and incorporated by reference herein. As stated in Paragraphs 67 and 69, at the time Defendant Jonathan Patrono executed the Commercial Guaranties for Promissory Notes 1 and 2, Defendant Jonathan Patrono's only source of income was from Hauser Estate. At the time Defendant Jonathan Patrono executed the Commercial Guaranties for Promissory Notes 1 and 2, Member's 1st had already perfected mortgage lien against the residence by way of a Mortgage signed by both Defendant Jonathan Patrono and his wife Melisa Patrono. As Hauser Estate was his only source of income at the time Promissory Notes 1 and 2 were executed, Defendant Jonathan Patrono had the power to pledge his residence as security for the Commercial Guaranties on behalf of himself and Melisa

4813-0364-6201

Patrono because the revolving LOC to Hauser Estate would provide Defendant Jonathan Patrono and Melisa Patrono with the income they required to, *inter alia*, pay their mortgage to Member's 1st, and thus Defendant Jonathan Patrono's action in executing the required loan documents for Promissory Notes 1 and 2 created a benefit that inured to both Defendant Jonathan Patrono and his wife, Melisa Patrono. To the extent that the property transferred by Defendant Jonathan Patrono and his wife, Melisa Patrono in Transfer No. 1 had previously been held by them as tenants by the entireties, this transfer terminated that tenancy. Less than two months after this transfer, Alejandro Nakahodo and Rosa Nakahodo transferred a purported 99% interest in the property back to Defendant Jonathan Patrono and Melisa Patrono. As evidenced by this indenture, attached hereto as Exhibit "M", there is no tenants by the entireties property because the transferees do not possess a 100% ownership interest. Defendant Jonathan Patrono and Melisa Patrono have remained in actual and physical possession of the property transferred subsequent to the transfer.[3]

b. The second transfer ("Fraudulent Transfer No. 2") was made by Indenture, dated July 18, 2018, by Defendant Kim Patrono and his wife, Defendant Jane Patrono, who transferred real property to their daughter, Defendant Polly Patrono. The Indenture was recorded on July 24, 2018 among the Land Records of Adams County, Pennsylvania at Book 6401 Page 164, Instrument No. 201800008077. A true and correct copy of the Indenture evidencing Fraudulent Transfer No. 2 is attached hereto as Exhibit "N" and incorporated by reference herein. To the extent that the property transferred by Defendant Kim Patrono and Defendant Jane Patrono in Fraudulent Transfer No. 2 had previously been held by them as tenants by the entireties, this transfer terminated that tenancy. Defendant Kim Patrono and Defendant Jane Patrono

---

[3] Discovery produced by Members 1st reveals that Defendant Jonathan Patrono and his wife, Melisa Patrono are currently in default of their mortgage loan with Members 1st and upon information and belief, Defendant Jonathan Patrono and his wife, Melisa Patrono are currently in work out negotiations with Members 1st, and Defendant Kim Patrono is apparently serving as their legal counsel based on correspondence exchanged with Members 1st. Given the fact that Members 1st has a first lien position on the property and the loan is in default, Plaintiffs have determined not to pursue a fraudulent conveyance claim with respect to Transaction No. 1. Even though Plaintiffs have determined not to pursue a fraudulent conveyance claim with respect to Fraudulent Transfer No. 1 at this time, the facts and circumstances of Fraudulent Transfer No. 1 are still relevant to the causes of action at issue in this matter because the facts and circumstances of Fraudulent Transfer No. 1 are among the factors which may be considered in determining the transferors' actual intent under Pennsylvania law in making the remaining transfers at issue herein which are being pursued by the Plaintiffs in this Complaint.

4813-0364-6201

have remained in actual and physical possession of the property transferred subsequent to the transfer.

c.    The third transfer ("Fraudulent Transfer No. 3") was made by Indenture, dated July 18, 2018, by Defendant Kim Patrono and his wife, Defendant Jane Patrono, who transferred real property to their daughter, Defendant Polly Patrono. The Indenture was recorded on July 24, 2018 among the Land Records of Adams County, Pennsylvania at Book 6401 Page 176, Instrument No. 201800008079. A true and correct copy of the Indenture evidencing Fraudulent Transfer No. 3 is attached hereto as Exhibit "O" and incorporated by reference herein. To the extent that the property transferred by Defendant Kim Patrono and Defendant Jane Patrono in Fraudulent Transfer No. 3 had previously been held by them as tenants by the entireties, this transfer terminated that tenancy. Defendant Kim Patrono and Defendant Jane Patrono have remained in actual and physical possession of the property transferred subsequent to the transfer.

d.    The fourth transfer ("Fraudulent Transfer No. 4") was made by Indenture, dated July 18, 2018, by Defendant Kim Patrono and his wife, Defendant Jane Patrono, who transferred real property to their daughter, Defendant Polly Patrono. The Indenture was recorded on July 24, 2018 among the Land Records of Adams County, Pennsylvania at Book 6401 Page 180, Instrument No. 201800008080. A true and correct copy of the Indenture evidencing Fraudulent Transfer No. 4 is attached hereto as Exhibit "P" and incorporated by reference herein. To the extent that the property transferred by Defendant Kim Patrono and Defendant Jane Patrono in Fraudulent Transfer No. 4 had previously been held by them as tenants by the entireties, this transfer terminated that tenancy. Defendant Kim Patrono and Defendant Jane Patrono have remained in actual and physical possession of the property transferred subsequent to the transfer.

e.    The fifth transfer ("Fraudulent Transfer No. 5") was made by Indenture, dated July 18, 2018, by Defendant Jane Patrono, individually, who transferred real property to her daughter, Defendant Polly Patrono. The Indenture was recorded on July 24, 2018 among the Land Records of Adams County, Pennsylvania at Book 6401 Page 168, Instrument No. 201800008078. A true and correct copy of the Indenture evidencing Fraudulent Transfer No. 5 is attached hereto as Exhibit "Q" and incorporated by reference herein. Defendant

30

Jane Patrono has remained in actual and physical possession of the property transferred subsequent to the transfer.

    f.    The sixth transfer ("Fraudulent Transfer No. 6") was made by Indenture, dated July 18, 2018, by Defendant Jonathan Patrono, individually, who transferred his ½ interest in an undivided 1/3 interest in certain real property to his sister, Defendant Polly Patrono. The Indenture was recorded on July 18, 2018 among the Land Records of Adams County, Pennsylvania at Book 6399 Page 349, Instrument No. 201800007855. A true and correct copy of the Indenture evidencing Fraudulent Transfer No. 6 is attached hereto as Exhibit "R" and incorporated by reference herein. The Indenture associated with Fraudulent Transfer No. 6 erroneously states that "[t]his is a transfer between sister and brother to brother and is therefore exempt from transfer tax." The transfer is clearly a transfer from brother to sister. Defendant Jonathan Patrono has remained in the actual and physical possession of the property transferred subsequent to the transfer.

127.    Fraudulent Transfer Nos. 1 and 6 were each made with the actual or constructive intent to hinder, delay, or defraud the transferor(s)' creditors. A true and correct copy of the relevant pages from Defendant Jonathan Patrono's January 26, 2021 Deposition Transcript are attached hereto as Exhibit "S".

128.    In his January 26, 2021 deposition, Defendant Jonathan Patrono admitted that Fraudulent Transfer Nos. 1 and 6 were made with the specific intent of placing the transferred assets beyond the reach of the transferor(s) creditors. *See* Exhibit "S".

129.    Fraudulent Transfer Nos. 2, 3, 4, and 5 were each made with the intent of placing the transferred assets beyond the reach of the transferor(s)' creditors. Fraudulent Transfer Nos. 2, 3, 4 and 5 were each made with the actual or constructive intent to hinder, delay, or defraud the transferor(s)' creditors. *See* Exhibit "S.

130.    Four (4) days after Fraudulent Transfer No. 5 was made by Defendant Jane Patrono, and one (1) day prior to the recordation of the Indenture, Defendant Jane Patrono

31

granted a Mortgage in an unstated amount on the parcel to the law firm, Smigel, Anderson, & Sacks, LLP as security for the payment of legal fees for Smigel, Anderson, & Sacks to represent the "Debtor," a term that was used to refer to Hauser Estate. The Mortgage, dated July 22, 2018, was recorded on July 23, 2018 among the Land Records of Adams County, Pennsylvania at Book 6400 Page 194, Instrument No. 201800007962. In making the mortgage to Smigel, Anderson, & Sacks, LLP, Defendant Jane Patrono was seeking to encumber property which she had already conveyed away and, at the time of the encumbrance, no longer owned.

131.    In the summer of 2018, literally within days of the property transfers detailed above, H&M Holdings instituted confessed judgment proceedings in the Court of Common Pleas of Adams County, Pennsylvania against Defendants Jane Patrono, Kim Patrono, and Jonathan Patrono. The confessed judgments filed in Adams County against Defendants Jane Patrono, Kim Patrono, and Jonathan Patrono, were stricken on procedural grounds and without prejudice to such confessed judgments being re-filed.

132.    The confessed judgments were re-filed against Defendants Jane Patrono, Kim Patrono, and Jonathan Patrono in the Court of Common Pleas of Cumberland County on November 27, 2019 and docketed to numbers 2019-12302 Civil, 2019-12301 Civil, and 2019-12300 Civil, respectively.

133.    On May 3, 2021, the confession of judgment actions were transferred to the Adams County Court of Common Pleas and are docketed at 2018-SU-1293.

4813-0364-6201

# COUNT I

## BREACH OF FIDUCIARY DUTY OF GOOD FAITH

### PLAINTIFFS MELINDA DAVIS, HANNAH HAUSER, AND HFF V. DEFENDANTS KIM PATRONO, JONATHAN PATRONO, JOHN MURPHY, PATRONO & MURPHY, LLC, AND/OR APPLE LEAF ABSTRACTING AND SETTLEMENT

134. The allegations of the foregoing paragraphs are incorporated by reference as if fully set forth herein.

135. Defendants Kim Patrono, Jonathan Patrono, John Murphy, Patrono & Murphy, LLC, and/or Apple Leaf negligently, recklessly, or intentionally failed to act in good faith and solely for the benefit of Plaintiffs Melinda Davis, Hannah Hauser, and/or HFF in all matters for which Defendants Kim Patrono, Jonathan Patrono, John Murphy, Patrono & Murphy, LLC, and/or Apple Leaf were engaged.

136. Defendants Kim Patrono, Jonathan Patrono, John Murphy, Patrono & Murphy, LLC, and/or Apple Leaf failed to act with the care with which a reasonable business person would act in the matters for which they acted on the behalf of Plaintiffs Melinda Davis, Hannah Hauser, and/or HFF.

137. The conduct of Defendants Kim Patrono, Jonathan Patrono, John Murphy, Patrono & Murphy, LLC, and/or Apple Leaf may have violated applicable laws, statutes, rules, or codes.

138. Plaintiffs Melinda Davis, Hannah Hauser, and/or HFF suffered, *inter alia*, financial injury as a direct result of the conduct of Defendants Kim Patrono, Jonathan Patrono, John Murphy, Patrono & Murphy, LLC, and/or Apple Leaf.

WHEREFORE, Plaintiffs Melinda Davis, Hannah Hauser, and HFF seek compensatory and punitive damages against the named Defendants in Count I in excess of

33

4813-0364-6201

the compulsory arbitration limit of Adams County, exclusive of interests and costs.

## COUNT II

### CIVIL CONSPIRACY - BREACH OF FIDUCIARY DUTY

### PLAINTIFFS MELINDA DAVIS, HANNAH HAUSER, AND HFF V. JANE PATRONO, POLLY PATRONO, JOHN MURPHY, PATRONO & MURPHY, LLC, AND APPLE LEAF ABSTRACTING AND SETTLEMENT

139. The allegations of the foregoing paragraphs are incorporated by reference as if fully set forth herein.

140. Defendants Kim Patrono and Jonathan Patrono negligently, recklessly, or intentionally breached fiduciary duties owed to Plaintiffs Melinda Davis, Hannah Hauser, and/or HFF.

141. Defendants John Murphy, Patrono & Murphy, Apple Leaf, Jane Patrono, and Polly Patrono knew of Defendants Kim Patrono and Jonathan Patrono's breach of their fiduciary duties owed to Plaintiffs Melinda Davis, Hannah Hauser, and/or HFF.

142. Defendants John Murphy, Patrono & Murphy, Apple Leaf, Jane Patrono and Polly Patrono substantially participated, assisted, enabled, and/or encouraged Defendants Kim Patrono and Jonathan Patrono in effecting Defendants Kim Patrono and Jonathan Patrono's breaches of fiduciary duties to Plaintiffs Melinda Davis, Hannah Hauser, and/or HFF.

143. The conduct of Defendants John Murphy, Patrono & Murphy, LLC, Apple Leaf, Jane Patrono, and Polly Patrono may have violated applicable laws, statutes, rules, or codes.

144. Plaintiffs Melinda Davis, Hannah Hauser, and/or HFF suffered, *inter alia*, financial injury as a direct result of the conduct of Defendants John Murphy, Patrono & Murphy, LLC, Apple Leaf, Jane Patrono, and Polly Patrono.

34

4813-0364-6201

WHEREFORE, Plaintiffs Melinda Davis, Hannah Hauser, and HFF seek compensatory and punitive damages against the named Defendants in Count II in excess of the compulsory arbitration limit of Adams County, exclusive of interests and costs.

## COUNT III

### PROFESSIONAL NEGLIGENCE

**PLAINTIFFS MELINDA DAVIS, HANNAH HAUSER, AND HFF V. DEFENDANTS KIM PATRONO, JONATHAN PATRONO, JOHN MURPHY, PATRONO & MURPHY, LLC, AND APPLE LEAF ABSTRACTING AND SETTLEMENT**

145. The allegations of the foregoing paragraphs are incorporated by reference as if fully set forth herein.

146. Plaintiffs Melinda Davis, Hannah Hauser, and/or HFF retained Defendants Kim Patrono, Jonathan Patrono, John Murphy, Patrono & Murphy, LLC, and/or Apple Leaf to provide them with professional services, including legal representation and counsel, with respect to all matters relating to Hauser Estate.

147. In the alternative, Defendants Kim Patrono, Jonathan Patrono, John Murphy, Patrono & Murphy, LLC, and/or Apple Leaf owed Plaintiffs Melinda Davis, Hannah Hauser, and/or HFF a duty of care because an attorney-client relationship existed between Defendants Kim Patrono, Jonathan Patrono, John Murphy, Patrono & Murphy, LLC and/or Apple Leaf with respect to all matters relating to Hauser Estate. Regardless of the lack of a formal retention agreement or engagement letter, Defendants Kim Patrono, Jonathan Patrono, John Murphy, Patrono & Murphy and/or Apple Leaf served as Plaintiffs Melinda Davis, Hannah Hauser, and/or HFF's sole exclusive attorney with respect to all matters relating to Hauser Estate.

35

4813-0364-6201

148. In acting as Plaintiffs Melinda Davis, Hannah Hauser, and/or HFF's attorney, Defendants Kim Patrono, Jonathan Patrono, John Murphy, Patrono & Murphy, LLC and/or Apple Leaf (which holds itself out as an "attorney owned business" and further identifies its principals on its website as Defendants Kim Patrono, Jonathan Patrono, John Murphy and Patrono and Murphy) failed to exercise the standard of care that a reasonable attorney would exercise under the circumstances including but not limited to engaging practices that create and constitute clear conflicts of interest between clients; engaging in self-dealing; failing to obtain informed consent from each party/client; failing to recognize the impropriety of representing the corporation as well as its shareholders, individually; and not engaging in fraudulent and unlawful business practices.

149. As a direct and proximate result of Defendants Kim Patrono, Jonathan Patrono, John Murphy, Patrono & Murphy, LLC, and/or Apple Leaf's failure to exercise the standard of care that a reasonable attorney would exercise under the circumstances, Plaintiffs Melinda Davis, Hannah Hauser, and/or HFF suffered, *inter alia*, financial injury.

150. In acting as Plaintiffs Melinda Davis, Hannah Hauser, and/or HFF's attorney, Defendants Kim Patrono, Jonathan Patrono, John Murphy, Patrono & Murphy, LLC, and Apple Leaf failed to exercise the ordinary skill and knowledge expected of an attorney.

151. As a direct and proximate result of Defendants Kim Patrono, Jonathan Patrono, John Murphy, Patrono & Murphy and/or Apple Leaf's failure to exercise the ordinary skill and knowledge expected of an attorney, Plaintiffs Melinda Davis, Hannah Hauser, and/or HFF were damaged.

4813-0364-6201

152.    The conduct of Defendants Kim Patrono, Jonathan Patrono, John Murphy, Patrono & Murphy, LLC, and Apple Leaf may have violated applicable laws, statutes, rules, or codes.

WHEREFORE, Plaintiffs Melinda Davis, Hannah Hauser, and HFF seek compensatory and punitive damages against the named Defendants in Count III in excess of the compulsory arbitration limit of Adams County, exclusive of interests and costs.

## COUNT IV

### FRAUDULENT TRANSFER

**PLAINTIFFS MELINDA DAVIS, HANNAH HAUSER, HFF, AND H&M HOLDINGS V. DEFENDANTS KIM PATRONO, JANE PATRONO AND POLLY PATRONO**

153.    The allegations of the foregoing paragraphs are incorporated by reference as if fully set forth herein.

154.    Defendants Kim Patrono and Jane Patrono's transfers of real property jointly and, as applicable, individually to Defendant Polly Patrono were made with the actual intent to hinder, delay, or defraud H&M Holdings and HFF within the meaning of PUVTA § 5104(a)(1) for reasons to include, without limitation that (a) the transfers were to an insider, (b) Defendants Kim Patrono and Jane Patrono retained possession or control of the assets transferred, (c) prior to the transfers, Defendants Kim Patrono and Jane Patrono had been sued or had been threatened with suit, (d) the transfers were of substantially all of Defendants Kim Patrono and Jane Patrono's assets, (e) the value received was not reasonably equivalent to the value of the assets transferred, (f) Defendants Kim Patrono and Jane Patrono were insolvent shortly before or shortly after the transfers were made, or (g) the transfers occurred shortly before or shortly after a substantial debt had been incurred.

37

4813-0364-6201

155. Alternatively, Defendants Kim Patrono and Jane Patrono's transfers of real property to Defendant Polly Patrono are voidable as to H&M Holdings and HFF within the meaning of PUVTA § 5105(a) since the transfers were made without receiving reasonably equivalent value in exchange for the transfers and Defendants Kim Patrono and Jane Patrono were insolvent at the time of the transfers or became insolvent as a result of the transfers having been made.

156. Defendant Kim Patrono's conduct in connection with his and Jane Patrono's transfer for real property to Defendant Polly Patrono was outrageous.

157. Defendant Polly Patrono is not a good faith transferee pursuant to PUVTA § 5108(a).

158. The conduct of Defendants Kim Patrono, Jane Patrono and Polly Patrono may have violated applicable laws, statutes, rules, or codes.

WHEREFORE, Plaintiffs Melinda Davis, Hannah Hauser, HFF, and H&M Holdings seek compensatory and punitive damages against the named Defendants in Count IV in excess of the compulsory arbitration limit of Adams County, exclusive of interests and costs.

## COUNT V

### FRAUDULENT TRANSFER

### PLAINTIFFS MELINDA DAVIS, HANNAH HAUSER, HFF, AND H&M HOLDINGS V. DEFENDANTS JANE PATRONO AND POLLY PATRONO

159. The allegations of the foregoing paragraphs are incorporated by reference as if fully set forth herein.

160. Defendant Jane Patrono's transfer of real property to Defendant Polly Patrono was made with the actual intent to hinder, delay, or defraud H&M Holdings and HFF within the

4813-0364-6201

meaning of PUVTA § 5104(a)(1) for reasons to include, without limitation that (a) the transfers were to an insider, (b) Defendant Jane Patrono retained possession or control of the assets transferred, (c) prior to the transfer, Defendant Jane Patrono had been sued or had been threatened with suit, (d) the transfers were of substantially all of Defendant Jane Patrono's assets, (e) the value received was not reasonably equivalent to the value of the assets transferred, (f) Defendant Jane Patrono was insolvent shortly before or shortly after the transfers were made, or (g) the transfers occurred shortly before or shortly after a substantial debt had been incurred.

161. Alternatively, Defendant Jane Patrono's transfer of real property to Defendant Polly Patrono is voidable as to H&M Holdings and HFF within the meaning of PUVTA § 5105(a) since the transfer was made without receiving reasonably equivalent value in exchange for the transfers and Defendant Jane Patrono was insolvent at the time of the transfer or became insolvent as a result of the transfer having been made.

162. Defendant Jane Patrono's conduct in connection with her transfer of real property to Defendant Polly Patrono was outrageous.

163. Defendant Polly Patrono is not a good faith transferee as that term pursuant to PUVTA § 5105(a).

164. The conduct of Defendants Jane Patrono and Polly Patrono may have violated applicable laws, statutes, rules, or codes.

WHEREFORE, Plaintiffs Melinda Davis, Hannah Hauser, HFF, and H&M Holdings seek compensatory and punitive damages against the named Defendants in Count V in excess of the compulsory arbitration limit of Adams County, exclusive of interests and costs.

4813-0364-6201

<center>**COUNT VI**</center>

<center>**FRAUDULENT TRANSFER**</center>

<center>**PLAINTIFFS MELINDA DAVIS, HANNAH HAUSER, HFF, AND H&M HOLDINGS V. DEFENDANTS JONATHAN PATRONO AND POLLY PATRONO**</center>

165. The allegations of the foregoing paragraphs are incorporated by reference as if fully set forth herein.

166. Defendant Jonathan Patrono's transfer of real property to Defendant Polly Patrono was made with the actual intent to hinder, delay, or defraud H&M Holdings and HFF within the meaning of PUVTA § 5104(a)(1) for reasons to include, without limitation that (a) the transfer was to an insider, (b) Defendant Jonathan Patrono retained possession or control of the asset transferred, (c) prior to the transfer, Defendant Jonathan Patrono had been sued or had been threatened with suit, (d) the transfer along with the other fraudulent transfers contemporaneously made by Defendant Jonathan Patrono was of substantially all of Defendant Jonathan Patrono's assets, (e) the value received was not reasonably equivalent to the value of the asset transferred, (f) Defendant Jonathan Patrono was insolvent shortly before or shortly after the transfer was made, or (g) the transfer occurred shortly before or shortly after a substantial debt had been incurred.

167. Alternatively, Defendant Jonathan Patrono's transfer of real property to Defendant Polly Patrono is voidable as to H&M Holdings and HFF within the meaning of PUVTA § 5105(a) since the transfer was made without receiving reasonably equivalent value in exchange for the transfer and Defendant Jonathan Patrono was insolvent at the time of the transfer or became insolvent as a result of the transfer having been made.

<center>40</center>

4813-0364-6201

168. In his January 26, 2021 deposition, Defendant Jonathan Patrono admitted that this fraudulent transfer to his sister, Defendant Polly Patrono was made with the specific intent of placing the transferred assets beyond the reach of the transferor's creditors. *See* Exhibit "S".

169. Defendant Jonathan Patrono's conduct in connection with his transfer of real property to Defendant Polly Patrono was outrageous.

170. Defendant Polly Patrono is not a good faith transferee as that term pursuant to PUVTA § 5105(a).

171. The conduct of Defendants Jonathan Patrono and Polly Patrono may have violated applicable laws, statutes, rules, or codes.

WHEREFORE, Plaintiffs Melinda Davis, Hannah Hauser, HFF, and H&M Holdings seek compensatory and punitive damages against the named Defendants in Count VI in excess of the compulsory arbitration limit of Adams County, exclusive of interests and costs.

## COUNT VII

### CIVIL CONSPIRACY - FRAUDULENT TRANSFER

### PLAINTIFFS MELINDA DAVIS, HANNAH HAUSER, HFF, AND H&M HOLDINGS V. ALL DEFENDANTS

172. The allegations of the foregoing paragraphs are incorporated by reference as if fully set forth herein.

173. Each of the Defendants conspired and agreed to either transfer, or to accept transfer of, substantially all of the valuable assets of Defendants Kim Patrono, Jane Patrono, and Jonathan Patrono, which assets were transferred to the transferee Defendants as well as possibly to other transferees whose identity is currently not known to the Plaintiffs to deprive H&M

41

4813-0364-6201

Holdings and HFF of a source of repayment of debts owed to them, directly as to H&M Holdings and as contribution as to HFF.

174. Each of the Defendants engaged in overt acts pursuant to, and in furtherance of, their conspiracy to defraud and to unlawfully transfer the assets of Kim Patrono, Jane Patrono, and Jonathan Patrono.

175. The conduct of Defendants in connection with the transfers was outrageous.

176. The conduct of Defendants may have violated applicable laws, statutes, rules, or codes.

WHEREFORE, Plaintiffs Melinda Davis, Hannah Hauser, HFF, and H&M Holdings seek compensatory and punitive damages against the named Defendants in Count VII in excess of the compulsory arbitration limit of Adams County, exclusive of interests and costs.

## COUNT VIII
### CIVIL CONVERSION
**PLAINTIFF HFF V. DEFENDANTS KIM PATRONO AND JONATHAN PATRONO**

177. The allegations of the foregoing paragraphs are incorporated by reference as if fully set forth herein.

178. Plaintiff HFF owns the real property located at 410 Cashtown Road, Biglerville, Pennsylvania including 100 acres of productive apple and pear orchards.

179. Pursuant to agreements, Plaintiff HFF regularly sold apples to Knouse Foods and others.

180. Knouse Foods and others sent payment checks, made payable to HFF, for the purchase of apples ("Produce Payment Checks").

4813-0364-6201

181. The Produce Payment Checks were sent by Knouse Foods to Defendants Kim Patrono and/or Jonathan Patrono at, upon information and belief, their offices located at the premises of Defendant Patrono & Murphy, LLC, or Defendant Apple Leaf.

182. Upon information and belief, Defendants Kim Patrono and/or Jonathan Patrono withheld Produce Payment Checks from HFF.

183. Upon information and belief, Defendants Kim Patrono and/or Jonathan Patrono fraudulently deposited and negotiated Produce Payment Checks into Hauser Estate bank accounts and/or other bank accounts over which they had access and control.

184. Defendants Kim Patrono and/or Jonathan Patrono had no right, title, or other interest in the Produce Payment Checks.

185. Defendants Kim Patrono and/or Jonathan Patrono took possession of the Produce Payment Checks without HFF's consent or other lawful justification.

186. Each individual taking of the Produce Payment Checks constitutes a conversion.

187. Defendants Kim Patrono and/or Jonathan Patrono are liable to HFF for the full value of the converted Produce Payment Checks.

188. The total amount of converted Produce Payment Checks is presently unknown but will be established through discovery.

WHEREFORE, Plaintiff HFF seeks compensatory and punitive damages against the named Defendants in Count VIII in excess of the compulsory arbitration limit of Adams County, exclusive of interests and costs.

43

## COUNT IX

## CIVIL CONVERSION

## PLAINTIFFS MELINDA DAVIS AND HANNAH HAUSER V. DEFENDANTS KIM PATRONO AND JONATHAN PATRONO

189. The allegations of the foregoing paragraphs are incorporated by reference as if fully set forth herein.

190. Plaintiffs Melinda Davis and Hannah Hauser own certain real property Farm 1, which includes acres of apple producing trees.

191. Upon information and belief, Defendants Kim Patrono and/or Jonathan Patrono directed Hauser Estate employees to enter the real property owned by Plaintiffs Melinda Davis and Hannah Hauser and harvest apples and then to deliver such apples to Hauser Estate for use in its operations.

192. Defendants Kim Patrono and Jonathan Patrono had no right, title, or other interest in or to the apples harvested from the real property owned by Plaintiffs Melinda Davis and Hannah Hauser and used the apples to produce hard cider by Hauser Estate.

193. Defendants Kim Patrono and/or Jonathan Patrono took possession of the apples harvested from the real property owned by Plaintiffs Melinda Davis and Hannah Hauser and used to produce hard cider by Hauser Estate without the consent of either Melinda Davis or Hannah Hauser or other lawful justification.

194. Each individual taking of apples harvested from the real property owned by Plaintiffs Melinda Davis and Hannah Hauser constituted a conversion.

195. Defendants Kim Patrono and/or Jonathan Patrono are liable to Melinda Davis and Hannah Hauser for the full value of the converted apples harvested from the real property owned by Plaintiffs Melinda Davis and Hannah Hauser.

44

4813-0364-6201

196. The total amount of converted apples harvested from the real property owned by Plaintiffs Melinda Davis and Hannah Hauser is presently unknown but will be established through discovery.

WHEREFORE, Plaintiffs Melinda Davis and Hannah Hauser seek compensatory and punitive damages against the named Defendants in Count IX in excess of the compulsory arbitration limit of Adams Count, exclusive of interests and costs.

## COUNT X

### CIVIL CONVERSION

### PLAINTIFFS, MELINDA DAVIS AND HANNAH HAUSER V. DEFENDANTS KIM PATRONO AND JANE PATRONO

197. The allegations of the foregoing paragraphs are incorporated by reference as if fully set forth herein.

198. Plaintiffs Melinda Davis and Hannah Hauser are partial owners along with their sister Defendant Jane Patrono of certain real property located in downtown Gettysburg referred to herein as 17 On The Square.

199. Upon information and belief, Defendant Jane Patrono wrongfully took advances against a LOC issued by PNC Bank relating to 17 On The Square and diverted such advances to herself, herself and her husband, Defendant Kim Patrono.

200. Defendant Jane Patrono also removed $20,000 from the business operating account of 17 On the Square to pay the Hauser Estate payroll without Plaintiffs, Hannah Hauser and Melinda Davis' knowledge and/or consent.

201. Upon information and belief, Defendant Jane Patrono took such advances against the LOC acting on the advice, counsel, urging and/or special insistence, and request of Defendant

45

Case 1:26-ap-00037-HWV    Doc 1-7    Filed 04/10/26    Entered 04/10/26 11:51:56    Desc
Exhibit G    Page 46 of 228

Kim Patrono, who was at the time serving as legal counsel for Plaintiff Melinda Davis, Defendant Kim Patrono knew or should have known that said advances against the LOC by Defendant Jane Patrono were for the benefit of Hauser Estate and/or Defendants Kim Patrono and Jane Patrono personally.

202. Defendant Kim Patrono likewise knew that Defendant Jane Patrono did not have the other business account holders' consent when she surreptitiously removed the $20,000 to use to pay the Hauser Estate payroll.

203. Defendant Jane Patrono had no right, title, or other interest in the LOC advances or in the $20,000 withdrawal from the operating account which she diverted to herself, her husband and/or Hauser Estate.

204. Defendants Kim Patrono and Jane Patrono took possession of LOC advances and business account withdrawals made by Defendant Jane Patrono, which they diverted to themselves and/or Hauser Estate without the consent of either Melinda Davis or Hannah Hauser or other lawful justification.

205. Each individual diversion of a LOC advance constitutes a conversion.

206. The removal of the $20,000 from the operating account of 17 On the Square constitutes a conversion as well.

207. Defendants Kim Patrono and Jane Patrono are liable to Plaintiffs Hannah Hauser and Melinda Davis for the full value of all LOC advances which Defendant Jane Patrono diverted to herself, her husband, and/or Hauser Estate, as well as for the $20,000 surreptitiously withdrawn from the business operating account by Defendant Jane Patrono.

4813-0364-6201

208.  The amount of converted LOC advances taken by Defendant Jane Patrono for the benefit of herself, her husband and/or Hauser Estate, is at least $50,000, but the total amount (principal and interest) will be established through discovery.

WHEREFORE, Plaintiffs Melinda Davis and Hannah Hauser seek compensatory and punitive damages against the named Defendants in Count X in excess of the compulsory arbitration limit of Adams County, exclusive of interests and costs.

Respectfully submitted,

OBERMAYER, REBMANN, MAXWELL & HIPPEL LLP

Date:  September 2, 2021

Paige Macdonald-Matthes, Esquire
Attorney No. 66266
Elizabeth K. Lilienthal, Esquire
Attorney ID 327248
200 Locust Street, Suite 400
Harrisburg, PA  17101
(717) 234-9730 Telephone
(717) 236-2485 Facsimile

4813-0364-6201

# CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Respectfully submitted,
*Obermayer Rebmann Maxwell & Hippel, LLP*

Date: September 2, 2021

Paige Macdonald-Matthes, Esquire
Attorney I.D. No.66266
Elizabeth K. Lilienthal, Esquire
Attorney I.D. No. 327248
200 Locust Street
Harrisburg, PA 17101
Telephone: (717) 234-9730
Facsimile: (717) 236-2485
*Attorneys for Plaintiff*

48

4813-0364-6201

<center>VERIFICATION</center>

I, Hannah M. Hauser, hereby verify that the statements made in the attached Plaintiffs' Third Amended Complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

I certify that I am a duly authorized representative of H & M Holdings, Group, LLC and as such, am authorized to make this Verification on its behalf.

H & M Holdings, LLC

By: _____
Hannah M. Hauser

Dated: 9·2·2021

4838-5914-5464

VERIFICATION

I, Hannah M. Hauser, hereby verify that the statements made in the attached Plaintiffs'

Third Amended Complaint are true and correct to the best of my knowledge, information, and

belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. §

4904 relating to unsworn falsification to authorities.

Hannah M. Hauser

Dated: 9.2.2021

4838-5914-5464

# VERIFICATION

I, Hannah M. Hauser, hereby verify that the statements made in the attached Plaintiffs'

Third Amended Complaint are true and correct to the best of my knowledge, information, and

belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. §

4904 relating to unsworn falsification to authorities.

I certify that I am a duly authorized representative of Hauser Family Farms, LLC and as

such, am authorized to make this Verification on its behalf.

Hauser Family Farms, LLC

By: _Hannah M. Hauser_____

Dated: _9·2·2021_

4838-5914-5464

# VERIFICATION

I, Melinda H. Davis, hereby verify that the statements made in the attached Plaintiffs' Third Amended Complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

I certify that I am a duly authorized representative of H & M Holdings, Group, LLC and as such, am authorized to make this Verification on its behalf.

H & M Holdings, LLC

By: _Melinda H Davis_
Melinda H. Davis

Dated: 9·2·2021

4838-5914-5464

## VERIFICATION

I, Melinda H. Davis, hereby verify that the statements made in the attached Plaintiffs' Third Amended Complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

I certify that I am a duly authorized representative of Hauser Family Farms, LLC and as such, am authorized to make this Verification on its behalf.

Hauser Family Farms, LLC

By: _____*Melinda H Davis*_____
Melinda H. Davis

Dated: *9.2.2021*

4838-5914-5464

## VERIFICATION

I, Melinda H. Davis, hereby verify that the statements made in the attached Plaintiffs' Third Amended Complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

_Melinda H. Davis_
Melinda H. Davis

Dated: 9·2·2021

4838-5914-5464

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Third Amended Complaint has been served upon all parties of interest via email and by placing the same in the United States Mail, first-class, postage pre-paid, at Harrisburg, Pennsylvania on this 2nd day of September, 2021, and addressed as follows:

Ronald L. Finck, Esquire
Mette, Evans & Woodside
3401 North Front Street
Harrisburg, PA 17110
rlfinck@mette.com

Paige Macdonald-Matthes, Esquire

4813-0364-6201

# EXHIBIT A



# Apple Leaf Abstracting & Settlement Company

We are an **attorney owned and operated** abstracting and settlement company in the heart of historic Gettysburg.

As **licensed title insurance agents for Old Republic National Title Insurance Company and Fidelity National Title Insurance Company**, we manage the **smooth transfer of residential and commercial** real estate by providing the following services:



- title abstracting

- preparation and production of closing and financing documents

- setting up business entities to manage investment properties

- issuing title insurance policies for both Lenders and Owners

- conducting settlement at our office or outside of the office

WIRE FRAUD WARNING: DUE TO AN INCREASE IN INTERNET WIRE FRAUD SCHEMES, BEFORE YOU WIRE ANY FUNDS TO OUR OFFICE, IT IS IMPERATIVE THAT YOU VERIFY, BY PHONE WITH BRENDA SNYDER OR STEPHANIE THOMAS, THAT THE WIRING INSTRUCTIONS PROVIDED WERE PROVIDED BY APPLE LEAF ABSTRACTING & SETTLEMENT COMPANY AND THAT THE INFORMATION CONTAINED IN THE WIRING INSTRUCTIONS IS ACCURATE.

WE DO NOT ACCEPT OR REQUEST CHANGES TO WIRE INSTRUCTIONS VIA EMAIL OF FAX. ALWAYS CALL TO VERIFY. WE WILL NOT PROVIDE WIRING INSTRUCTIONS UNLESS YOU REQUEST THEM.

IF YOU RECEIVE WIRING INSTRUCTIONS FROM OUR OFFICE THAT DO NOT CONTAIN THIS WARNING, YOU SHOULD ASSUME THAT THEY HAVE NOT BEEN PROVIDED BY OUR COMPANY AND SHOULD CONTACT US IMMEDIATELY.

Post navigation

Attorneys →

## Contact Us

Phone: (717) 334-8098

Fax: (717) 334-5040

## Address

Apple Leaf Abstracting & Settlement Company

Patrono & Murphy, LLC

28 West Middle Street

Gettysburg, PA 17325

## Hours

Open Monday thru Friday

8:30 am – 5:00 pm

Also available outside of normal business hours upon request.

· © 2021 Apple Leaf Abstracting – Legal Services · Powered by Ⓦ · Designed with the Customizr theme ·



Home » Patrono & Murphy, LLC

# Patrono & Murphy, LLC

Our firm concentrates our practice in the following areas of the law:

Real Estate Law

- agreements of sale, both residential and commercial
- municipal law, including subdivision, zoning, variance and special exception hearings
- homeowner associations
- tax assessment appeals
- short sale negotiations

Estate Planning

- wills and trusts
- advanced healthcare directives (living wills) & healthcare power of attorneys
- general or limited power of attorney

Estate Settlement

- probating wills and settling the estate
- advising and counseling Executors, Personal Representatives and Trustees
- preparing the PA Inheritance Tax Return

Bankruptcy & Debt Relief – We are a debt relief agency

- mortgage foreclosure defense
- short sale and deed-in-lieu of foreclosure negotiations
- Chapter 7 Bankruptcy petitions

# Contact Us

Apple Leaf Abstracting & Settlement Company
Patrono & Murphy, LLC

28 West Middle Street
Gettysburg, PA 17325
Phone: (717) 334-8098
Fax: (717) 334-5040

Open Monday thru Friday
8:30 am — 5:00 pm

Search

# Contact Us

Phone: (717) 334-8098
Fax: (717) 334-5040

# Address

Apple Leaf Abstracting & Settlement Company
Patrono & Murphy, LLC
28 West Middle Street
Gettysburg, PA 17325

# Hours

Open Monday thru Friday
8:30 am — 5:00 pm

Also available outside of normal business hours upon request.

· © 2021 Apple Leaf Abstracting – Legal Services · Powered by Ⓦ · Designed with the Customizr theme ·



Home » Attorneys

# Attorneys

### Alan Kim Patrono, Esquire

Kim is a graduate of Gettysburg College and the University of Pittsburgh School of Law. Kim is a member of the Adams County Bar Association, the Pennsylvania Bar Association, Gettysburg Chamber of Commerce, Adams County Builders Associations, Adams County Community Foundation and the Chambersburg Totem Pole Society.

### John J. Murphy III, Esquire

John is a graduate of the University of Pittsburgh and the University of Dayton School of Law. John is a member of the Adams County Bar Association and the Pennsylvania Bar Association. John is licensed to practice before the US District Court for the Middle District of Pennsylvania, US Bankruptcy Court and the Pennsylvania Supreme Court. John is a past board member of the Gettysburg Jaycees, El Centro and the American Heart Association/ American Stroke Association, Great Rivers Chapter.

### Jonathan A. Patrono, Esquire

Jonathan is a graduate of Dickinson College and the University of Dayton School of Law. Jonathan is a member of the Adams County Bar Association and the Pennsylvania Bar Association. Jonathan is the President of the Pennsylvania Winery Association and member of the Gettysburg Rotary.

## Contact Us

Apple Leaf Abstracting & Settlement Company
Patrono & Murphy, LLC

Case 1:26-ap-00037-HWV     Doc 1-7     Filed 04/10/26     Entered 04/10/26 11:51:56     Desc
Exhibit G     Page 62 of 228

28 West Middle Street
Gettysburg, PA 17325
Phone: (717) 334-8098
Fax: (717) 334-5040

Open Monday thru Friday
8:30 am – 5:00 pm

Search

## Contact Us

Phone: (717) 334-8098

Fax: (717) 334-5040

## Address

Apple Leaf Abstracting & Settlement Company

Patrono & Murphy, LLC

28 West Middle Street

Gettysburg, PA 17325

## Hours

Open Monday thru Friday

8:30 am – 5:00 pm

Also available outside of normal business hours upon request.

· © 2021 Apple Leaf Abstracting – Legal Services · Powered by Ⓦ · Designed with the Customizr theme ·

Case 1:26-ap-00037-HWV    Doc 1-7    Filed 04/10/26    Entered 04/10/26 11:51:56    Desc
Exhibit G    Page 63 of 228



# pple Leaf Abstracting & Settlement Company

Home » Attorneys

# Attorneys

### Alan Kim Patrono, Esquire

Kim is a graduate of Gettysburg College and the University of Pittsburgh School of Law. Kim is a member of the Adams County Bar Association, the Pennsylvania Bar Association, Gettysburg Chamber of Commerce, Adams County Builders Associations, Adams County Community Foundation and the Chambersburg Totem Pole Society.

### John J. Murphy III, Esquire

John is a graduate of the University of Pittsburgh and the University of Dayton School of Law. John is a member of the Adams County Bar Association and the Pennsylvania Bar Association. John is licensed to practice before the US District Court for the Middle District of Pennsylvania, US Bankruptcy Court and the Pennsylvania Supreme Court. John is a past board member of the Gettysburg Jaycees, El Centro and the American Heart Association/ American Stroke Association, Great Rivers Chapter.

### Jonathan A. Patrono, Esquire

Jonathan is a graduate of Dickinson College and the University of Dayton School of Law. Jonathan is a member of the Adams County Bar Association and the Pennsylvania Bar Association. Jonathan is the President of the Pennsylvania Winery Association and member of the Gettysburg Rotary.

## Contact Us

Apple Leaf Abstracting & Settlement Company
Patrono & Murphy, LLC



Case 1:26-ap-00037-HWV    Doc 1-7    Filed 04/10/26    Entered 04/10/26 11:51:56    Desc
Exhibit G     Page 64 of 228

28 West Middle Street
Gettysburg, PA 17325
Phone: (717) 334-8098
Fax: (717) 334-5040

Open Monday thru Friday
8:30 am – 5:00 pm

Search

## Contact Us

Phone: (717) 334-8098

Fax: (717) 334-5040

## Address

Apple Leaf Abstracting & Settlement Company

Patrono & Murphy, LLC

28 West Middle Street

Gettysburg, PA 17325

## Hours

Open Monday thru Friday

8:30 am – 5:00 pm

Also available outside of normal business hours upon request.

· © 2021 Apple Leaf Abstracting – Legal Services · Powered by Ⓦ · Designed with the Customizr theme ·

Case 1:26-ap-00037-HWV     Doc 1-7     Filed 04/10/26     Entered 04/10/26 11:51:56     Desc
Exhibit G     Page 65 of 228

# EXHIBIT B

OPERATING AGREEMENT
OF
*Hauser Family Farms, LLC*
(A Pennsylvania Limited Liability Company)

This Operating Agreement of *Hauser Family Farms* (the "Company"), dated this 20th day of _July_, 2007, has been adopted by and between the Members of the Company.

RECITALS

A. The Company is to be organized as a Pennsylvania limited liability company by the filing of a certificate of organization with the Department of State of the Commonwealth of Pennsylvania under and pursuant to the Act.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and intending to be legally bound hereby, the Members agree as follows:

1. Definitions. In addition to the terms defined in other provisions of this Agreement, the following terms shall have the meanings set forth below unless the context requires otherwise:

"Act." The Pennsylvania Limited Liability Company Law of 1094, 15 Pa.C.S. § 8901, et seq., and any successor statute, as amended from time to time.

"Affiliate." As to any Person, any other Person that directly or indirectly, through one or more intermediaries controls, is controlled by, or is under common control with such Person or, if such Person is an individual, the Immediate Family of such Person or trusts solely for the benefit of such Immediate Family. As used in this definition, the term "control" means the possession, directly or indirectly, or as trustee or executor, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, as trustee or executor, by contract or credit arrangement or otherwise.

"Agreement." This Operating Agreement, as amended, modified, supplemented, or restated from time to time.

"Capital Account." The individual account maintained by the Company with respect to each Member as provided in Section 7.

"Capital Contribution." The aggregate amount of cash and the agreed value of any property or services (as determined by the Member and the Company) contributed by each Member to the Company as provided in section 6. In the case of a Member that acquires a Membership Interest in the Company by an assignment or transfer in accordance with the terms of this Agreement, "Capital Contribution" means the Capital Contribution of that Member's predecessor proportionate to the acquired Membership Interest.

"Certificate." The certificate of organization of the Company and any and all amendments thereto and restatements thereof filed on behalf of the Company with the Department of State of the Commonwealth of Pennsylvania pursuant to the Act.

"Claim." See section 21(b).

"Code." The Internal Revenue Code of 1986, as amended.

"Company." See the preamble.

"Covered Person." A Member, any Affiliate of a Member, any officer, director, shareholder, partner, employee, representative, or agent of a Member, or their respective Affiliates, or any officer, employee, or agent of the Company or its Affiliates.

"Damages." See section 21(a).

"Immediate Family." With respect to any individual, such individual's parents, spouse, issue, and adopted children, or any of them.

"Indemnified Party." See section 21(b).

"Laws." Any of the following:

(1)  all constitutions, treaties, laws, statutes, codes, ordinances, orders, decrees, rules, regulations, and municipal bylaws, whether domestic, foreign, or international;

(2)  all judgments, orders, writs, injunctions, decisions, rulings, decrees, and awards of any governmental body;

(3)  all policies, practices, and guidelines of any governmental body; and

(4)  any amendment, modification, re-enactment, restatement, or extension of any of the foregoing, in each case binding on or affecting the party or Person referred to in the context in which such word is used.

"Majority Vote." The written approval of, or the affirmative vote by, Members holding a majority of the Voting Rights.

"Manager." A Person designated by the initial member to act as the manager of the Company pursuant to the powers set forth in this Agreement.

"Member." A Person who at the time is a member of the Company. "Members" means two or more Persons when acting in their capacities as members of the Company. For purposes of the application of a provision of the Act to the Company, the Members shall constitute one class or group of members. Annex A shall be amended from time to time to show the current Members.

"Membership Interest." The interest of a Member in the Company, including, without limitation, interests in the profits and losses, rights to distributions (liquidating or otherwise), allocations and information, and rights to consent to or approve actions by the Company, all in accordance with the provisions of this Agreement and the Act.

"Notice." See section 21(b).

"Percentage Interest." The proportionate Membership Interest of a Member expressed as a percentage as shown on Annex A.

"Person." A natural person, corporation, general or limited partnership, limited liability company, joint venture, trust, estate, association, or other legal entity or organization.

"Profits and Losses." For each taxable year or other period, an amount equal to the Company's taxable income or loss for that year or period, determined in accordance with Code

§ 703(a) (for these purposes, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code § 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(1)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to the foregoing shall be added to such taxable income or loss.

(2)     Any expenditures of the Company described in Code section 705(a)(2)(B) or that are treated as Code § 705(a)(2)(B) expenditures pursuant to Treas. Reg. § 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits and Losses pursuant to the foregoing shall be subtracted from such taxable income or loss.

(3)     In the event the Gross Asset Value of any Company asset is adjusted pursuant to paragraph (2), (3), or (4) of the definition of Gross Asset Value, the amount of the adjustment shall be taken into account as gain or loss from the disposition of the asset for purposes of computing Profits and Losses.

(4)     Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of the property differs from its Gross Asset Value.

(5)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for the taxable year or other period, computed in accordance with the definition of Depreciation under this Agreement.

(6)     Notwithstanding the above, any items that are specially allocated to certain Members shall not be taken into account in computing Profits and Losses.

"Tax Payment Loan." See section 14.

"Treasury Regulations" or "Treas. Regs." The income tax regulations, including temporary regulations, promulgated under the Code, as those regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Voting Rights." The number of votes of each Member (as set forth in section 16(b)) for the purpose of voting on any matter arising under this Agreement.

"Withholding Tax Act." See section 14.

2.     Organization. The Members hereby authorize the organization of the Company as a limited liability company under and pursuant to the provisions of the Act and agree that the rights, duties, and liabilities of the Members shall be as provided in the Act, except as otherwise provided in this Agreement. Jonathan Patrono, Esq., as an authorized person, shall execute, deliver, and file the Certificate.

3.     Purpose.

(a) The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, operating real estate for a family farm operation and engaging in any lawful act or activity for which limited liability companies may be

organized under the Act and engaging in any and all activities necessary, convenient, desirable, or incidental to the foregoing.

(b) The Company shall be required to enter into a lease with Hauser Estate, Inc., such that Hauser Estate, Inc. shall be responsible for the maintenance of the property plus, upon determination of the Board of Directors, Inc., a cash rental based upon the earnings of Hauser Estate, Inc. The initial Lease shall be twenty-five (25) years and six (6) months. At no time shall Hauser Family Farms, LLC be entitled to lease the premises to anyone other than Hauser Estate, Inc., unless approved in writing by Hauser Estate, Inc.

4. Term. The existence of the Company shall commence on the date the Certificate is filed in the office of the Department of State of the Commonwealth of Pennsylvania and shall continue until the Company is dissolved in accordance with the provisions of this Agreement.

5. Principal Office. The principal office of the Company shall be located at 30 West Middle Street, Gettysburg PA 17325, or at such other location as may be determined, from time to time, by the Members. The Company may also have such other offices at such other locations as, from time to time, may be determined by the Members.

6. Company Capital and Percentage Interests.

(a) Initial Capital Contributions. The initial Capital Contribution that each Member has made or is deemed to have made to the Company is set forth opposite the Member's name in Annex A.

(b) Additional Capital Contributions. A Member shall not be required to make any capital contribution to the Company not specifically agreed to in writing between the Member and the Company, or be obligated or required under any circumstances to restore any negative balance in the Member's Capital Account.

(c) No Interest. Interest shall not be paid on or with respect to the Capital Contribution or Capital Account of any Member.

(d) No Right to Return of Capital Contributions. Although the Company may make distributions to the Members from time to time as a return of their Capital Contributions, a Member shall not have the right to withdraw or demand a return of any of the Member's Capital Contribution or Capital Account, except upon dissolution or liquidation of the Company.

(e) Percentage Interests. The Percentage Interest of each Member shall be as set forth in Annex A.

7. Capital Accounts.

At all times while there is more than one Member, a Capital Account shall be established and maintained on the books of the Company for each Member.

(a) Tax Provisions. The allocation and capital account maintenance provisions of Treasury Regulations under section 704 of the Code are hereby incorporated by reference, including a "qualified income offset" within the meaning of Treas. Reg. § 1.704-1(b)(2)(ii)(d), the rules regarding allocation of "partner nonrecourse deductions" under Treas. Reg. § 1.704-2(i)(1), "minimum gain chargeback" under Treas. Reg. § 1.704-2(f) and "partner nonrecourse debt minimum gain chargeback" under Treas. Reg. § 1.704-2(i)(4), and the limitation on allocation of losses to any Member that would cause a deficit capital account in excess of such Member's capital contribution obligations and share of

minimum gain and partner nonrecourse debt minimum gain under Treas. Reg. § 1.704-1(b)(2)(ii)(d) as modified by Treas. Reg. §§ 1.704-2(g)(1) and 1.704-2(i)(5).

(b)      Contributed Property. To the extent contributed property has a fair market value at the time of contribution that differs from the contributing Member's basis in the property, and to the extent the carrying value of property of the Company for Capital Account purposes otherwise differs from the Company's basis in such property, depreciation, gain, and loss for capital account purposes shall be computed by reference to such carrying value rather than such tax basis. In accordance with section 704(c) of the Code, income, gain, loss, and deduction with respect to such property shall, solely for tax purposes, be shared among the Members so as to take account of the variation between the basis of the property to the Company and its fair market value at the time of contribution, or at the time that the carrying value of such property is adjusted under Treas. Reg. § 1.704-1(b)(2)(iv)(f), as the case may be.

8.      Allocation of Profits or Losses. At all times while there is more than one Member, Profits or Losses shall be allocated to the Members in accordance with Percentage Interests, except as otherwise provided in section 7.

9.      Distributions.

(a)      General Rule. Subject to subsection (b), distributions of cash and/or other assets or property of the Company, from whatever source (including, without limitation, net proceeds of Company operations and sale, and financing or refinancing of Company assets) shall be made to the Members in accordance with their respective Percentage Interests at such times, and in such amounts, as the Members shall determine. In making determinations regarding distributions, the Members may set aside funds and establish reserves for such items as the Members shall determine, including, without limitation, working capital, maintenance of bonding capacity, capital expenditures, acquisition of other assets by the Company, and the satisfaction of liabilities (including, without limitation, contingent liabilities).

(b)      Minimum Distribution. With respect to any taxable year of the Company in which Members are allocated taxable income for federal income tax purposes (and for this purpose all items of income, gain, loss, or deduction required to be separately stated pursuant to section 703 of the Code shall be included in the calculation of taxable income (other than the amount, if any, by which capital losses exceed capital gains)), the Company shall distribute to the Members, within 90 days after the close of that taxable year, no less than the amount determined by multiplying the Company's taxable income (computed as set forth in this sentence) by the highest composite federal, state, and local income tax rate applicable to any Member. For purposes of the preceding sentence, the Company's taxable income for a year shall be reduced by any net loss of the Company in prior years that has not previously been so taken into account under this section 9(b). Nothing herein shall require the Company to borrow money or reduce its cash flow so as to restrict its ability to operate the day-to-day activities of the business in order to make such distributions.

10.      Establishment of Reserves. The Members shall have the right and obligation to establish reasonable reserves for maintenance, improvements, acquisitions, capital expenditures, and other contingencies, such reserves to be funded with such portion of the operating revenues of the Company as the Members may deem necessary or appropriate for that purpose.

11.      Tax Returns. The Members shall arrange for the preparation of all tax returns required to be filed for the Company. Each Member shall be entitled to receive copies of all federal, state, and local income tax returns and information returns, if any, which the Company is required to file. All information needed by the Members and other Persons who were Members during the

applicable taxable year for income tax purposes shall be prepared by the Company's accountants and furnished to each such Person after the end of each taxable year of the Company.

12. Tax Elections.

(a) Elections to be Made. To the extent permitted by applicable tax law, the Company may make the following elections on the appropriate tax returns:

(1) to adopt the calendar year as the Company's taxable year;

(2) to adopt the cash method of accounting and to keep the Company's books and records on the income-tax method;

(3) if a transfer of a Membership Interest as described in section 743 of the Code occurs, on written request of the transferee, or if a distribution of Company property is made on which gain described in section 734(b)(1)(A) of the Code is recognized or there is an excess of adjusted basis as described in section 734(b)(1)(B) of the Code, to elect, pursuant to section 754 of the Code, to adjust the basis of Company properties;

(4) to elect to amortize the organizational expenses of the Company and the start-up expenditures of the Company ratably over a period of 60 months as permitted by sections 195 and 709(b) of the Code; and

(5) any other election the Members may deem appropriate and in the best interests of the Members.

(b) No Election of Corporate Taxation. Neither the Company nor any Member may make an election for the Company to be taxable as a corporation for federal income tax purposes or to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law, and no provision of this Agreement shall be construed to sanction or approve such an election.

13. Tax Matters Partner. If the Company is subject to the consolidated audit procedures of sections 6221 to 6234 of the Code, the "tax matters partner" of the Company pursuant to section 6231(a)(7) of the Code shall be a Member that is designated as such by vote of the Members. Any Member who is designated "tax matters partner" shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of section 6223 of the Code. Any Member who is designated "tax matters partner" shall inform each other Member of all significant matters that may come to its attention in its capacity as "tax matters partner" by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity. The Company shall reimburse the tax matters partner for any costs incurred representing the interests of the Members in respect of Company tax matters.

14. Tax Withholding. Unless treated as a Tax Payment Loan, any amount paid by the Company for or with respect to any Member on account of any withholding tax or other tax payable with respect to the income, profits, or distributions of the Company pursuant to the Code, the Treasury Regulations, or any state or local statute, regulation, or ordinance requiring such payment (each a "Withholding Tax Act") shall be treated as a distribution to the Member for all purposes of this Agreement. To the extent that the amount required to be remitted by the Company under a Withholding Tax Act exceeds the amount then otherwise distributable to the Member, the excess shall constitute a loan from the Company to the Member (a "Tax Payment Loan"). Each Tax

Payment Loan shall be payable upon demand and shall bear interest, from the date that the Company makes the payment to the relevant taxing authority, at the applicable federal short-term rate under section 1274(d)(1) of the Code, determined and compounded semiannually. So long as any Tax Payment Loan or the interest thereon remains unpaid, the Company shall make future distributions due to the Member under this Agreement by applying the amount of any such distribution first to the payment of any unpaid interest on all Tax Payment Loans of the Member and then to the repayment of the principal of all Tax Payment Loans of the Member. The Members shall take all actions necessary to enable the Company to comply with the provisions of any Withholding Tax Act applicable to the Company and to carry out the provisions of this subsection.

15.     Conflicts of Interest.

(a)     Other Business Interests. Any Member or Affiliate thereof may engage in or possess an interest in other business ventures of any nature or description, independently or with others, similar or dissimilar to the business of the Company, and the Company and the Members shall have no rights by virtue of this Agreement in and to such independent ventures or the income or profits derived therefrom, and the pursuit of any such venture, even if competitive with the business of the Company, shall not be deemed wrongful or improper. No Member or Affiliate thereof shall be obligated to present any particular investment opportunity to the Company even if the opportunity is of a character that, if presented to the Company, could be taken by the Company, and any Member or Affiliate thereof shall have the right to take for its own account (individually or as a partner or fiduciary) or to recommend to others any such particular investment opportunity.

(b)     Interested Transactions. A contract or transaction between the Company and one or more of its Members or between the Company and another domestic or foreign association in which one or more of its Members have a management role or a financial or other interest, shall not be void or voidable solely for that reason, or solely because the Member is present at or participates in the meeting of the Members that authorizes the contract or transaction, or solely because the vote of the Member is counted for that purpose, if:

(1)     the material facts as to the relationship or interest and as to the transaction are disclosed or known to the Members entitled to vote thereon and the contract or transaction is specifically approved in good faith by vote of those Members; or

(2)     the contract or transaction is fair to the Company as of the time it is authorized, approved, or ratified by the Members.

16.     Control and Management.

(a)     Power and Authority of the Manager. Management of the business and affairs of the Company shall be vested in the Manager, who shall either be a member then designated as a Managing Member or a non-member then designated as Manager. Except as otherwise provided in this Agreement, any decision, determination, or other action to be made or taken by the Manager shall be as made by all the Members. The Manager shall be Melinda H. Davis who, after certain contemplated gifts, shall be the Managing Member. Should Melinda H. Davis be unwilling or unable to serve, the Manager shall be Jonathan A. Patrono. The Manager shall have all rights and powers relating to the Company, including, but not limited to, the following:

(1)     to retain all or any part of the Company's assets as long as the Members deem advisable, and to invest, reinvest, and keep invested all or any part thereof, without being restricted in any way with respect to the type of assets retained or invested in or with respect to the portion of the assets devoted to any investment;

(2)    to purchase, lease, or otherwise acquire the ownership, use, or benefit of assets, properties, rights, or privileges, real or personal, tangible or intangible, of any kind or description, whether income producing or not;

(3)    to sell, pledge, mortgage, lease without limit of time, exchange, or to grant options for the purchase, lease, or exchange of any Company assets, on such terms and conditions as the Members may determine;

(4)    to institute any legal action or proceeding on behalf of the Company;

(5)    to assign, transfer, pledge, compromise, or release any claims or debts due the Company;

(6)    to vote at any election or meeting of any corporation, partnership, limited liability company, joint venture, or other entity, in person or by proxy, to appoint agents to do so in the place and stead of the Members, and to exercise all rights (including without limitation approval and consent rights) that the Company may have with respect to such entity, whether pursuant to applicable law, governing documents, contracts, or otherwise;

(7)    to borrow money for any purpose that the Members consider to be for the benefit of the Company or to facilitate its administration, and to mortgage or pledge Company assets to secure the repayment thereof;

(8)    to retain and pay custodians, accountants, counsel, and other agents and to incur any other expenses which are reasonably related to the operation of the Company;

(9)    to enter into agreements with, and to fix and adjust the compensation of, employees of the Company; and

(10)    to invest in time deposits and savings accounts and to maintain banking accounts in any institutions determined by the Members.

(b)    Voting Rights. Each Member shall have that number of Voting Rights as equals such Member's Percentage Interest in the Company (e.g., a Member who has a 10% Membership Interest in the Company has 10 Voting Rights).

(c)    Voting Procedures. Members may vote in person or by proxy at a meeting of Members (which may be held by conference telephone), or by consent in lieu of a meeting. Proxies and consents shall be in writing or communicated by electronic means.

(d)    Binding Effect of Actions. Each Member shall be bound by, and hereby consents to, any and all actions taken and decisions made by the Manager in accordance with the terms of this Agreement. Any person designated by the Members, including a Member so designated, shall have the authority to bind the Company. Any act taken by, or any document executed by, Members holding a majority of the Voting Rights shall be binding on the Company with the same force and effect as if the action, or the execution of the document, were approved by a vote of the Members. Except as provided in this section 16(d), no Member shall have authority to bind the Company.

(e)    Business Transactions. Notwithstanding any other provision of this Agreement, unless approved by Members holding sixty-six percent (66%) of the Voting Rights, the Company may not:

(1)    engage in a merger or consolidation with or into any corporation, partnership, limited liability company, or any other entity, whether or not the Company shall be the surviving entity of such merger or consolidation;

(2)    sell all or substantially all of its assets to any person or entity;

(3)    divide into two or more limited liability companies; or

(4)    engage in any similar business transaction.

(5)    to borrow money for any purpose that the Members consider to be for the benefit of the Company or to facilitate its administration, and to mortgage or pledge Company assets to secure the repayment thereof;

17. Transfer of Interests; Admission of Additional Members.

(a)    It is the intent of the existing Sole Member to transfer her interest in part or in full to her three daughters and that they shall be governed by a Member's Agreement to be executed at the time of the first transfer.

(b)    Admission of new Members shall be governed by be Members Agreement to be executed by the original Member's daughters, pursuant to paragraph 17a.

18.    Dissolution.

(a)    Events of Dissolution. The Company shall dissolve, and its affairs shall be wound up, in accordance with the terms of the Member Agreement set forth in paragraph 17a.

(b)    Distributions upon Dissolution. In the event of the dissolution of the Company, the assets of the Company shall be liquidated in such manner as the Members shall determine and, after the obligations of the Company to third parties have been discharged or provided for in accordance with applicable law, the net proceeds of the liquidation shall be distributed in accordance with the following procedure:

(1)    The net proceeds shall be distributed first, among the Members, if any, who have made unrepaid loans or advances to the Company, in an amount up to the aggregate amount of such unrepaid loans and advances, and in proportion to the amount of such loans and advances and the unpaid interest thereon.

(2)    The Company may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members.

(3)    With respect to all Company property that has not been sold, the fair market value of that property shall be deemed and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution.

(4)    After completion of the steps in paragraphs (1) and (2), the remaining assets shall be distributed to the Members in an amount equal to the credit balance in each of their

Capital Accounts, after giving effect to all contributions, distributions, and allocations for all periods.

(c)     Procedure. A reasonable time shall be allowed for the liquidation of the Company in order to minimize the losses normally attendant upon a liquidation.

(d)     Certificate of Dissolution. On completion of the liquidation of Company assets as provided herein, the Members (or such other person or persons as the Act may require or permit) shall file a Certificate of Dissolution with the Department of State of the Commonwealth of Pennsylvania and take such other actions as may be necessary to terminate the existence of the Company.

(e)     Final Accounting. In connection with the Company's liquidation, the Company's accountants shall compile and furnish to each Member a statement setting forth the assets and liabilities of the Company as of the date of complete liquidation.

10.     Books and Records.

(a)     General Rule. The Members shall cause to be kept full and accurate books and records of the Company. All books and records of the Company shall be kept at the Company's principal office and shall be available at such location at reasonable times for inspection and copying by the Members or their duly authorized representatives. The Company shall maintain the following records, among others:

(1)     a current list of the full name and last known mailing address of each Member.

(2)     a copy of the Certificate and all amendments thereto.

(3)     copies of the Company's federal, foreign, state, and local income tax returns and reports.

(4)     a copy of this Agreement and all amendments thereto.

(5)     any financial statements of the Company.

(b)     Annual Financial Information. The Company shall furnish to its Members annual financial statements, including at least a balance sheet as of the end of each fiscal year and a statement of income and expenses for the fiscal year. The financial statements shall be prepared on the basis of generally accepted accounting principles, if the Company prepares financial statements for the fiscal year on that basis for any purpose, and may be consolidated statements of the Company and one or more of its subsidiaries. The financial statements shall be mailed by the Company to each of the Members within 120 days after the close of each fiscal year. Statements that are not audited or reviewed by a certified public accountant shall be accompanied by a statement of the person in charge of the Company's financial records:

(1)     stating his or her reasonable belief as to whether or not the financial statements were prepared in accordance with generally accepted accounting principles and, if not, describing the basis of presentation.

(2)     describing any material respects in which the financial statements were not prepared on a basis consistent with those of the previous year.

20. Liability of Members. The Members, as such, shall not be liable for the debts, obligations, or liabilities of the Company except to the extent required by the Act.

21. Indemnification.

(a) Indemnification of Covered Persons. Except as expressly prohibited by Law, the Company shall indemnify, defend, and hold harmless each Covered Person from and against any and all debts, losses, claims, damages, costs, demands, fines, judgments, contracts (implied and expressed, written and unwritten), penalties, obligations, payments, liabilities of every type and nature (whether known or unknown, fixed or contingent), including, without limitation, those arising out of any lawsuit, action, or proceeding (whether brought by or on behalf of a party to this Agreement or by any third party), together with any reasonable costs and expenses (including, without limitation, reasonable attorneys' fees, out-of-pocket expenses, and other reasonable costs and expenses incurred in investigating, preparing, or defending any pending or threatened lawsuit, action, or proceeding) incurred in connection with the foregoing (collectively "Damages") suffered or sustained by such Covered Person by reason of any act, omission, or alleged act or omission by such Covered Person arising out of such Covered Person's activities taken primarily on behalf of the Company, or at the request or with the approval of the Company, or primarily in furtherance of the interests of the Company. Notwithstanding the foregoing, indemnification shall not be available under this section where the acts, omissions, or alleged acts or omissions upon which an actual or threatened action, proceeding, or claim is based constituted willful misconduct or recklessness.

(b) Indemnification Procedure. The procedure under which indemnification shall be provided under this section shall be as follows:

(1) A party seeking indemnification from the Company pursuant to subsection (a) (an "Indemnified Party") shall give prompt notice to the Company of the assertion of any claim, including any claim brought by a third party, in respect of which indemnity may be sought (a "Claim") and shall give the Company such information with respect thereto as the Company may reasonably request, but no failure to give such notice shall relieve the Company of any liability hereunder except to the extent the Company has suffered actual prejudice thereby.

(2) Except as provided in paragraph (3), the Company shall have the right, exercisable by written notice (the "Notice") to the Indemnified Party (which Notice shall state that the Company expressly agrees that as between the Company and the Indemnified Party, the Company shall be solely obligated to satisfy and discharge the Claim) within 30 days of receipt of notice from the Indemnified Party of the commencement of or assertion of any Claim, to assume the defense of the Claim, using counsel selected by the Company and reasonably acceptable to the Indemnified Party. If the Company fails to give the Indemnified Party the Notice within the stated time period, the Indemnified Party shall have the right to assume control of the defense of the Claim and all Damages in connection therewith shall be reimbursed by the Company upon demand of the Indemnified Party.

(3) The Company shall not have the right to assume the defense of a Claim:

(i) seeking an injunction, restraining order, declaratory relief, or other non-monetary relief against the Indemnified Party (whether or not the Company is also named as a party), or

(ii) if the named parties to the action (including any impleaded parties) include both the Indemnified Party and the Company and the Indemnified Party has been advised by counsel that there are one or more legal or equitable defenses

available to the Indemnified Party that are different from those available to the Company.

(4)  A party defending a Claim shall not have the right to compromise or settle any claim for non-monetary relief against any other party without the other party's consent. A party defending a Claim shall not have the right to compromise or settle any claim for monetary relief against any other party without the other party's consent unless the monetary relief is paid in full by the settling party. A party shall not unreasonably withhold or deny its consent under this paragraph, but an Indemnified Party shall not be required to consent to a compromise or settlement of a Claim if in the reasonable judgment of the Indemnified Party the compromise or settlement would have a continuing material adverse effect on the Indemnified Party's business (including any material impairment of its relationships with customers and suppliers).

(5)  If at any time after the Company assumes the defense of a Claim the situation changes such that the Company would not be able to assume the defense of the Claim under paragraph (3) if the Claim were newly filed at that time, the Indemnified Party shall have the same rights as if the Company never assumed the defense of the Claim.

(6)  The Company or the Indemnified Party, as the case may be, shall always have the right to participate, at its own expense, in the defense of any Claim that the other is defending.

(7)  Whether or not the Company chooses to defend or prosecute a Claim involving a third party, the Company and the Indemnified Party shall cooperate in the defense or prosecution thereof and shall furnish such records, information, and testimony, and attend such conferences, discovery proceedings, hearings, trials, and appeals as may be reasonably requested in connection therewith.

(c)  Right to Advancement of Expenses. Except as expressly prohibited by Law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit, or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit, or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in subsection (a).

(d)  Insurance. The Company may purchase and maintain insurance, to the extent and in such amounts as the Members shall deem reasonable, on behalf of Covered Persons and such other Persons as the Members shall determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company or such indemnities, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement. The Company may enter into indemnity contracts with Covered Persons and such other Persons as the Members shall determine and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under this section 21 and containing such other procedures regarding indemnification as are appropriate.

(e)  Non-exclusivity of Rights. The rights conferred on any person by this section 21 shall not be exclusive of any other rights which such person may have or hereafter acquire under any statute, provision of the Certificate, agreement, vote of Members, or otherwise.

(f)     Amendment or Repeal. Any repeal or modification of this section 21 shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to the time of such repeal or modification.

(g)     Changes in Law. References in this section 21 to Law shall be to such Law as it existed on the date this Agreement was executed or as such Law thereafter may be changed, except that:

(1)     in the case of any change that limits the indemnification rights or the rights to advancement of expenses that the Company may provide, the rights to indemnification and to the advancement of expenses provided in this section 21 shall continue as theretofore agreed upon to the extent permitted by law; and

(2)     if the change permits the Company without the requirement of any further action by the Members to provide broader indemnification rights or rights to the advancement of expenses than the Company was permitted to provide prior to the change, then the rights to indemnification and the advancement of expenses shall be so broadened to the extent permitted by Law.

(h)     Applicability. The provisions of this section 21 shall be applicable to all actions, suits, or proceedings commenced after its adoption, whether such arise out of acts or omissions which occurred prior or subsequent to such adoption and shall continue as to a person who has ceased to be a Covered Person, and shall inure to the benefit of the heirs and personal representatives of such person.

22.     Miscellaneous.

(a)     Notices to Members. Any notice required to be given to a Member under the provisions of this Agreement or by the Act shall be given either personally or by sending a copy thereof:

(1)     by first class or express mail, postage prepaid, or courier service, charges prepaid, to the postal address of the Person appearing on the books of the Company for the purposes of notice. Notice pursuant to this paragraph shall be deemed to have been given to the Person entitled thereto when deposited in the United States mail or with a courier service for delivery to that Person.

(2)     by facsimile transmission, e-mail, or other electronic communication to the Person's facsimile number or address for e-mail or other electronic communications supplied by the Person to the Company for the purpose of notice. Notice pursuant to this paragraph shall be deemed to have been given to the Person entitled thereto when sent.

(b)     Entire Agreement. This Agreement constitutes the entire agreement among the Members with respect to the subject matter hereof and supersedes all prior agreements, express or implied, oral or written, with respect thereto. The express terms of this Agreement control and supersede any course of performance or usage of trade inconsistent with any of the terms hereof.

(c)     Effect of Waiver or Consent. A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver

by that Person of its rights with respect to that default until the period of the applicable statute of limitations has run.

(d) Execution in Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. If executed in multiple counterparts, this Agreement shall become binding when any counterpart or counterparts, individually or taken together, bear the signatures of all of the parties.

(e) Amendments. The Certificate may be amended only if the amendment is approved by the vote, consent, or agreement of Members holding at least sixty-six percent ((66%) of the Voting Rights, except that any provision of this Agreement requiring a higher vote may only be amended or repealed by at least that higher vote. An amendment to this Agreement must be in writing and shall take effect when executed by Members holding at least the number of the Voting Rights required to approve the amendment, provided, however, that any provision relating to the Member Agreement as set forth in paragraph 17a shall require a unanimous agreement of all members to amend.

(f) Binding Effect and Rights of Third Parties. This Agreement has been adopted to govern the operation of the Company, and shall be binding on and inure to the benefit of the Members and their respective heirs, personal representatives, successors, and assigns. This Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person, except a Person entitled to indemnification or advancement of expenses under section 21. Except and only to the extent provided by applicable statute, no such creditor or other Person shall have any rights under this Agreement.

(g) Governing Law. This Agreement shall be governed by and interpreted and enforced in accordance with the substantive laws of the Commonwealth of Pennsylvania (including, without limitation, provisions concerning limitations of actions), without reference to the conflicts of laws rules of that or any other jurisdiction, except that federal law shall also apply to the extent relevant.

(h) Severability. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances shall not be affected thereby and that provision shall be enforced to the greatest extent permitted by law.

(i) Arbitration. All disputes arising under this Agreement shall promptly be submitted to arbitration in Getttysburg, Pennsylvania, before one arbitrator in accordance with the rules of the American Arbitration Association. The arbitrator may assess costs, including counsel fees, in such manner as the arbitrator deems fair and equitable. The award of the arbitrator shall be final and binding upon all parties, and judgment upon the award may be entered in any court of competent jurisdiction.

(j) Construction. Whenever the context requires, the gender of any word used in this Agreement includes the masculine, feminine, or neuter, and the number of any word includes the singular or plural. All references to articles and sections refer to articles and sections of this Agreement, and all references to annexes are to annexes attached hereto, each of which is made a part hereof for all purposes. The headings in this Agreement are for convenience only; they do not form a part of this Agreement and shall not affect its interpretation.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the date first above written.

_____Helen B. Hauser_____
HELEN B. HAUSER

Annex A

Date:

| Member (Name and Address) | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| Halen B. Hauser | | 100% |

# EXHIBIT C

# AGREEMENT OF SHAREHOLDERS

## OF

## HAUSER ESTATE, INC.

### Table of Contents

Article 1.  Two Classes of Shares
Article 2.  Restrictions on Transfers of Shares
Article 3.  Transfers to Family Members
Article 4.  Transfer of Shares
Article 5.  Actions Requiring Board Approval
Article 6.  Subchapter S Election
Article 7.  Officers and Directors
Article 8.  Corporate Bank Accounts
Article 9.  Corporate Books and Records
Article 10.. Transactions with the Corporation
Article 11. Issuance of New Shares Prohibited
Article 12. Legend on Certificates
Article 13. Representations
Article 14. Notices
Article 15. Miscellaneous
EXHIBIT A – Shares Owned by the Shareholders

AGREEMENT, dated October 5, 2006, among **Melinda Hauser Davis**, having an address at 48 Beechwood Dr., Fairfield, PA; **Hannah M. Hauser**, having an address at 210 Ridgewood Dr., Gettysburg, PA; **Jonathan Patrono**, having an address at 160 Country Club Lane, Gettysburg, PA; **Polly Patrono-Carlson**, having an address at 130 Montclair Road, Gettysburg, PA, **Jane H. Patrono**, having an address of 98 East Broadway, Gettysburg, PA and **Lee A. Wagner**, having an address at 220 Heckenluber Road, Biglerville, PA (the aforesaid parties, together with all subsequent owners of the capital stock of **Hauser Estate, Inc.**, being hereinafter referred to collectively as "Shareholders" and individually as a "Shareholder"); and **Hauser Estate, Inc.**, a Pennsylvania corporation, having its principal place of business at 30 West Middle Street, Gettysburg, PA (the "Corporation").

## WITNESSETH:

**WHEREAS**, the Shareholders are the owners of the shares of the capital stock of the Corporation listed in Exhibit A and Exhibit B hereto, being all of the issued and outstanding stock of the Corporation (said shares, together with any other shares of capital stock of the Corporation hereafter issued and outstanding, being hereinafter referred to as the "Shares"); and

**WHEREAS**, the parties hereto desire to set forth their agreement with respect to the Shares.

**NOW, THEREFORE**, in consideration of the mutual covenants herein contained, the parties hereto agree as follows:

### 1. Two Classes of Shares

The aggregate number of shares which the Corporation shall have authority to issue is 2,000 shares, which are to be divided into classes as follows:

1,000 shares of Class A (Non-Voting), which are to be without par value.

1,000 shares of Class B (Voting), having a par value of One Dollar ($1.00) per share.

Class A shares shall have no voting rights in the corporation, and are strictly for value and equity. Class A shareholders will be entitled to their percentage of shares owned to shares outstanding in profits, as determined by the Board of Directors unanimously. The Board of Directors will control what profits are retained by the company and what are distributed to Class A shareholders.

Class A shareholders will provide the primary capitalization of the company and as such will be repaid first, and upon dissolution of the corporation, all liquidation of the assets of the corporation will be distributed to these shareholders first.

Class B shares shall have voting rights in the corporation and will be without par value. Class B shareholders will be entitled to all voting as specified herein and will elect both the officers and the Board of Directors.

Wherever there is mention of any voting in the Shareholders Agreement, it shall refer to Class B shareholders.

## 2. Restrictions on Transfers of Shares

No Shareholder shall, directly or indirectly, sell, donate, pledge, hypothecate, encumber or otherwise transfer all or any part of the Shares now or hereafter owned by him or her without complying with the provisions of this Agreement.

Notwithstanding any other provision of this Agreement to the contrary, no sale, donation, pledge, hypothecation, encumbrance or other transfer of Shares shall be recognized or deemed effective unless the transferee shall execute and agree to be bound by this Agreement.

Any sale, donation, pledge, hypothecation, encumbrance or other transfer which is not in compliance with the provisions of this Agreement shall be null and void, and shall not be recognized by the Corporation or the Shareholders, and the transferee shall not be entitled to vote any of the shares of the Corporation, nor receive any dividends, profits or other distributions, nor shall the transferee have any other rights as a Shareholder of the Corporation.

## 3. Transfers to Family Members

Notwithstanding the provisions of Articles 1 and 3 hereof, but subject to the restrictions in Article 6 hereof, a Shareholder may transfer all or a part of his or her Shares by gift or otherwise to the spouse, lawful issue, parents, brothers or sisters of such Shareholder, provided that each such transferee executes and agrees to be bound by this Agreement. Notwithstanding any such transfer, the Shares transferred shall remain subject to the provisions of this Agreement, and each transferee shall be bound by the terms, covenants and conditions of this Agreement.

A shareholder outside the Hauser family lines shall be entitled to their shares so long as they are employed by the corporation. If employment ceases, their shares shall be sold back to the corporation following the procedures stated herein.

2

## 4. Transfers of Shares

Restriction During Life: The shareholder may not transfer any of his/her shares of the corporation during his/her lifetime to any person, firm or entity, without the consent of the corporation, their stockholders, unless the shareholder desiring to make the transfer or encumber their interest shall have first made the offer hereinafter described, and such offer shall not have been accepted:

A. Offer: Any shareholder who desires to sell or transfer his/her interest must make an offer to sell all of his/her interest in the corporation to Hauser Estate, Inc., pursuant to the terms and conditions hereinafter set forth and Hauser Estate, Inc. shall purchase the interest pursuant to the terms and conditions hereinafter set forth.

B. Purchase Upon Death: Upon the death of any shareholder, the estate shall sell and the respective corporation shall buy the deceased shareholder's interest in the corporation, pursuant to the terms and conditions hereinafter set forth.

C. Purchase Price and Terms. In the event the shareholder desires to sell or encumber, pursuant to paragraph 4.A or dies pursuant to paragraph 4.B, the purchase price and terms of payment shall be as follows:

1. The price shall be determined by an appraisal. The appraisal shall be equal to the fair market value as an on-going business at the time of the appraisal. Each party (selling and buying) shall select an appraiser who shall be able to demonstrate his/her qualification to make the aforesaid type of appraisal. Each party shall pay for the services of his/her own appraiser. The final price shall be the average of the two appraisals unless the difference between the appraisals is more than ten percent (10%), at which point the company's CPA shall select a third appraiser whose appraisal shall be binding upon the parties. The cost shall be borne equally by the parties.

2. Notwithstanding the foregoing appraisal provisions, the parties may set the purchase price by agreement, which agreement shall be good for one year from the date of the price agreement; at which time it must be restated or it will lapse and revert to the appraisal system.

3. Upon the establishment of the final purchase price it shall be paid as follows:

a. In the case of a sale by virtue of voluntary transfer, ten percent (10%) is to be paid at closing with the balance to be evidenced by a Note with repayment of the remaining balance over a ten

3

b.  (10) year period, with annual interest at the then New York Prime Rate, secured by a mortgage on the farm or equipment.

    b. In the case of sale by virtue of death, ten percent (10%) to be paid at closing with the balance to be evidenced by a Note, with repayment of the remaining balance over a ten (10) year period, with annual interest at the then New York Prime Rate.

4. Closing on any transaction pursuant to paragraphs (a) or (b) herein, shall be within six (6) months notice from the withdrawing party or the estate of the deceased party of his/her desire to transfer or encumber his/her interest.

## 5. Actions Requiring Board Approval

The following actions shall be taken by the Corporation only after the unanimous approval of the Board of Directors of the Corporation:

(a)   an amendment of the Certificate of Incorporation or By-laws of the Corporation;

(b) the purchase of any interest in the stock, assets or business of any corporation, partnership or other entity other than in the ordinary course of business;

(c) the selection or discharge of the officers of the Corporation;

(d) the merger, consolidation, dissolution, liquidation or cessation of business activities of the Corporation;

(e)   the entering into, modification or termination of any lease, contract or agreement with a term of one year or more;

(f) the sale, purchase, transfer, hypothecation or lease of any asset other than in the ordinary course of business;

(g) the borrowing of money in excess of $50,000.00;

(h)   the making by the Corporation of any loan or advance to any person, corporation, partnership or other entity;

(i) the guaranty of any obligation or debt of any third party;

(j) the making of any capital expenditure of $10,000 or more that falls outside of the approved budget;

4

(k) the making of capital expenditures which aggregate $50,000 or more within any fiscal year that falls outside of the approved budget;

(l) the declaration or payment of dividends or distributions upon the Shares, unless otherwise provided for in this Agreement;

### 6. Subchapter S Election

The parties agree that the Corporation shall elect to be taxed as a "small business corporation" under Subchapter S of the Internal Revenue Code of 1986, as amended, or such other provisions of law now or hereafter applicable to such election. The parties shall cause the Corporation to execute the forms necessary for exercising such election, and shall execute the necessary stockholder's consent and take all other actions necessary or advisable to make such election. Such forms and consents shall be filed with the appropriate tax authorities. The parties agree to continue such election unless they unanimously agree otherwise. None of the parties, without the consent of the others, shall take any action or make any transfer or disposition of Shares of the Corporation which will result in a termination or revocation of such election, and each shall take such action as may be required to continue such election from year to year. The Corporation also shall make such elections as may be necessary or appropriate to receive similar treatment under any applicable state or local tax laws.

### 7. Officers and Directors

The Class B Shareholders shall vote their Shares and otherwise act so as to provide that the directors of the Corporation shall be three in number, consisting of Jonathan Patrono, Melinda Hauser Davis and Hannah Hauser, and that the initial officers of the Corporation shall be Jonathan Patrono as President, Hannah M. Hauser as Vice-President, Melinda Hauser Davis as Secretary, and Melinda Hauser Davis as Treasurer. If any director or officer of the Corporation shall cease to be a Shareholder, he or she shall be deemed to have thereby tendered his or her resignation as such director and/or officer.

Except as otherwise provided in this Agreement, each officer and director of the Corporation shall devote such time and attention to the business of the Corporation as he or she deems advisable, and shall receive for his or her services to the Corporation such compensation as the Board of Directors of the Corporation from time to time may determine.

Each officer and director shall receive such compensation as the Board of Directors from time to time may authorize and shall be reimbursed by the Corporation for reasonable expenses incurred in furthering the business of the Corporation, provided said expenses are supported by proper vouchers.

### 8. Corporate Bank Accounts

5

The Corporation shall maintain one or more bank accounts in any bank or banks as the Board of Directors may from time to time designate. Any corporate resolutions, signature cards or similar instruments requested by any bank shall provide that the following persons shall be the authorized signatories on behalf of the Corporation for the purpose of making deposits and withdrawing corporate funds: Jonathan Patrono

## 9. Corporate Books and Records

The Corporation shall maintain true, complete and accurate records and books of account. All books and records of the Corporation shall at all times be made accessible and available to the parties hereto and their duly authorized representatives, for examination during reasonable hours, provided that reasonable notice of a party's intention to exercise such rights is given to the Corporation.

## 10. Transactions with the Corporation

No director or officer of the Corporation shall be disqualified by such directorship or office from dealing or contracting with the Corporation as vendor, purchaser or otherwise. No contract, transaction or act of the Corporation shall be void or voidable or affected by reason of the fact that any such director or officer, or any person, corporation, partnership or other entity in which any such director or officer has an interest or is an officer, director, stockholder or employee, whether or not such interest is adverse to the Corporation. No director or officer having such interest shall be liable to the Corporation or to any Shareholder, or creditor thereof, or to any other person or entity, for any loss incurred by it under or by reason of any such contract, transaction or act; nor shall any such director or officer be accountable for any gains or profits realized thereon. Nothing in this Article 10 shall be deemed or construed to protect any director or officer of the Corporation against any liability to the Corporation or the holders of its Shares to which he would otherwise be subject by reason of willful misfeasance, fraud, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of his or her directorship or office.

## 11. Issuance of New Shares Prohibited

It is the intention and agreement of the parties that their respective interests in the Corporation shall not be diluted by the issuance or sale of new Shares. Accordingly, the Corporation shall not issue or sell any additional stock after the date hereof, whether by way of original issue or sale of treasury shares, without the prior written consent of all of the Shareholders.

## 12. Legend on Certificates

6

Every certificate representing the Class A Shares shall bear the following legend:

> This Certifies that Shareholder is the owner of x fully paid and non-assessable Shares of the Class A Non-Voting Shares of Hauser Estate, Inc. transferrable only on the books of the Corporation by the holder hereof in person or by duly authorized attorney upon surrender of this Certificate properly endorsed.

Every certificate representing the Class B Shares shall bear the following legend:

> This Certifies that Shareholder is the owner of x fully paid and non-assessable Shares of the Class B Voting Shares of Hauser Estate, Inc. transferrable only on the books of the Corporation by the holder hereof in person or by duly authorized attorney upon surrender of this Certificate properly endorsed.

Further, every certificate of each class shall bear the following legend:

> The stock represented by this certificate is subject to, and may not be transferred except in accordance with, the provisions of those certain Agreements of Shareholders, dated as of July 23rd, 2007 and October 5th, 2006, to which the Corporation and its Shareholders are parties, a copy of which Agreements of Shareholders is on file at the principal office of the Corporation.

The Shareholders agree to promptly deliver to the appropriate officer of the Corporation any certificates previously issued for the purpose of adding the foregoing legend thereto.

## 13. Representations

The Shareholders and the Corporation each represents, warrants and agrees as follows: each Shareholder acquired the Shares in the Corporation for the Shareholder's own account for investment purposes only and not with a view to the sale or distribution thereof; the Shareholder, if an individual, is over the age of 21; if the Shareholder is an organization, such organization is duly organized, validly existing and in good standing under the laws of its state of organization and that it has full power and authority to execute this Agreement and perform its obligations hereunder; the execution and performance of this Agreement by the Shareholder and the Corporation does not conflict with, and will not result in any breach of, any law or any order, writ, injunction or decree of any court or governmental authority against or which binds the Shareholder or the Corporation, or of any agreement or instrument to which the Shareholder or the Corporation is a party; and the Shareholder shall not dispose of such interest or any part thereof in any manner which would constitute a violation of the Securities Act of 1933, the Rules and Regulations of the Securities and Exchange Commission, or any applicable laws, rules or regulations of any state or other governmental authorities, as the same may be amended.

## 14. Notices

7

Any notice or other communication required or permitted to be given pursuant to this Agreement shall be in writing and shall be deemed to have been properly given when delivered by hand, or by FAX or telex, or by Federal Express courier, or by registered or certified mail, return receipt requested, with postage prepaid, to the party or parties to whom such notice is intended to be given at the address of such party first above written or such other address as such party may designate by notice given hereunder.

## 15. Miscellaneous

This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania. If any provision or provisions of this Agreement is found to be void or unenforceable, the remaining provisions of this Agreement shall remain binding and in full force and effect.

Wherever appropriate, the singular shall include the plural, and vice versa, and the male gender shall include the female and neuter. The captions in this Agreement are for convenience only, and shall not affect the construction of the provisions hereof.

This Agreement may be terminated, waived or modified only by a written agreement executed by the party against which enforcement of such termination, waiver or modification is sought. No waiver of any breach of any provision of this Agreement shall be deemed a waiver of a party's right to demand strict performance of all of the terms of this Agreement, nor shall it constitute a waiver of any subsequent breach of any provision of this Agreement.

This Agreement merges and supersedes all prior understandings and oral or written agreements of the parties hereto with respect to the subject matter hereof.

This Agreement may be executed in several counterparts, each of which shall constitute an original, but all counterparts shall constitute but one and the same agreement. The Corporation agrees that a copy of this Agreement shall be kept at the principal office of the Corporation, for inspection by the Shareholders. Any Shareholder shall have the right to inspect said copy of this Agreement and the books and records of the Corporation at reasonable times after reasonable notice.

The execution and performance of this Agreement has been duly authorized and approved by the Board of Directors of the Corporation.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns. This Agreement shall apply to all stock and equity securities of the Corporation now or hereafter acquired by the Shareholders or any of their successors in interest.

8

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

HAUSER ESTATE, INC.:

ATTEST:

By _____

By _____

Melinda Hauser Davis

Hannah Hauser

Jonathan Patrono

Polly Carlson

Jane Patrono

Lee Wagner

s:\worddocs/legal/files/WINERY/Winery Shareholder Agreement.rtf

10

## EXHIBIT A

### SHARES OWNED BY THE SHAREHOLDERS

<u>Class A Shares (Non-Voting)</u>

| Shareholder | Shares Held | Certificate |
| --- | --- | --- |
| Melinda Hauser Davis | 300 | |
| Hannah M. Hauser | 300 | |
| Lee A. Wagner | 100 | |
| Jonathan A. Patrono | 149-1/2 | |
| Jane H. Patrono | 1 | |
| Polly Patrono-Carlson | 149-1/2 | |

<u>Class B Shares (Voting)</u>

| Shareholder | Shares Held | Certificate |
| --- | --- | --- |
| Jonathan A. Patrono | 510 | |
| Melinda Hauser Davis | 145 | |
| Hannah M. Hauser | 145 | |
| Unissued | 200 | |

10

COMMONWEALTH OF PENNSYLVANIA, COUNTY OF *Adams* , ss.

On this *5* day of *October* , 2007, before me, the undersigned officer, personally appeared Jonathan Patrono, known to me known, who being duly sworn, did depose and say and did acknowledge that he is the President of Hauser Estate, Inc., the corporation described in and which executed the foregoing instrument; that he/she knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by the order of the board of directors of the said corporation; and that he/she signed his/her name thereto by like order for the uses and purposes therein contained.

IN WITNESS WHEREOF I hereunto set my hand and official seal.

*Judith A. Rohanna*
Notary Public
My commission expires on

NOTARIAL SEAL
Judith A. Rohanna, Notary Public
Gettysburg Boro., Adams County
My commission expires October 7, 2007

# EXHIBIT D

## SHAREHOLDER/MEMBER AGREEMENT

THIS AGREEMENT, made this _23rd_ day of July, 2007, by and between

JONATHAN A. PATRONO, POLLY E. PATRONO-CARLSON, HANNAH M. HAUSER, MELINDA H. DAVIS and JANE H. PATRONO, being all the shareholders of Hauser Estate, Inc., a Pennsylvania corporation (except Lee A. Wagner - covered by a separate agreement), and

JANE H. PATRONO, HANNAH M. HAUSER and MELINDA H. DAVIS, being all the members of Hauser Family Farms, LLC, a Pennsylvania family farm limited liability company being operated in the partnership form, HAUSER ESTATE, INC., a Pennsylvania corporation, and HAUSER FAMILY FARMS, LLC, a Pennsylvania family farm limited liability company.

WHEREAS, Jonathan A. Patrono, Polly E. Patrono-Carlson, Hannah M. Hauser, Melinda H. Davis and Jane H. Patrono are the owners of most of the stock, voting and non-voting of the issued and outstanding shares of Hauser Estate, Inc.

WHEREAS, Helen Hauser, Jane H. Patrono, Hannah M. Hauser and Melinda H. Davis are the only members of Hauser Family Farms, LLC.

WHEREAS, the business purpose of Hauser Family Farms, LLC is to own a tract of land having an address of 496 Cashtown Road, Biglerville, PA 17307 for the purpose of establishing on the property a vineyard, a winery production and sales facility, and to lease the land and facilities to Hauser Estate, Inc. for the purpose of maintaining the vineyard, the winery, and the sales facility.

WHEREAS, the business purpose of Hauser Estate, Inc. is to enter into a lease with Hauser Family Farms, LLC to operate the vineyard and winery production and sales facility, and to own and maintain all the necessary equipment to facilitate the operation.

WHEREAS, Hauser Family Farms, LLC will also be the beneficiary of a tract of land having an address of Parcel# 12-011-0011, Gettysburg, Pennsylvania 17325, otherwise known as the Royer Farm from Helen B. Hauser for the purpose of selling that property in an orderly fashion to provide capital to improve the land owned by Hauser Family Farms, LLC as hereinbefore stated.

WHEREAS, the parties hereto desire to set forth their agreement with respect to their shares, membership interests and ownership in the Royer Farm.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties agree as follows:

I. The parties ratify the enabling documents, setting forth the entities, their ownership and interrelated purposes.

II. The parties having an interest in Hauser Family Farms, LLC and Hauser Estate, Inc. agree to execute a lease between Hauser Family Farms, LLC and Hauser Estate, Inc.

III. The parties agree to liquidate the Royer Farm and to raise capital for the business purpose of Hauser Family Farms, LLC.

IV. Restriction During Life: The shareholder or member may not transfer any of his/her shares of the corporation or membership interest in the limited liability company during his/her lifetime to any person, firm or entity, without the consent of the corporation, limited liability company, their stockholders or members, unless the shareholder or member desiring to make the transfer or encumber their interest shall have first made the offer hereinafter described, and such offer shall not have been accepted:

A. Offer: Any shareholder, member or individual who desires to sell or transfer his/her interest in one of the entities as hereinbefore described, must make an offer to sell all of their interest in the corporation and the limited liability company to Hauser Estate, Inc. or Hauser Family Farms, LLC, pursuant to the terms and conditions hereinafter set forth and Hauser Estate, Inc. or Hauser Family Farms, LLC shall purchase the interest pursuant to the terms and conditions hereinafter set forth.

B. Purchase Upon Death: Upon the death of any shareholder or member, the estate shall sell and the respective corporation or limited liability company

2

shall buy the deceased shareholder's, member's or individual owner's interest in the corporation and limited liability company, pursuant to the terms and conditions hereinafter set forth.

C. Family Exemption: Notwithstanding the prohibitions set forth in paragraph IV A & B, the parties may transfer their shareholder and membership interest to his/her lineal descendants by sale, gift or will, provide that he/she transfers all of his/her interest at the same time. Further, upon receipt, the family descendant may similarly transfer, by sale, gift or will, his/her interest to his/her lineal descendants, or his/her brother or sister, provided that he/she transfer all of his/her interest at the same time.

D. Purchase Price and Terms. In the event the shareholder or member desires to sell or encumber, pursuant to paragraph IV A or dies pursuant to paragraph IV B, the purchase price and terms of payment shall be as follows:

1. The price shall be a combination of all the interests in Hauser Family Farms, LLC and Hauser Estate, Inc. to be sold by the selling party as determined and allocated by an appraisal. The appraisal shall be equal to the fair market value as an on-going business at the time of the appraisal, with the final price being allocated by the company's certified public accountant and between Hauser Family Farms, LLC and Hauser Estate, Inc., should the selling party have an interest in both entities. Each party (selling and buying) shall select an appraiser who shall be able to demonstrate his/her qualification to make the aforesaid type of appraisal. Each party shall pay for the services of his/her own appraiser. The final price shall be the average of the two appraisals unless the difference between the appraisals is more than ten percent (10%), at which point the company's CPA shall select a third appraiser whose appraisal shall be binding upon the parties. The cost shall be borne equally by the parties.

3

2. In the event that the sale includes the Royer Farm, it shall also be done by an appraisal to be included in the total value of Hauser Family Farms LLC. The appraisal shall establish a price based on a comparable sales analysis of highest and best use, with the comparables being no greater than ten (10) miles from the site and no older than two (2) years from the date of the appraisal. The intent would be to permit the same appraiser as in paragraph 1, provided he/she is qualified to do both types of appraisals. The final price shall be the average of the two appraisals so obtained.

3. Notwithstanding the foregoing appraisal provisions, the parties may set the purchase price by agreement, which agreement shall be good for one year from the date of the price agreement; at which time it must be restated or it will lapse and revert to the appraisal system.

4. Once a purchase price has been agreed upon, that price shall be subject to a penalty reduction as follows:

   a. in the event the sale is by virtue of voluntary withdrawal - ten percent (10%); and
   b. in the event the sale is by virtue of a death - five percent (5%), provided the election is made on or before nine (9) months from the death of the party triggering the sale. After the nine (9) month period, the request for a sale shall be considered a voluntary withdrawal.

5. Upon the establishment of the final purchase price and its allocation to each entity, should the selling party be selling multiple interests, it shall be paid as follows:

   a. In the case of a sale by virtue of voluntary transfer, ten percent (10%) is to be paid at closing with the balance to

4

be evidenced by a Note with repayment of the remaining balance over a ten (10) year period, with annual interest at the then New York Prime Rate, secured by a mortgage on the farm or equipment.

b. In the case of sale by virtue of death, ten percent (10%) to be paid at closing with the balance to be evidenced by a Note, with repayment of the remaining balance over a ten (10) year period, with annual interest at the then New York Prime Rate.

6. Closing on any transaction pursuant to paragraphs (a) or (b) herein, shall be within six (6) months notice from the withdrawing party or the estate of the deceased party of his/her desire to transfer or encumber his/her interest.

V. Endorsement on stock certificate and/or operating agreement of the limited liability company representing shares of the stock both voting and non-voting, now or hereafter held by the stockholders, shall contain a legend in substantially the following form: the transfer or encumbrance of the shares of stock represented by the within certificate is restricted under the terms of an agreement dated July 31, 2007, a copy of which is on file at the corporation office. In addition, the operating agreement of Hauser Family Farms, LLC shall, and any certificate of membership interest shall, include language in substantially the following form: the transfer or encumbrance of the membership interest of Hauser Family Farms, LLC is restricted under the terms of an Agreement dated July 31, 2007, a copy of which is on file at the limited liability company office.

VI. Amendments. This Agreement may be amended or altered by execution of a written agreement authorized by all the parties hereto and properly executed by the individuals or entities.

VII. Life Insurance. Hauser Estate, Inc. shall purchase an annual renewable term life insurance policy on the life of Jonathan A. Patrono, with a beneficiary designation determined by Jonathan A. Patrono, in the

5

face amount of Five Hundred Thousand ($500,000) Dollars, until such time as Jonathan A. Patrono has children.

VIII. <u>Previous Shareholders Agreement</u>. There is, in existence, a Shareholder Agreement between the shareholders of Hauser Estate, Inc., which include Lee Wagner. By executing this Agreement, all terms and conditions contained in the Shareholder Agreement that are in conflict with the terms and conditions herein (as they pertain to all except Lee Wagner) are revoked and replaced by the terms and conditions of this Agreement.

IX. <u>Notices</u>. Any and all notices required herein shall be by registered or certified mail, fax or email, to the address as hereinafter set forth (or as modified in writing by the parties). In the case of fax or email, a record of receipt shall be required.

| Name | Address | Fax# | Email |
|---|---|---|---|
| Jonathan A. Patrono | 160 Country Club Lane Gettysburg, PA 17325 | | |
| Polly Patrono-Carlson | 120 Montclair Road Gettysburg, PA 17325 | | |
| Hannah M. Hauser | 210 Ridgewood Dr. Gettysburg, PA 17325 | | |
| Melinda H. Davis | 48 Beechwood Dr. Fairfield, PA 17320 | | |
| Jane H. Patrono | 98 East Broadway Gettysburg, PA 17325 | | |
| Hauser Estate, Inc. | 30 West Middle Street Gettysburg, PA 17325 | 717-334-5040 | |
| Hauser Family Farms, LLC | 30 West Middle St. Gettysburg, PA 17325 | | |

X. <u>Invalid Provisions</u>. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in al aspects as if such invalid or unenforceable provision had been omitted.

6

XI. Modification. It is understood between the parties that this Agreement contains the entire understanding of the parties and no change or modification of this Agreement shall be valid unless the same be in writing and signed by all the parties hereto.

XII. Binding Effect. This Agreement shall bind and, unless inconsistent with its provisions, shall inure to the benefit of the Executor, Administrator or Personal Representative, and the heirs and assigns of each of the shareholders or members.

XIII. In the case of any sale of a party's interest in Hauser Family Farms, LLC and Hauser Estate, Inc. the transfer shall be free and clear of any liens and/or encumbrances.

XIV. Termination of Agreement. This Agreement shall terminate upon the occurrence of one of the following events:

A. The written agreement of the parties hereto or their successors in interest to that effect;
B. The bankruptcy, receivership, or dissolution of both the corporation and limited liability company;
C. All of the issued and outstanding stock of the corporation or membership interest of the LLC becoming owned by one of the stockholders or members of the corporation and LLC, respectively and individually.

XV. Laws Governed By. This Agreement is executed in and shall be construed by and governed under the laws of the State of Pennsylvania.

XVI. Dissolution and Liquidation. Notwithstanding anything to the contrary herein, should both the corporation and limited liability company desire not to purchase a shareholder's or member's interest pursuant to paragraph IV herein, it may do so only by liquidating the assets of Hauser Estate, Inc. and Hauser Family Farms, LLC as soon as practical and distributing the proceeds to the then shareholders and/or members.

7

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals the day and year first above written.

Signed and sealed in the presence of:

WITNESS:

HAUSER ESTATE, INC.

_____
JONATHAN A. PATRONO

_____
POLLY E. PATRONO-CARLSON

_____
HANNAH M. HAUSER

_____
MELINDA H. DAVIS

_____
JANE H. PATRONO
Shareholders

HAUSER FAMILY FARMS, LLC

_____
JANE H. PATRONO

_____
HANNAH M. HAUSER

_____
MELINDA H. DAVIS
Members

# EXHIBIT E

Case 1:26-ap-00037-HWV    Doc 1-7    Filed 04/10/26    Entered 04/10/26 11:51:56    Desc
Exhibit G    Page 105 of 228

**Date Range** 01-01-2018 12-31-2018

**Grower** 30563 HAUSER FAMILY FARMS LLC

**Account** Customer Receivable

| Check Number | Check Date | DESCRIPTION | Amount |
|---|---|---|---|
| 82357 | Feb 2, 2018 | Knouse Raw Fruit Payment COMPLETE (20180123_1443) | ($4,305.60) |
| | | | ($4,305.60) |

**Account** Raw Fruit Payments

| Check Number | Check Date | DESCRIPTION | Amount |
|---|---|---|---|
| 82227 | Jan 5, 2018 | Knouse Raw Fruit Payment ADVANCE_1 (20171228_0950) | $24,869.71 |
| 82357 | Feb 2, 2018 | Knouse Raw Fruit Payment ADVANCE_2 (20180123_1151) | $24,869.71 |
| 82485 | Mar 2, 2018 | Knouse Raw Fruit Payment ADVANCE_3 (20180223_1027) | $24,869.71 |
| 82623 | Apr 6, 2018 | Knouse Raw Fruit Payment ADVANCE_4 (20180326_1505) | $24,869.71 |
| 82751 | May 4, 2018 | Knouse Raw Fruit Payment ADVANCE_5 (20180424_1028) | $24,869.71 |
| 82869 | Jun 1, 2018 | Knouse Raw Fruit Payment ADVANCE_6 (20180522_1110) | $24,869.40 |
| 83115 | Sep 27, 2018 | Knouse Raw Fruit Payment HARVEST (20180925_1416) | $2,097.66 |
| 83161 | Oct 4, 2018 | Knouse Raw Fruit Payment HARVEST (20181002_0953) | $5,358.83 |
| 83225 | Oct 11, 2018 | Knouse Raw Fruit Payment HARVEST (20181008_0920) | $5,184.63 |
| 83302 | Oct 18, 2018 | Knouse Raw Fruit Payment HARVEST (20181015_0743) | $9,148.61 |
| 83370 | Oct 25, 2018 | Knouse Raw Fruit Payment HARVEST (20181018_1622) | $16,682.27 |
| 83448 | Nov 1, 2018 | Knouse Raw Fruit Payment HARVEST (20181030_0926) | $21,670.93 |
| 83508 | Nov 8, 2018 | Knouse Raw Fruit Payment HARVEST (20181105_1453) | $29,816.35 |
| 83546 | Nov 15, 2018 | Knouse Raw Fruit Payment HARVEST (20181113_1421) | $18,027.93 |
| 83570 | Nov 23, 2018 | Knouse Raw Fruit Payment HARVEST (20181116_1244) | $2,030.40 |
| 83585 | Nov 29, 2018 | Knouse Raw Fruit Payment HARVEST (20181123_0918) | $3,925.51 |
| | | **Box 3, Form 1099** | **$263,161.07** |

**Account** Rental Bins, Tanks, etc.

| Check Number | Check Date | DESCRIPTION | Amount |
|---|---|---|---|
| 82869 | Jun 1, 2018 | Knouse Raw Fruit Payment ADVANCE_6 (20180522_1110) | ($6,889.60) |
| | | | ($6,889.60) |

**Grower Totals** $251,965.87

# EXHIBIT F

# COMMERCIAL GUARANTY

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| | | | | | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Hauser Estate Inc
28 W. Middle St
Gettysburg, PA 17325

**Lender:** Members 1st Federal Credit Union
ATTN: Business Lending
5000 Louise Drive
Mechanicsburg, PA 17055

**Guarantor:** Alan K. Patrono
98 East Broadway
Gettysburg, PA 17325

**GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Credit Agreement and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Credit Agreement and Related Documents.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, reasonable attorneys' fees, arising from any and all debts, liabilities and obligations that Borrower individually or collectively or interchangeably with others, owes or will owe Lender under the Credit Agreement and Related Documents and any renewals, extensions, modifications, refinancings, consolidations and substitutions of the Credit Agreement and Related Documents.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS GUARANTY ENCOMPASSES A LINE OF CREDIT AND GUARANTOR UNDERSTANDS AND AGREES THAT THIS GUARANTY SHALL BE OPEN AND CONTINUOUS UNTIL THE INDEBTEDNESS IS PAID IN FULL AND THE LENDER DECLARES THAT THE LINE OF CREDIT IS FULLY SATISFIED, PERFORMED AND TERMINATED.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. This Guaranty covers a revolving line of credit and it is specifically anticipated that fluctuations will occur in the aggregate amount of the Indebtedness. Guarantor specifically acknowledges and agrees that fluctuations in the amount of the Indebtedness, even to zero dollars ($ 0.00), shall not constitute a termination of this Guaranty. Guarantor's liability under this Guaranty shall terminate only upon (A) termination in writing by Borrower and Lender of the line of credit, (B) payment of the Indebtedness in full in legal tender, and (C) payment in full in legal tender of all of Guarantor's other obligations under this Guaranty.

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional

Case 1:26-ap-00037-HWV    Doc 1-7    Filed 04/10/26    Entered 04/10/26 11:51:56    Desc
Exhibit G    Page 108 of 228

loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS. Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR. Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

MISCELLANEOUS PROVISIONS. The following miscellaneous provisions are a part of this Guaranty:

Amendments. This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Arbitration. Borrower and Guarantor and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Guaranty or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Collateral shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Collateral, including any claim to rescind, reform, or otherwise modify any agreement relating to the Collateral, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Guaranty shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

Attorneys' Fees; Expenses. Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

Caption Headings. Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

Governing Law. This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the Commonwealth of Pennsylvania without regard to its conflicts of law provisions.

Choice of Venue. If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of Cumberland County, Commonwealth of Pennsylvania.

Integration. Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the

opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Unless otherwise provided by applicable law, any notice required to be given under this Guaranty shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided by applicable law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** The terms of this Guaranty shall be binding upon Guarantor, and upon Guarantor's heirs, personal representatives, successors, and assigns, and shall be enforceable by Lender and its successors and assigns.

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Hauser Estate Inc and includes all co-signers and co-makers signing the Credit Agreement and all their successors and assigns.

**Credit Agreement.** The words "Credit Agreement" mean the credit agreement dated June 22, 2011, with credit limit of $300,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation Alan K. Patrono, and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means Members 1st Federal Credit Union, its successors and assigns.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**CONFESSION OF JUDGMENT.** GUARANTOR HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY OR THE PROTHONOTARY OR CLERK OF ANY COURT IN THE COMMONWEALTH OF PENNSYLVANIA, OR ELSEWHERE, TO APPEAR AT ANY TIME FOR GUARANTOR AFTER THE AMOUNTS HEREUNDER BECOME DUE AND WITH OR WITHOUT COMPLAINT FILED, CONFESS OR ENTER JUDGMENT AGAINST GUARANTOR FOR THE ENTIRE PRINCIPAL BALANCE OF THIS GUARANTY AND ALL ACCRUED INTEREST, LATE CHARGES AND ANY AND ALL AMOUNTS EXPENDED OR ADVANCED BY LENDER RELATING TO ANY COLLATERAL SECURING THE INDEBTEDNESS, TOGETHER WITH COSTS OF SUIT, AND AN ATTORNEY'S COMMISSION OF TEN PERCENT (10%) OF THE UNPAID PRINCIPAL BALANCE AND ACCRUED INTEREST FOR COLLECTION, BUT IN ANY EVENT NOT LESS THAN FIVE HUNDRED DOLLARS ($500) ON WHICH JUDGMENT OR JUDGMENTS ONE OR MORE EXECUTIONS MAY ISSUE IMMEDIATELY; AND FOR SO DOING, THIS GUARANTY OR A COPY OF THIS GUARANTY VERIFIED BY AFFIDAVIT SHALL BE SUFFICIENT WARRANT. THE AUTHORITY GRANTED IN THIS GUARANTY TO CONFESS JUDGMENT AGAINST GUARANTOR SHALL NOT BE EXHAUSTED BY ANY EXERCISE OF THAT AUTHORITY, BUT SHALL CONTINUE FROM TIME TO TIME AND AT ALL TIMES UNTIL PAYMENT IN FULL OF ALL AMOUNTS DUE UNDER THIS GUARANTY. GUARANTOR HEREBY WAIVES ANY RIGHT GUARANTOR MAY HAVE TO NOTICE OR TO A HEARING IN CONNECTION WITH ANY SUCH CONFESSION OF JUDGMENT AND STATES THAT EITHER A REPRESENTATIVE OF LENDER SPECIFICALLY CALLED THIS CONFESSION OF JUDGMENT PROVISION TO GUARANTOR'S ATTENTION OR GUARANTOR HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED JUNE 22, 2011.

THIS GUARANTY IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS GUARANTY IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

GUARANTOR:

X _____(Seal)
Alan K. Patrono

LASER PRO Lending, Ver. 5.54.00.006 Copr. Harland Financial Solutions, Inc. 1997, 2011. All Rights Reserved. - PA C:\COMMERCIAL\CFI\LPL\E20.FC  TR-2759  PR-13

# COMMERCIAL GUARANTY

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer *** | Initials |
|---|---|---|---|---|---|---|---|

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Hauser Estate Inc
28 W. Middle St
Gettysburg, PA 17325

**Lender:** Members 1st Federal Credit Union
ATTN: Business Lending
5000 Louise Drive
Mechanicsburg, PA 17055

**Guarantor:** Jane H. Patrono
98 East Broadway
Gettysburg, PA 17325

**GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Credit Agreement and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Credit Agreement and Related Documents.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, reasonable attorneys' fees, arising from any and all debts, liabilities and obligations that Borrower individually or collectively or interchangeably with others, owes or will owe Lender under the Credit Agreement and Related Documents and any renewals, extensions, modifications, refinancings, consolidations and substitutions of the Credit Agreement and Related Documents.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS GUARANTY ENCOMPASSES A LINE OF CREDIT AND GUARANTOR UNDERSTANDS AND AGREES THAT THIS GUARANTY SHALL BE OPEN AND CONTINUOUS UNTIL THE INDEBTEDNESS IS PAID IN FULL AND THE LENDER DECLARES THAT THE LINE OF CREDIT IS FULLY SATISFIED, PERFORMED AND TERMINATED.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. This Guaranty covers a revolving line of credit and it is specifically anticipated that fluctuations will occur in the aggregate amount of the Indebtedness. Guarantor specifically acknowledges and agrees that fluctuations in the amount of the Indebtedness, even to zero dollars ($ 0.00), shall not constitute a termination of this Guaranty. Guarantor's liability under this Guaranty shall terminate only upon (A) termination in writing by Borrower and Lender of the line of credit, (B) payment of the Indebtedness in full in legal tender, and (C) payment in full in legal tender of all of Guarantor's other obligations under this Guaranty.

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional

loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS. Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR. Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

MISCELLANEOUS PROVISIONS. The following miscellaneous provisions are a part of this Guaranty:

Amendments. This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Arbitration. Borrower and Guarantor and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Guaranty or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Collateral shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Collateral, including any claim to rescind, reform, or otherwise modify any agreement relating to the Collateral, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Guaranty shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

Attorneys' Fees; Expenses. Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

Caption Headings. Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

Governing Law. This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the Commonwealth of Pennsylvania without regard to its conflicts of law provisions.

Choice of Venue. If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of Cumberland County, Commonwealth of Pennsylvania.

Integration. Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the

opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Unless otherwise provided by applicable law, any notice required to be given under this Guaranty shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided by applicable law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** The terms of this Guaranty shall be binding upon Guarantor, and upon Guarantor's heirs, personal representatives, successors, and assigns, and shall be enforceable by Lender and its successors and assigns.

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Hauser Estate Inc and includes all co-signers and co-makers signing the Credit Agreement and all their successors and assigns.

**Credit Agreement.** The words "Credit Agreement" mean the credit agreement dated June 22, 2011, with credit limit of $300,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation Jane H. Patrono, and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means Members 1st Federal Credit Union, its successors and assigns.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**CONFESSION OF JUDGMENT.** GUARANTOR HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY OR THE PROTHONOTARY OR CLERK OF ANY COURT IN THE COMMONWEALTH OF PENNSYLVANIA, OR ELSEWHERE, TO APPEAR AT ANY TIME FOR GUARANTOR AFTER THE AMOUNTS HEREUNDER BECOME DUE AND WITH OR WITHOUT COMPLAINT FILED, CONFESS OR ENTER JUDGMENT AGAINST GUARANTOR FOR THE ENTIRE PRINCIPAL BALANCE OF THIS GUARANTY AND ALL ACCRUED INTEREST, LATE CHARGES AND ANY AND ALL AMOUNTS EXPENDED OR ADVANCED BY LENDER RELATING TO ANY COLLATERAL SECURING THE INDEBTEDNESS, TOGETHER WITH COSTS OF SUIT, AND AN ATTORNEY'S COMMISSION OF TEN PERCENT (10%) OF THE UNPAID PRINCIPAL BALANCE AND ACCRUED INTEREST FOR COLLECTION, BUT IN ANY EVENT NOT LESS THAN FIVE HUNDRED DOLLARS ($500) ON WHICH JUDGMENT OR JUDGMENTS ONE OR MORE EXECUTIONS MAY ISSUE IMMEDIATELY; AND FOR SO DOING, THIS GUARANTY OR A COPY OF THIS GUARANTY VERIFIED BY AFFIDAVIT SHALL BE SUFFICIENT WARRANT. THE AUTHORITY GRANTED IN THIS GUARANTY TO CONFESS JUDGMENT AGAINST GUARANTOR SHALL NOT BE EXHAUSTED BY ANY EXERCISE OF THAT AUTHORITY, BUT SHALL CONTINUE FROM TIME TO TIME AND AT ALL TIMES UNTIL PAYMENT IN FULL OF ALL AMOUNTS DUE UNDER THIS GUARANTY. GUARANTOR HEREBY WAIVES ANY RIGHT GUARANTOR MAY HAVE TO NOTICE OR TO A HEARING IN CONNECTION WITH ANY SUCH CONFESSION OF JUDGMENT AND STATES THAT EITHER A REPRESENTATIVE OF LENDER SPECIFICALLY CALLED THIS CONFESSION OF JUDGMENT PROVISION TO GUARANTOR'S ATTENTION OR GUARANTOR HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED JUNE 22, 2011.

THIS GUARANTY IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS GUARANTY IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

GUARANTOR:

X _____(Seal)
Jane H. Patrono

LASER PRO Lending, Ver. 5.54.00.006 Copr. Harland Financial Solutions, Inc. 1997, 2011. All Rights Reserved. - PA C:\COMMERCIAL\CFILPLLE20.FC TR-2758 PR-13

# COMMERCIAL GUARANTY

| Borrower: | Hauser Estate Inc<br>28 W. Middle St<br>Gettysburg, PA 17325 | Lender: | Members 1st Federal Credit Union<br>ATTN: Business Lending<br>5000 Louise Drive<br>Mechanicsburg, PA 17055 |
|---|---|---|---|
| Guarantor: | Jonathan A. Patrono<br>160 Country Club Lane<br>Gettysburg, PA 17325 | | |

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, reasonable attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor

and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

GUARANTOR'S FINANCIAL STATEMENTS. Guarantor agrees to furnish Lender with the following:

Tax Returns. As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Guarantor's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

Additional Requirements. Guarantor authorizes the Lender to verify its credit by, among other things, obtaining credit report(s) when Lender deems it appropriate, and Guarantor shall, not less than once in every 12 month period or upon request by the Lender, submit to the Lender a personal financial statement on a form as provided by Lender.

All financial reports required to be provided under this Guaranty shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Guarantor as being true and correct.

GUARANTOR'S WAIVERS. Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS. Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

STATUTORY LIEN. Guarantor agrees that all Guarantor's obligations under this Guaranty are secured by all shares and deposits in all joint and individual accounts Guarantor has with Lender now and in the future. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty. Shares and deposits in an Individual Retirement Account and any other account that would lose special tax treatment under state or federal law if given as security are not subject to the security interest Guarantor has given in Guarantor's shares and deposits.

SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR. Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

MISCELLANEOUS PROVISIONS. The following miscellaneous provisions are a part of this Guaranty:

Amendments. This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and

signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law.** This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the Commonwealth of Pennsylvania without regard to its conflicts of law provisions.

**Choice of Venue.** If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of Cumberland County, Commonwealth of Pennsylvania.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Unless otherwise provided by applicable law, any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided by applicable law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** The terms of this Guaranty shall be binding upon Guarantor, and upon Guarantor's heirs, personal representatives, successors, and assigns, and shall be enforceable by Lender and its successors and assigns.

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Hauser Estate Inc and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation Jonathan A. Patrono, and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means Members 1st Federal Credit Union, its successors and assigns.

**Note.** The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

CONFESSION OF JUDGMENT. GUARANTOR HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY OR THE PROTHONOTARY OR CLERK OF ANY COURT IN THE COMMONWEALTH OF PENNSYLVANIA, OR ELSEWHERE, TO APPEAR AT ANY TIME FOR GUARANTOR AFTER THE AMOUNTS HEREUNDER BECOME DUE AND WITH OR WITHOUT COMPLAINT FILED, CONFESS OR ENTER JUDGMENT AGAINST GUARANTOR FOR THE ENTIRE PRINCIPAL BALANCE OF THIS GUARANTY AND ALL ACCRUED INTEREST, LATE CHARGES AND ANY AND ALL AMOUNTS EXPENDED OR ADVANCED BY LENDER RELATING TO ANY COLLATERAL SECURING THE INDEBTEDNESS, TOGETHER WITH COSTS OF SUIT, AND AN ATTORNEY'S COMMISSION OF TEN PERCENT (10%) OF THE UNPAID PRINCIPAL BALANCE AND ACCRUED INTEREST FOR COLLECTION, BUT IN ANY EVENT NOT LESS THAN FIVE HUNDRED DOLLARS ($500) ON WHICH JUDGMENT OR JUDGMENTS ONE OR MORE EXECUTIONS MAY ISSUE IMMEDIATELY; AND FOR SO DOING, THIS GUARANTY OR A COPY OF THIS GUARANTY VERIFIED BY AFFIDAVIT SHALL BE SUFFICIENT WARRANT. THE AUTHORITY GRANTED IN THIS GUARANTY TO CONFESS JUDGMENT AGAINST GUARANTOR SHALL NOT BE EXHAUSTED BY ANY EXERCISE OF THAT AUTHORITY, BUT SHALL CONTINUE FROM TIME TO TIME AND AT ALL TIMES UNTIL PAYMENT IN FULL OF ALL AMOUNTS DUE UNDER THIS GUARANTY. GUARANTOR HEREBY WAIVES ANY RIGHT GUARANTOR MAY HAVE TO NOTICE OR TO A HEARING IN CONNECTION WITH ANY SUCH CONFESSION OF JUDGMENT AND STATES THAT EITHER A REPRESENTATIVE OF LENDER SPECIFICALLY CALLED THIS CONFESSION OF JUDGMENT PROVISION TO GUARANTOR'S ATTENTION OR GUARANTOR HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL.

GUARANTOR HEREBY ACKNOWLEDGES AND AGREES THAT GUARANTOR'S REASONABLE EXPECTATION WITH RESPECT TO THE AUTHORIZATION GRANTED PURSUANT TO ANY WARRANT OF ATTORNEY OR POWER OF ATTORNEY HEREUNDER, IS THAT LENDER OR ITS ATTORNEY MAY CONFESS JUDGMENT AS SET FORTH HEREIN, SEEK TO FORECLOSE ON COLLATERAL AND TAKE ALL OTHER ACTIONS WITH RESPECT TO THE EXERCISE OF LENDER'S RIGHTS HEREUNDER. GUARANTOR HEREBY WAIVES ALL OTHER DUTIES OF LENDER THAT MAY ARISE UNDER 20 PA. C.S.A. §5601.3(b). GUARANTOR HEREBY REMISES, RELEASES, AND FOREVER DISCHARGES, AND WAIVES ALL CLAIMS, CAUSES OF ACTION AND ANY OTHER RIGHTS AGAINST, LENDER AND ITS PREDECESSORS, LEGAL REPRESENTATIVES, PAST AND PRESENT PARENT COMPANIES, SUBSIDIARIES, AGENTS, EMPLOYEES, SERVANTS, INSURERS, ATTORNEYS, OFFICERS, DIRECTORS, STOCKHOLDERS, AFFILIATES, AFFILIATE COUNTERPARTIES, SUCCESSORS IN INTEREST, AND ASSIGNS OF AND FROM ANY AND ALL CLAIMS, DEMANDS, DAMAGES, FEES, AND COSTS, SUMS OF MONEY, RIGHTS, CAUSES OF ACTION, OBLIGATIONS AND LIABILITIES OF ANY KIND OR NATURE WHATSOEVER INCLUDING ATTORNEYS' FEES, ARISING UNDER OR RELATING TO ANY DUTIES OF AN AGENT UNDER 20 PA. C.S.A. §5601.3 OR OTHERWISE.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED FEBRUARY 24, 2017.

THIS GUARANTY IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS GUARANTY IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

GUARANTOR:

X _____ (Seal)
Jonathan A. Patrono

---

## INDIVIDUAL ACKNOWLEDGMENT

COMMONWEALTH OF PENNSYLVANIA )
) SS
COUNTY OF _ADAMS_ )

On this, the _24th_ day of _MARCH_, 20 _17_, before me _JENNIFER L. Kulp_, the undersigned Notary Public, personally appeared Jonathan A. Patrono, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he or she executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal.

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
JENNIFER L KULP
Notary Public
GETTYSBURG BORO., ADAMS COUNTY
My Commission Expires Aug 25, 2017

Notary Public in and for the State of _PA_

LaserPro, Ver. 16.4.0.017 Copr. D+H USA Corporation 1997, 2017. All Rights Reserved. - PA Z:\CFI\LPL\E76.FC TR-5356 PR-43

# EXHIBIT G

Print Application Details - Indirect

## Application

App ID: 80111
Created Date: 10/17/2014  05:56 PM  Product: Vehicle Indirect  Sub Product: Auto Ind  Purpose Code: Purchase Auto

## Primary Applicant

Membership Number: 0000405567  Member Loyalty Rewards:

First Name: JONATHAN  Middle Name: A  Last Name: PATRONO  Suffix:
SSN/TIN:  Date of Birth: 10/12/1978  Age: 36 years 0 mos  Marital Status: Unmarried

Residential Status: Own with Mortgage  Time at Address: 1 year 0 mos
Address: 2795 BIGLERVILLE ROAD RO/  Address 2:
City: GETTYSBURG  State: Pennsylvania  Zip: 17325
Monthly Housing Expense: 2,000.00  Mortgage Balance: 2,000.00
Home Phone Number: 717-337-0377  Work Phone Number: 717-334-4888  Work Phone Extension:
Mobile Phone Number:  Email:

Residency Status:  ID Type:  ID State:  ID Number:

## Primary Applicant Income

| Type | Amount | Frequency | Source | Title | Part Time | Hours/ Week | Self Employed | Start Date | End Date |
|---|---|---|---|---|---|---|---|---|---|
| Salary | $120,000.00 | Annually | HAUSER INC | | | | | 10/17/2006 | |

## ☐ Joint Applicant

Membership Number:  Member Loyalty Rewards:

First Name:  Middle Name:  Last Name:  Suffix:
SSN/TIN:  Date of Birth:  Age:  Marital Status:

Residential Status:  Time at Address:
Address:  Address 2:
City:  State:  Zip:
Monthly Housing Expense:  Mortgage Balance:
Home Phone Number:  Work Phone Number:  Work Phone Extension:
Mobile Phone Number:  Email:

Residency Status:  ID Type:  ID State:  ID Number:

## Additional Applicant Income

| Type | Amount | Frequency | Source | Title | Part Time | Hours/ Week | Self Employed | Start Date | End Date |
|---|---|---|---|---|---|---|---|---|---|

## Collateral - Vehicle

Vehicle Type: *Car (Manual)  Collateral Value: 31,262.00
Year: 2015  Make: SUBARU  Model: LEGACY  Sub Model: 4DR SDN H4 AUTO 2.5I LIMI'
Mileage: 5  VIN:

## Loan Terms

Dealer Number: 101  Dealer: Apple Acura Subaru

Final Decision User: Keller, Thomas  Final Decision Date: 10/17/2014  06:11 PM  Final Decision: Approve  Risk Tier High: B

Final Loan Amount: 4,710.00  Term (months): 48  Monthly Payment Amount: 104.75  Dealer Reserve:

Buy Rate: 3.240  Contract Rate:  Dealer Reserve Fee Type:

## Scores

| Model | Average | High | Low | JONATHAN A PATRONO |
|---|---|---|---|---|
| FICO Auto (TransUnion) | 692 | 692 | 692 | 692 |
| TransRisk Bankruptcy | 367 | 367 | 367 | 367 |
| Vantage | 681 | 681 | 681 | 681 |

## Aggregates

| Name | Application | JONATHAN A PATRONO |
|---|---|---|
| Disposable Income Postloan | 6,678.10 | 6,678.10 |
| Total Expenses Payment Postloan | 3,321.90 | 3,321.90 |
| Total Income | 10,000.00 | 10,000.00 |

## Ratios

| Name | Application | JONATHAN A PATRONO |
|---|---|---|
| Debt To Income Expenses Postloan | 33.20% | 33.20% |
| Loan Payment To Income | 1.00% | 1.00% |

M1ST 1198

12/21/2020

Name                                          Application                                    JONATHAN A PATRONO
Loan To Value                                                              15.10%

M1ST 1199
12/21/2020

Print Application Details

### Application

App ID: 410797
Created Date: 10/22/2016  09:24 PM
Product: Vehicle Direct
Sub Product: Auto
Purpose Code: Purchase Auto

### Primary Applicant

Membership Number: 0000405567

Member Loyalty Member Rewards:

First Name: Jonathan
Middle Name:
Last Name: Patrono
Suffix:

SSN/TIN:
Date of Birth: 10/12/1978
Age: 38 years 0 mos
Marital Status: Married

Residential Status: Own with Mortgage
Time at Address: 2 years 0 mos

Address: 2795 BIGLERVILLE RD
Address 2:

City: GETTYSBURG
State: Pennsylvania
Zip: 17325-8046

Monthly Housing Expense: 2,250.00
Mortgage Balance: 492,292.00

Home Phone Number: (717) 337-0377
Work Phone Number: (717) 337-0377
Work Phone Extension:

Mobile Phone Number:
Email: JONPATRONO@YAHOO.COM

Residency Status: US Citizen
ID Type:
ID State:
ID Number:

### Primary Applicant Income

| Type | Amount | Frequency | Source | Title | Part Time | Hours/ Week | Self Employed | Start Date | End Date |
|---|---|---|---|---|---|---|---|---|---|
| Salary | $8,568.91 Monthly | | Hauser Estate Inc | President | | | | 10/22/2008 | 10/22/2016 |
| Additional Income | $0.01 Monthly | | Other household | | | | | 10/21/2016 | |

### Primary Applicant Declarations

| | Description | Explanation |
|---|---|---|
| | Are you obligated to pay Alimony, Child Support or Separate Maintenance? | |
| | Have you declared bankruptcy in the past 7 years? | |

### Joint Applicant

Membership Number:

Member Loyalty Rewards:

First Name:
Middle Name:
Last Name:
Suffix:

SSN/TIN:
Date of Birth:
Age:
Marital Status:

Residential Status:
Time at Address:

Address:
Address 2:

City:
State:
Zip:

Monthly Housing Expense:
Mortgage Balance:

Home Phone Number:
Work Phone Number:
Work Phone Extension:

Mobile Phone Number:
Email:

Residency Status:
ID Type:
ID State:
ID Number:

### Additional Applicant Income

| Type | Amount | Frequency | Source | Title | Part Time | Hours/ Week | Self Employed | Start Date | End Date |
|---|---|---|---|---|---|---|---|---|---|

### Additional Applicant Declarations

| | Description | Explanation |
|---|---|---|
| | Are you obligated to pay Alimony, Child Support or Separate Maintenance? | |
| | Have you declared bankruptcy in the past 7 years? | |

### Collateral - Real Estate

Property Type:
Property Address Line 1:
Property Address Line 2:

Property Address City:
Property Address State:
Property Address Postal Code:

Property Address Township:
Property Address County:
Property Tax ID Number:

Estimated Value:
Appraised Value:

### Loan Terms

Final Decision User: Sweigart, Kathleen
Final Decision Date: 10/24/2016  08:19 AM
Final Decision: Approve
Risk Tier High: D

Final Loan Amount: 56,000.00
Term (months): 72
Interest Rate Actual: 8.840
Monthly Payment Amount: 1,004.83

Is QM: ☐

### Scores

| Model | Average | High | Low | Jonathan Patrono |
|---|---|---|---|---|
| FICO Auto (TransUnion) | 549 | 549 | 549 | 549 |
| TransRisk Bankruptcy | 175 | 175 | 175 | 175 |
| Vantage | 598 | 598 | 598 | 598 |

### Aggregates

| Name | Application | Jonathan Patrono |
|---|---|---|
| Disposable Income Postloan | 2,751.92 | 2,751.92 |
| Number Trades Open | 13.00 | 13.00 |

M1ST 1200

12/21/2020

# EXHIBIT H



June 22, 2011

Hauser Estate, Inc.
28 W. Middle Street
Gettysburg, PA 17325

**Dear Hauser Estate, Inc.:**

Members 1st Federal Credit Union (Lender) is pleased to confirm that Lender is willing to commit a **$300,000.00** (Commitment Amount) line of credit to **Hauser Estate, Inc.** (Borrower) for a three year period, subject to the terms and conditions of this Loan Commitment (Commitment). Line of Credit will be renewed every three years and Lender reserves the right to not renew the line of credit with 30 days notice. Credit extended to Borrower will be subject to the execution of a Note, other loan documentation and security documents that Lender deems necessary and appropriate for transactions of this nature.

**Interest Rate:** The Interest Rate is the Prime Rate plus **one percent (1.00%),** with a floor of **3.99%.** The Prime Rate is the prime rate as published in the Wall Street Journal the first business day of each month. Borrower will pay the loan on the 16th day of each month based on the accrued interest from the previous calendar month. Interest on this Commitment is computed on a 365/365 simple interest basis; that is, by applying the ratio of the annual interest rate over the number of days in a year, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.

**Interest After Default:** Upon default, including failure to pay upon final maturity, Lender, at its option, may, if permitted under the applicable law, increase the interest rate on this Commitment to 15% per annum. The interest rate will not exceed the maximum rate permitted by applicable law. If judgment is entered in connection with this Commitment, interest will continue to accrue on this Commitment after judgment at the existing interest rate provided by this Commitment.

**Collateral:** The loan will be secured by a **second** mortgage and Assignment of Rents on the Real Property located at **410 Cashtown Road, Brigglerville, PA,** a personal guaranty of **Melinda H. Davis, Hannah M. Hauser, Jane H. Patrono, Alan K. Patrono** and **Jonathan A. Patrono,** and corporate guaranty of **Hauser Family Farms, LLC,** and other fixed and current assets of the business deemed necessary by Lender for a secure collateral position.

**Acceptance:** Borrower shall accept the terms of this Commitment by the close of business day on **January 11, 2011,** then this Commitment shall expire automatically, unless extended in writing by Lender. After acceptance by the Borrower, the Commitment shall expire on **July 15, 2011** if the loan is not closed by that date, unless an extension is granted by the Lender.

**Reimbursement of Fees: A $1,000.00 loan documentation fee will apply to the proposed transaction.** In addition, the borrower shall promptly reimburse Lender for, or pay directly, all reasonable costs and expenses including, without limitation, legal fees and disbursements, incurred by Lender in connection with review of the proposed transaction and the

preparation, execution and delivery of this Commitment, the loan application, the loan documentation and any amendment or modification of this Commitment or the loan documentation.

**Conditions Precedent:** Lender's commitment to extend credit to Borrower as described herein is subject to the satisfaction of each of the following conditions precedent in such a manner acceptable to the Lender at its sole discretion:

(A) Appraisal on the property to be **financed** for a total appraised value of not less than **$2,958,334.** The appraisal must be reviewed and accepted by Lender. Lender has sole discretion to approve or reject the appraisal.

(B) An ALTA Title Insurance policy issued in favor of and acceptable to the Lender

(C) A flood map search acceptable to the Lender.

(D) An Environmental Questionnaire and Environmental Screen Report acceptable to the Lender.

(E) Receipt and review of 2008 personal tax return of Jonathan A. Patrono

(F) Qualification of credit union membership and establishment of a member account for borrowing entity seven days prior to loan settlement.

(G) Borrower will maintain Members 1st FCU as the primary financial institution for the checking account(s) and any savings account(s). Borrower may maintain deposits at other financial institutions upon written permission from the Lender.

(H) All necessary insurance information requested by Lender to be provided to Lender prior to or at Loan Closing with Members 1st Federal Credit Union listed as a loss payee in first position.

(I) Borrower agrees to and satisfies all of the terms and conditions of this Commitment

(J) There is no change, occurrence or development prior to the closing that could, in Lender's opinion, have a materially adverse effect on the business, assets, liabilities (actual or contingent), operations, condition (financial or otherwise), or prospects of Borrower.

**Representations and Warranties:** Borrower represents and warrants that all information provided by Borrower to Lender in connection with this application or transaction is and will be at the closing complete and correct in all material respects, and does not and will not contain any untrue statement of a material fact or omit to state a material fact.

**Miscellaneous Provisions:**

**Governing Law:** The Commitment will be governed by, construed and enforced in accordance with federal law and the laws of the Commonwealth of Pennsylvania. This Commitment has been accepted by Lender in the Commonwealth of Pennsylvania.

**Amendments:** This Commitment constitutes the entire understanding and agreement of the parties as to the matters set forth in this Commitment. No alteration of or amendment to this Commitment shall be effective unless given in writing and signed by the parties sought to be charged or bound by the alteration or amendment.

**Severability:** If a court of competent jurisdiction finds any provision of this Commitment to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Commitment. Unless otherwise required by law, the illegality, invalidity, or unenforceable ability of any provision of this Commitment shall not affect any other provision of this Commitment.

**Survival of Representations and Warranties:** Borrower understands and agrees that in making the Commitment, Lender is relying on all representations, warranties, and covenants made by Borrower in this Commitment or in any certificate or other instrument delivered by Borrower to Lender. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Commitment and delivery to Lender of the Related Documents shall be continuing in nature.

Sincerely,


Kristi A. Raykos

Business Loan Officer

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS COMMITMENT. BORROWER ACCEPTS AND AGREES TO THE TERMS OF THE COMMITMENT AS OF _June 22, 2011_____.

**Hauser Estate, Inc.**

X_____

Jonathan A. Patrono

X_Melinda H. Davis, by_ Melinda Hitton-Wood, agent

Melinda H. Davis

X_____

Hannah M. Hauser

**Guarantors:**

X_____, Individually

Jane H. Patrono

X_Melinda H. Davis, by_, Individually Melinda Hitton-Wood, agent

Melinda H. Davis

X_____, Individually

Hannah M. Hauser

X_____, Individually

Alan K. Patrono

X_____, Individually

Jonathan A. Patrono

**Hauser Family Farms, LLC**

X_____

Jane H. Patrono

X _Melinda H Davis,_ by _Melinda Hitta-wood, agent_

Melinda H. Davis

X_____

Hannah M. Hauser

Prepared By: Members 1st FCU
5000 Louise Drive
Mechanicsburg, PA 17055

Return To: Members 1st FCU
Real Estate Department
5000 Louise Drive
Mechanicsburg, PA 17055
(717)-795-6026

## OPEN-END MORTGAGE
## THIS MORTGAGE SECURES FUTURE ADVANCES

AMOUNT OF PRINCIPAL INDEBTEDNESS: $ 100,000.00
THIS MORTGAGE IS DATED 12/24/2010 , between JONATHAN A. PATRONO
AND MELISA NAKAHODO PATRONO
whose address is 160 COUNTRY CLUB LANE, Gettysburg, PA, 17325
(referred to below as "Grantor"); and MEMBERS 1ST FEDERAL CREDIT UNION , whose address is
P.O. Box 40, Mechanicsburg, PA 17055 (referred to below as "Lender"),
a corporation organized and existing under the laws of the Federal Credit Union Act.

1. **GRANT OF MORTGAGE.** For valuable consideration, Grantor grants, bargains, sells, conveys, assigns, transfers, releases, confirms and mortgages to Lender all of Grantor's right, title, and interest in the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all streets, lanes, alleys, passages, and ways; all easements, rights of way, all liberties, privileges, tenements, hereditaments, and appurtenances thereunto belonging or anywise made appurtenant hereafter, and the reversions and remainders with respect thereto; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation any rights the Grantor later acquires in the fee simple title to the land, subject to a Lease, if any, and all minerals, oil, gas, geothermal and similar matters:

All that certain property of the Mortgagor located in CUMBERLAND
TOWNSHIP , Adams County, Pennsylvania.

SEE LEGAL DESCRIPTION

The Real Property or its address is commonly known as 160 COUNTRY CLUB LANE
Gettysburg , PA, 17325
Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all leases of the Property.

Account Number AppID 4479770001

Image ID: 000002976481 Type: GEN
Recorded: 02/11/2011 at 12:11:17 PM
Fee Amt: $93.50 Page 1 of 14
Instr# 201100001947
Adams County, PA
Linda K Myers Register and Recorder
BK 5568 PG 643

2. **DEFINITIONS.** The following words shall have the following meanings when used in this Mortgage. Terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Pennsylvania Uniform Commercial Code.

**Borrower.** The word "Borrower" means each and every person who signs the Line of Credit Home Equity Agreement secured by this Mortgage.

**Credit Agreement.** The words "Credit Agreement" mean the revolving line of credit agreement dated 12/24/2010 between Lender and Grantor with a credit limit of the amount shown on the first page of this Security Instrument, together with all renewals of, extensions of, modifications of, refinancing of, consolidations of, and substitutions for the Credit Agreement. The maturity date of this Mortgage, which is the date by which all Indebtedness under the Credit Agreement and this Mortgage is due is December 31, 2025.

**Grantor.** The word "Grantor" means any and all persons and entities executing this Mortgage, including without limitation all Grantors named above. The Grantor is the mortgagor under this Mortgage. Any Grantor who signs this Mortgage, but does not sign the Credit Agreement, is signing this Mortgage only to grant and convey that Grantor's interest in the Real Property and to grant a security interest in Grantor's interest in the Rents and Personal Property to Lender and is not personally liable under the Credit Agreement except as otherwise provided by contract or law.

**Improvements.** The word "Improvements" means and includes without limitation all existing and future improvements, fixtures, buildings, structures, mobile homes affixed on the Real Property, facilities, additions and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal and interest payable under the Credit Agreement and any amounts expended or advanced by Lender to discharge obligations of Grantor or expenses incurred by Lender to enforce obligations of Grantor under this Mortgage, together with interest on such amounts as provided in this Mortgage. **Specifically, without limitation, this Mortgage secures a revolving line of credit, which obligates Lender to make advances to Grantor so long as Grantor complies with all the terms of the Credit Agreement. Such advances may be made, repaid, and remade from time to time, subject to the limitation that the total outstanding balance owing at any one time, not including finance charges on such balance at a fixed or variable rate or sum as provided in the Credit Agreement, any temporary overages, other charges, and any amounts expended or advanced as provided in this paragraph, shall not exceed the Credit Limit as provided in the Credit Agreement. Notwithstanding the amount outstanding at any particular time, this Mortgage secures the total Credit Agreement amount shown above. The unpaid balance of the revolving line of credit may at certain times be lower than the amount shown or zero. A zero balance does not terminate the line of credit or terminate Lender's obligation to advance funds to Grantor. Therefore, the lien of this Mortgage will remain in full force and effect notwithstanding any zero balance. The liens and security interests created pursuant to this Mortgage covering the Indebtedness which may be created in the future shall relate back to the date of this Mortgage.**

**Lease.** The word "Lease" means any lease between Grantor and the Lessor of the Property.

**Lender.** The word "Lender" means MEMBERS 1ST FEDERAL CREDIT UNION, its successors and assigns. The Lender is the mortgagee under this Mortgage.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

Page 2 of 13

Image ID: 000002976482 Type: GEN
Page 2 of 14
BK 5568 PG 644

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the property, interests and rights described above in the "Grant of Mortgage" section.

**Related Documents.** The words "Related Documents" mean and include without limitation all promissory notes, credit agreements, loan agreements, guaranties, security agreements, mortgages, deeds of trust, and all other instruments and documents, whether now or hereafter existing, executed in connection with Grantor's Indebtedness to Lender.

**Rents.** The word "Rents" means all rents, revenues, income, issues, royalties, and profits from the Property.

THIS MORTGAGE, AND, IF ANY, A SECURITY INTEREST IN THE PERSONAL PROPERTY, IS GIVEN TO SECURE (1) PAYMENT OF THE INDEBTEDNESS AND (2) PERFORMANCE OF ALL OBLIGATIONS OF GRANTOR UNDER THIS MORTGAGE AND THE RELATED DOCUMENTS. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

**3. PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Mortgage, Grantor shall pay to Lender all amounts secured by this Mortgage as they become due, and shall strictly perform all of Grantor's obligations under the Line of Credit Home Equity Agreement and under this Mortgage.

**4. POSSESSION AND MAINTENANCE OF THE PROPERTY.** Grantor agrees that Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.** Until in default, Grantor may remain in possession and control of and operate and manage the Property and collect the Rents from the Property.

**Duty to Maintain.** Grantor shall maintain the Property in tenantable condition and promptly perform all repairs and maintenance necessary to preserve its value.

**Hazardous Substances.** Grantor represents and warrants that the Property never has been, and never will be so long as this Mortgage remains a lien on the Property, used for the generation, manufacture, storage, treatment, disposal, release or threatened release of any hazardous waste or substance, as those terms are defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act ("SARA"), applicable state or Federal laws, or regulations adopted pursuant to any of the foregoing. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Grantor hereby (a) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Lender against any and all claims and losses resulting from a breach of this paragraph of the Mortgage. This obligation to indemnify shall survive the payment of the Indebtedness and the satisfaction of this Mortgage.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Specifically without limitation, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), soil, gravel or rock products without the prior written consent of Lender.

**Lender's Right to Enter.** Lender and its agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

Page 3 of 13

Image ID: 000002976483  Type: GEN
Page 3 of 14

BK 5568 PG 645

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations of all governmental authorities applicable to the use or occupancy of the Property. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon nor leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**5.  COMPLIANCE WITH LEASE.** If there is a Lease on the Property, Grantor will pay all rents and will strictly observe and perform on a timely basis all other terms, covenants, and conditions of the Lease. Grantor further agrees (a) not to surrender, terminate, or cancel the Lease, and (b) not to modify, change, supplement, alter, or amend the Lease, either orally or in writing, without Lender's prior written consent. No estate in the Property, whether fee title to the leasehold premises, the leasehold estate, or any subleasehold estate, will merge without Lender's express written consent; rather these estates will remain separate and distinct, even if there is a union of these estates in the landlord, Grantor, or a third party who purchases or otherwise acquires the estates. Grantor further agrees that if Grantor acquires all or a portion of the fee simple title, or any other leasehold or subleasehold title to the Property, that title will, at Lender's option, immediately become subject to the terms of this Mortgage, and Grantor will execute, deliver and record all documents necessary or appropriate to assure that such title is secured by this

**6.  REHABILITATION LOAN AGREEMENT.** Grantor shall fulfill all of Grantor's obligations under any home rehabilitation, improvement, repair, or other loan agreement which Grantor may enter into with Lender. Lender, at Lender's option, may require Grantor to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Grantor may have against parties who supply labor, materials or services in connection with improvements made to the Property

**7.  DUE ON SALE - CONSENT BY LENDER.** Lender may, at its option, have the right to accelerate, that is, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without the Lender's prior written consent, of all or any pad of the Reel Property, or any interest in the Real Property. If Grantor sells or transfers the Real Property without the written consent of Lender, then, prior to acceleration Lender shall give notice to Grantor. The notice shall provide a period of not less than ten (10) days from the date of the notice within which Grantor may pay the sums declared due. If Grantor fails to pay those sums prior to the expiration of such period, Lender may, without further notice or demand on Grantor, invoke any remedies permitted in this Mortgage. A "sale or transfer" means the conveyance of Real Property or any right, title or interest therein; whether legal or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of Real Property interest. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Pennsylvania law.

**8.  TRANSFER OF PROPERTY.** The following provisions relating to the transfer of the Real Property are a pad of this Mortgage:

**Notice of Transfer.** Grantor shall give notice to Lender, as provided in this Mortgage, prior to any sale or transfer of all or part of the Property or any rights in the Real Property. Any person to whom all or part of the Real Property is sold or transferred also shall be obligated to give notice to Lender, as provided in this Mortgage, promptly after such transfer.

Page 4 of 13

Image ID: 000002976484  Type: GEN
Page 4 of 14

BK5568 PG646

**Advances After Transfer.** All amounts advanced under the Line of Credit Home Equity Agreement, up to the Credit Limit, are secured by this Mortgage, whether advanced before or after sale or transfer of the Real Property, except any amounts which may be advanced by Lender more than five (5) days after notice to Lender, as provided in this Mortgage, that such transfer or sale has occurred. Even if Grantor transfers the Real Property, Grantor will continue to be obligated under the Credit Agreement and this Mortgage unless Lender releases Grantor in writing. As a condition to Lender's consent to any proposed transfer or as a condition to the release of Grantor, Lender may require that the person to whom the Real Property is transferred sign an assumption agreement satisfactory to Lender and Lender may impose an assumption fee. The assumption agreement will not entitle the person signing it to receive advances under the Credit Agreement.

**9.    TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are a pad of this Mortgage.

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Mortgage, except for the lien of taxes and assessments not due, except for the Existing Indebtedness referred to below, and except as otherwise provided in the following paragraph.

**Right To Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be assigned on account of the work, services, or materials and the cost exceeds $10,000.00. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

Image ID: 000002976485  Type: GEN
Page 5 of 14
BK 5568 PG 647

**10. PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage.

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. If the Real Property is located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain Federal Flood Insurance to the extent such insurance is required and is available for the term of the loan and for the full unpaid principal balance of the loan. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of ten (10) days' prior written notice to Lender.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property if the estimated cost of repair or replacement exceeds $10,000.00. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. If, in Lender's judgment, the restoration or repair is economically feasible and Lender's security is not lessened, insurance proceeds shall be applied to restoration or repair of the damaged Property. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Mortgage whether or not then due, with any excess paid to Grantor. If Grantor abandons the Property, or does not answer within thirty (30) days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Mortgage, whether or not then due.

**Unexpired Insurance at Sale.** Any unexpired insurance shall inure to the benefit of, and pass to, the purchaser of the Property covered by this Mortgage at any trustee's sale or other sale held under the provision of this Mortgage, or at any foreclosure sale of such Property.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Mortgage, to the extent compliance with the terms of this Mortgage would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Mortgage for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**11. EXPENDITURES BY LENDER.** If Grantor fails to comply with any provision of this Mortgage, including any obligation to maintain Existing Indebtedness in good standing as required below, or if any action or proceeding is commenced that would materially affect Lender's interests in the Property, Lender on Grantor's behalf may, upon notice to Grantor, but shall not be required to, take any action that Lender deems appropriate. Any amount that Lender expends in so doing will bear interest at the rate charged under the Credit Agreement from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses, at Lender's option, will (a) be payable on demand, or (b) be added to the balance of the credit line. This Mortgage also will secure payment of these amounts. The rights provided for in this paragraph shall be in addition to any other rights or any remedies to which Lender may be entitled on account of the default. Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had.

Image ID: 000002976486 Type: GEN
Page 6 of 14

BK 5568 PG 648

Page 6 of 13

**12. WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage.

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property (including a leasehold interest, if any), free and clear of all liens and encumbrances except those of record, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**13. EXISTING INDEBTEDNESS.** The following provisions concerning existing indebtedness (the "Existing Indebtedness") are a part of this Mortgage.

**Existing Lien.** The lien of this Mortgage securing the Indebtedness may be secondary and inferior to an existing lien, if there is such a lien. Grantor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such Indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

**No Modification.** Grantor shall not enter into any agreement with the holder of any mortgage or other security agreement which has priority over this Mortgage by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. Grantor shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**14. CONDEMNATION.** The following provisions relating to condemnation of the Property are a part of this Mortgage.

**Application of Net Proceeds.** If all or any part of the Property is condemned, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness under the Line of Credit Home Equity Agreement, subject to the terms of any mortgage or deed of trust with a lien which has priority over this Mortgage. The net proceeds of the award shall mean the award after payment of all actual costs, expenses, and attorneys' fees necessarily paid or incurred by Grantor or Lender in connection with the condemnation.

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments as may be requested by it from time to time to permit such participation.

Image ID: 000002976487 Type: GEN
Page 7 of 14

BK 5568 PG 649

**15. IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (a) a specific tax upon this type of Mortgage or upon all or any pad of the Indebtedness secured by this Mortgage; (b) a specific tax on Grantor which Grantor is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (c) a tax on this type of Mortgage chargeable against the Lender or the holder of the Credit Agreement; and (d) a specific tax on all or any portion of the indebtedness or on payments of principal and interest made by Grantor.

**16. FURTHER ASSURANCES.** The following provisions relating to further assurances are a part of this Mortgage.

**Further Assurances.** Upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (a) the obligations of Grantor under the Credit Agreement, this Mortgage, and the Related Documents, and (b) the liens and security interests created by this Mortgage on the Property. Unless prohibited by law or agreed to the contrary by Lender in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**17. FULL PERFORMANCE.** If Grantor pays all the Indebtedness when due, terminates the credit line account, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**18. DEFAULT.** Each of the following, at the option of Lender, shall constitute an event of default ("Event of Default") under this Mortgage: (a) Grantor commits fraud or makes a material misrepresentation at any time in connection with the credit line account. This can include, for example, a false statement about Grantor's income, assets, liabilities, or any other aspects of Grantor's financial condition. (b) Grantor does not meet the repayment terms of the credit line account. (c) Grantor's action or inaction adversely affects the collateral for the credit line account or Lender's rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a lien on the dwelling without Lender's permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

Image ID: 000002976488 Type: GEN
Page 8 of 14

BK **5568** PG **650**

**19. GRANTOR'S RIGHT TO CURE.** Upon the occurrence of any Event of Default (other than fraud or material misrepresentation) and prior to exercising any of the rights and remedies provided in this Mortgage or by law, Lender shall give notice as provided in the Mortgage and as required by applicable law. The notice may be combined or sent with any notice required by applicable law and shall specify: (a) the Event of Default; (b) the action required to cure the default; (c) a date not less than thirty (30) days (or any longer period as required by applicable law or elsewhere in this Mortgage) from the date the notice is given to Grantor by which the default must be cured and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Mortgage and sale of the property. The notice shall further inform Grantor of the right to reinstate after acceleration and the right to assert in a foreclosure proceeding the nonexistence of an event of default or any other defense of Grantor to acceleration and sale. However if Lender has given Grantor a right to cure with respect to a prior Event of Default which occurred within three hundred sixty-five (365) days of the present event of Default, Grantor shall not be entitled to receive the right to cure described in this paragraph.

**20. RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of any Event of Default and at any time thereafter, Lender, at its option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Subject to applicable law, Lender shall have the right at its option to declare the entire Indebtedness immediately due and payable.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Possession of the Property.** For the purpose of procuring possession of the Property, Grantor hereby authorizes and empowers any attorney of any court of record in the Commonwealth of Pennsylvania or elsewhere, as attorney for Lender and all persons claiming under or through Lender, to sign an agreement for entering in any competent court an amicable court action in ejectment for possession of the Property and to appear for and confess judgment against Grantor, and against all persons claiming under or through Grantor, for the recovery by Lender of possession of the Property, without any stay of execution, for which this Mortgage, or a copy of this Mortgage verified by affidavit, shall be a sufficient warrant; and thereupon a writ of possession may be issued forthwith, without any prior writ or proceeding whatsoever.

**Nonjudicial Sale.** If permitted by applicable law, Lender may foreclose Grantor's interest in all or in any part of the Personal Property or the Real Property by non judicial sale.

**Deficiency Judgment.** Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (a) pay a reasonable rental for the use of the Property, or (b) vacate the Property immediately upon the demand of Lender.

Page 9 of 13

Image ID: 000002976489 Type: GEN
Page 9 of 14
BK 5568 PG 651

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Line of Credit Home Equity Agreement or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Grantor hereby waives any and all right to have the property marshaled. In exercising its rights and remedies, Lender shall be free to sell all or any pad of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender shall give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Unless otherwise required by applicable law, reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition.

**Waiver; Election of Remedies.** A waiver by any party of a breach of a provision of this Mortgage shall not constitute a waiver of or prejudice the party's rights otherwise to demand strict compliance with that provision or any other provision. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or take action to perform an obligation of Grantor under this Mortgage after failure of Grantor to perform shall not affect Lender's right to declare a default and exercise its remedies under this Mortgage.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and on any appeal. Whether or not any court action is involved, all reasonable expenses incurred by Lender that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest from the date of expenditure until repaid at the Credit Agreement rate. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

21.    **GRANTOR'S RIGHT TO REINSTATE.** If Grantor meets certain conditions, Grantor shall have the right to have enforcement of this Mortgage discontinued at any time prior to the earlier of (i) five (5) days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Mortgage or (ii) entry of a judgment enforcing this Mortgage. Those conditions are that Grantor: (a) pays Lender all sums which would then be due under this Mortgage and the Credit Agreement had no acceleration occurred; (b) cures all other defaults under this Mortgage and the Credit Agreement; (c) pays all reasonable expenses incurred in enforcing this Mortgage, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Mortgage, Lender's rights in the Property and Grantor's obligation to pay the sums secured by this Mortgage shall continue unchanged. Upon reinstatement by Grantor, this Mortgage and the obligations secured hereby shall remain fully effective as if no acceleration had occurred but Lender shall not be obligated to make any more credit advances. This right to reinstate shall apply if Grantor has not previously exercised the right to reinstate under this same Mortgage.

**22. NOTICES TO GRANTOR AND OTHER PARTIES.** Unless otherwise provided by applicable law, any notice under this Mortgage shall be in writing and shall be effective when actually delivered or, if mailed, shall be deemed effective when deposited in the United States mail first class, registered mail, postage prepaid, directed to the addresses shown near the beginning of this Mortgage. Any party may change its address for notices under this Mortgage by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address.

**23. ASSOCIATION OF UNIT OWNERS.** The following provisions apply if the Real Property has been submitted to unit ownership law or similar law for the establishment of condominiums or cooperative ownership of the Real Property:

**Power of Attorney.** Grantor grants an irrevocable power of attorney to Lender to vote in its discretion on any matter that may come before the association of unit owners. Lender shall have the right to exercise this power of attorney only after default by Grantor; however, Lender may decline to exercise this power as it sees fit.

**Insurance.** The insurance as required above may be carried by the association of unit owners on Grantor's behalf, and the proceeds of such insurance may be paid to the association of unit owners for the purpose of repairing or reconstructing the Property. If not so used by the association, such proceeds shall be paid to Lender.

**Compliance with Regulations of Association.** Grantor shall perform all of the obligations imposed on Grantor by the declaration submitting the Real Property to unit ownership, by the bylaws of the association of unit owners, or by any rules or regulations thereunder. If Grantor's interest in the Real Property is a leasehold interest and such property has been submitted to unit ownership, Grantor shall perform all of the obligations imposed on Grantor by the lease of the Real Property from its owner.

**24. MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** This Mortgage, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Mortgage. No alteration of or amendment to this Mortgage shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Applicable Law.** This Mortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Grantor's Copy of Documents.** Lender agrees to provide Grantor with a conformed copy of both the Line of Credit Home Equity Agreement and this Mortgage at the time they are executed or within a reasonable time after this Mortgage is recorded.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Mortgage to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Mortgage in all other respects shall remain valid and enforceable.

Image ID: 000002976491 Type: GEN
Page 11 of 14
BK 5568 PG 653

**Successors and Assigns.** Subject to the limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their heirs, personal representatives, successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the indebtedness.

**Time Is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Waivers and Consents.** Lender shall not be deemed to have waived any rights under this Mortgage (or under the Related Documents) unless such waiver is in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by any party of a provision of this Mortgage shall not constitute a waiver of or prejudice the party's right otherwise to demand strict compliance with that provision or any other provision. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or any of Grantor's obligations as to any future transactions. Whenever consent by Lender is required in this Mortgage, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required.

Image ID: 000002876492 Type: GEN
Page 12 of 14
BK 5568 PG 654

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND GRANTOR AGREES TO ITS TERMS.

GRANTOR:

X _____ (seal)
JONATHAN A. PATRONO

X _____ (seal)
MELISA NAKAHODO PATRONO

Signed, acknowledged and delivered in the presence of:

X _____
Witness

X _____
Witness

COMMONWEALTH OF PENNSYLVANIA, _Cumberland_ County ss.:

On this, the _3rd_ day of _February_ _2011_, before me, _Jody L. Travis_ the undersigned officer, personally appeared JONATHAN A. PATRONO AND MELISA NAKAHODO PATRONO

known to me (or satisfactorily proven) to be the person(s) whose name(s) _____ subscribed to the within instrument and acknowledged that _____ executed the same for the purposes herein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.
My Commission expires:

_____
Title of Officer

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Jody L. Travis, Notary Public
Lower Allen Twp., Cumberland County
My Commission Expires Sept. 29, 2012
Member, Pennsylvania Association of Notaries

## Certificate of Residence of Mortgagee

Members 1st Federal Credit Union, Mortgagee within named, hereby certifies that its residence is 5000 Louise Drive, Mechanicsburg, PA 17055.

By _Patricia Keys_

Page 13 of 13

Image ID: 000002976493 Type: GEN
Page 13 of 14
BK 5568 PG 655

Order ID: 625779

## LEGAL DESCRIPTION

Parcel No: 09F13.0010

All that certain lot or piece of ground situate in Cumberland Township, County of Adams, Commonwealth of Pennsylvania bounded and described as follows:

BEGINNING at the Southwest corner of Loy No 11 and the Northwest corner of Lot No 12  on the East side of the roadway of the West side of the Country Club; thence along the line of Lot No 11 South 60 degrees 45 minutes East 150 feet to a stake; thence along the Gettysburg Country Club Golf Course South 29 degrees 15 minutes West 200 feet to a stake; thence along the Western part of Lot No 13 North 60 degrees  45 minutes West 150 feet to the East side of said roadway; thence along said roadway North 29 degrees 15 minutes East 200 feet to the place of BEGINNING.

Subject to any right-of-ways, easements, restrictions, and/or adverses that pertain to this property

Image ID: 000002976494 Type: GEN
Page 14 of 14
BK 5568 PG 656

Prepared By: Members 1st FCU
5000 Louise Drive
Mechanicsburg, PA 17055

Return To: Members 1st FCU
Real Estate Department
5000 Louise Drive
Mechanicsburg, PA 17055
(717)-795-6026

## OPEN-END MORTGAGE
## THIS MORTGAGE SECURES FUTURE ADVANCES

**AMOUNT OF PRINCIPAL INDEBTEDNESS: $** 118,000.00

**THIS MORTGAGE IS DATED** 05/31/2011 , between JONATHAN A. PATRONO

AND MELISA NAKAHODO PATRONO

whose address is 160 COUNTRY CLUB LANE, Gettysburg, PA, 17325

(referred to below as "Grantor"); and MEMBERS 1ST FEDERAL CREDIT UNION , whose address is

P.O. Box 40, Mechanicsburg, PA 17055 (referred to below as "Lender"),

a corporation organized and existing under the laws of the Federal Credit Union Act.

1. GRANT OF MORTGAGE. For valuable consideration, Grantor grants, bargains, sells, conveys, assigns, transfers, releases, confirms and mortgages to Lender all of Grantor's right, title, and interest in the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all streets, lanes, alleys, passages, and ways; all easements, rights of way, all liberties, privileges, tenements, hereditaments, and appurtenances thereunto belonging or anywise made appurtenant hereafter, and the reversions and remainders with respect thereto; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation any rights the Grantor later acquires in the fee simple title to the land, subject to a Lease, if any, and all minerals, oil, gas, geothermal and similar matters:

All that certain property of the Mortgagor located in CUMBERLAND
TOWNSHIP , Adams County, Pennsylvania.

The Real Property or its address is commonly known as 160 COUNTRY CLUB LANE
Gettysburg , PA, 17325

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all leases of the Property.

Account Number_____ App ID 4922440001

Image ID: 000003010947 Type: GEN
Recorded: 06/16/2011 at 11:46:40 AM
Fee Amt: $93.50 Page 1 of 14
Instr# 201100007937
Adams County, PA
Linda K Myers Register and Recorder
BK 5606 PG 460

**2. DEFINITIONS.** The following words shall have the following meanings when used in this Mortgage. Terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Pennsylvania Uniform Commercial Code.

**Borrower.** The word "Borrower" means each and every person who signs the Line of Credit Home Equity Agreement secured by this Mortgage.

**Credit Agreement.** The words "Credit Agreement" mean the revolving line of credit agreement dated 05/31/2011 between Lender and Grantor with a credit limit of the amount shown on the first page of this Security Instrument, together with all renewals of, extensions of, modifications of, refinancing of, consolidations of, and substitutions for the Credit Agreement. The maturity date of this Mortgage, which is the date by which all indebtedness under the Credit Agreement and this Mortgage is due is May 31, 2026.

**Grantor.** The word "Grantor" means any and all persons and entities executing this Mortgage, including without limitation all Grantors named above. The Grantor is the mortgagor under this Mortgage. Any Grantor who signs this Mortgage, but does not sign the Credit Agreement, is signing this Mortgage only to grant and convey that Grantor's interest in the Real Property and to grant a security interest in Grantor's interest in the Rents and Personal Property to Lender and is not personally liable under the Credit Agreement except as otherwise provided by contract or law.

**Improvements.** The word "Improvements" means and includes without limitation all existing and future improvements, fixtures, buildings, structures, mobile homes affixed on the Real Property, facilities, additions and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal and interest payable under the Credit Agreement and any amounts expended or advanced by Lender to discharge obligations of Grantor or expenses incurred by Lender to enforce obligations of Grantor under this Mortgage, together with interest on such amounts as provided in this Mortgage. **Specifically, without limitation, this Mortgage secures a revolving line of credit, which obligates Lender to make advances to Grantor so long as Grantor complies with all the terms of the Credit Agreement. Such advances may be made, repaid, and remade from time to time, subject to the limitation that the total outstanding balance owing at any one time, not including finance charges on such balance at a fixed or variable rate or sum as provided in the Credit Agreement, any temporary overages, other charges, and any amounts expended or advanced as provided in this paragraph, shall not exceed the Credit Limit as provided in the Credit Agreement. Notwithstanding the amount outstanding at any particular time, this Mortgage secures the total Credit Agreement amount shown above. The unpaid balance of the revolving line of credit may at certain times be lower than the amount shown or zero. A zero balance does not terminate the line of credit or terminate Lender's obligation to advance funds to Grantor. Therefore, the lien of this Mortgage will remain in full force and effect notwithstanding any zero balance. The liens and security interests created pursuant to this Mortgage covering the Indebtedness which may be created in the future shall relate back to the date of this Mortgage.**

**Lease.** The word "Lease" means any lease between Grantor and the Lessor of the Property.

**Lender.** The word "Lender" means MEMBERS 1ST FEDERAL CREDIT UNION, its successors and assigns. The Lender is the mortgagee under this Mortgage.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

Image ID: 000003010948 Type: GEN
Page 2 of 14
BK 5606 PG 461

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the property, interests and rights described above in the "Grant of Mortgage" section.

**Related Documents.** The words "Related Documents" mean and include without limitation all promissory notes, credit agreements, loan agreements, guaranties, security agreements, mortgages, deeds of trust, and all other instruments and documents, whether now or hereafter existing, executed in connection with Grantor's Indebtedness to Lender.

**Rents.** The word "Rents" means all rents, revenues, income, issues, royalties, and profits from the Property.

THIS MORTGAGE, AND, IF ANY, A SECURITY INTEREST IN THE PERSONAL PROPERTY, IS GIVEN TO SECURE (1) PAYMENT OF THE INDEBTEDNESS AND (2) PERFORMANCE OF ALL OBLIGATIONS OF GRANTOR UNDER THIS MORTGAGE AND THE RELATED DOCUMENTS. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

3.    **PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Mortgage, Grantor shall pay to Lender all amounts secured by this Mortgage as they become due, and shall strictly perform all of Grantor's obligations under the Line of Credit Home Equity Agreement and under this Mortgage.

4.    **POSSESSION AND MAINTENANCE OF THE PROPERTY.** Grantor agrees that Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.** Until in default, Grantor may remain in possession and control of and operate and manage the Property and collect the Rents from the Property.

**Duty to Maintain.** Grantor shall maintain the Property in tenantable condition and promptly perform all repairs and maintenance necessary to preserve its value.

**Hazardous Substances.** Grantor represents and warrants that the Property never has been, and never will be so long as this Mortgage remains a lien on the Property, used for the generation, manufacture, storage, treatment, disposal, release or threatened release of any hazardous waste or substance, as those terms are defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act ("SARA"), applicable state or Federal laws, or regulations adopted pursuant to any of the foregoing. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Grantor hereby (a) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Lender against any and all claims and losses resulting from a breach of this paragraph of the Mortgage. This obligation to indemnify shall survive the payment of the Indebtedness and the satisfaction of this Mortgage.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Specifically without limitation, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), soil, gravel or rock products without the prior written consent of Lender.

**Lender's Right to Enter.** Lender and its agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

Page 3 of 13

Image ID: 000003010949 Type: GEN
Page 3 of 14

BK **5606** PG **462**

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations of all governmental authorities applicable to the use or occupancy of the Property. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon nor leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**5. COMPLIANCE WITH LEASE.** If there is a Lease on the Property, Grantor will pay all rents and will strictly observe and perform on a timely basis all other terms, covenants, and conditions of the Lease. Grantor further agrees (a) not to surrender, terminate, or cancel the Lease, and (b) not to modify, change, supplement, alter, or amend the Lease, either orally or in writing, without Lender's prior written consent. No estate in the Property, whether fee title to the leasehold premises, the leasehold estate, or any subleasehold estate, will merge without Lender's express written consent; rather these estates will remain separate and distinct, even if there is a union of these estates in the landlord, Grantor, or a third party who purchases or otherwise acquires the estates. Grantor further agrees that if Grantor acquires all or a portion of the fee simple title, or any other leasehold or subleasehold title to the Property, that title will, at Lender's option, immediately become subject to the terms of this Mortgage, and Grantor will execute, deliver and record all documents necessary or appropriate to assure that such title is secured by this

**6. REHABILITATION LOAN AGREEMENT.** Grantor shall fulfill all of Grantor's obligations under any home rehabilitation, improvement, repair, or other loan agreement which Grantor may enter into with Lender. Lender, at Lender's option, may require Grantor to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Grantor may have against parties who supply labor, materials or services in connection with improvements made to the Property

**7. DUE ON SALE - CONSENT BY LENDER.** Lender may, at its option, have the right to accelerate, that is, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without the Lender's prior written consent, of all or any pad of the Reel Property, or any interest in the Real Property. If Grantor sells or transfers the Real Property without the written consent of Lender, then, prior to acceleration Lender shall give notice to Grantor. The notice shall provide a period of not less than ten (10) days from the date of the notice within which Grantor may pay the sums declared due. If Grantor fails to pay those sums prior to the expiration of such period, Lender may, without further notice or demand on Grantor, invoke any remedies permitted in this Mortgage. A "sale or transfer" means the conveyance of Real Property or any right, title or interest therein; whether legal or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of Real Property interest. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Pennsylvania law.

**8. TRANSFER OF PROPERTY.** The following provisions relating to the transfer of the Real Property are a pad of this Mortgage:

**Notice of Transfer.** Grantor shall give notice to Lender, as provided in this Mortgage, prior to any sale or transfer of all or part of the Property or any rights in the Real Property. Any person to whom all or part of the Real Property is sold or transferred also shall be obligated to give notice to Lender, as provided in this Mortgage, promptly after such transfer.

Page 4 of 13

Image ID: 000003010950 Type: GEN
Page 4 of 14

BK5606 PG463

**Advances After Transfer.** All amounts advanced under the Line of Credit Home Equity Agreement, up to the Credit Limit, are secured by this Mortgage, whether advanced before or after sale or transfer of the Real Property, except any amounts which may be advanced by Lender more than five (5) days after notice to Lender, as provided in this Mortgage, that such transfer or sale has occurred. Even if Grantor transfers the Real Property, Grantor will continue to be obligated under the Credit Agreement and this Mortgage unless Lender releases Grantor in writing. As a condition to Lender's consent to any proposed transfer or as a condition to the release of Grantor, Lender may require that the person to whom the Real Property is transferred sign an assumption agreement satisfactory to Lender and Lender may impose an assumption fee. The assumption agreement will not entitle the person signing it to receive advances under the Credit Agreement.

9.   **TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are a pad of this Mortgage.

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Mortgage. except for the lien of taxes and assessments not due, except for the Existing Indebtedness referred to below, and except as otherwise provided in the following paragraph.

**Right To Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be assigned on account of the work, services, or materials and the cost exceeds $10,000.00. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

Image ID: 000003010951 Type: GEN
Page 5 of 14

BK5606 PG464

**10.    PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage.

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. If the Real Property is located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain Federal Flood Insurance to the extent such insurance is required and is available for the term of the loan and for the full unpaid principal balance of the loan. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of ten (10) days' prior written notice to Lender.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property if the estimated cost of repair or replacement exceeds $10,000.00. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. If, in Lender's judgment, the restoration or repair is economically feasible and Lender's security is not lessened, insurance proceeds shall be applied to restoration or repair of the damaged Property. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Mortgage whether or not then due, with any excess paid to Grantor. If Grantor abandons the Property, or does not answer within thirty (30) days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Mortgage, whether or not then due.

**Unexpired Insurance at Sale.** Any unexpired insurance shall inure to the benefit of, and pass to, the purchaser of the Property covered by this Mortgage at any trustee's sale or other sale held under the provision of this Mortgage, or at any foreclosure sale of such Property.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Mortgage, to the extent compliance with the terms of this Mortgage would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Mortgage for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**11.    EXPENDITURES BY LENDER.** If Grantor fails to comply with any provision of this Mortgage, including any obligation to maintain Existing Indebtedness in good standing as required below, or if any action or proceeding is commenced that would materially affect Lender's interests in the Property, Lender on Grantor's behalf may, upon notice to Grantor, but shall not be required to, take any action that Lender deems appropriate. Any amount that Lender expends in so doing will bear interest at the rate charged under the Credit Agreement from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses, at Lender's option, will (a) be payable on demand, or (b) be added to the balance of the credit line. This Mortgage also will secure payment of these amounts. The rights provided for in this paragraph shall be in addition to any other rights or any remedies to which Lender may be entitled on account of the default. Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had.

**12. WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage.

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property (including a leasehold interest, if any), free and clear of all liens and encumbrances except those of record, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**13. EXISTING INDEBTEDNESS.** The following provisions concerning existing Indebtedness (the "Existing Indebtedness") are a part of this Mortgage.

**Existing Lien.** The lien of this Mortgage securing the Indebtedness may be secondary and inferior to an existing lien, if there is such a lien. Grantor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

**No Modification.** Grantor shall not enter into any agreement with the holder of any mortgage or other security agreement which has priority over this Mortgage by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. Grantor shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**14. CONDEMNATION.** The following provisions relating to condemnation of the Property are a part of this Mortgage.

**Application of Net Proceeds.** If all or any part of the Property is condemned, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness under the Line of Credit Home Equity Agreement, subject to the terms of any mortgage or deed of trust with a lien which has priority over this Mortgage. The net proceeds of the award shall mean the award after payment of all actual costs, expenses, and attorneys' fees necessarily paid or incurred by Grantor or Lender in connection with the condemnation.

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments as may be requested by it from time to time to permit such participation.

Image ID: 000003010953 Type: GEN
Page 7 of 14

BK 5606 PG 466

Page 7 of 13

15. **IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (a) a specific tax upon this type of Mortgage or upon all or any pad of the Indebtedness secured by this Mortgage; (b) a specific tax on Grantor which Grantor is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (c) a tax on this type of Mortgage chargeable against the Lender or the holder of the Credit Agreement; and (d) a specific tax on all or any portion of the indebtedness or on payments of principal and interest made by Grantor.

16. **FURTHER ASSURANCES.** The following provisions relating to further assurances are a part of this Mortgage.

**Further Assurances.** Upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (a) the obligations of Grantor under the Credit Agreement, this Mortgage, and the Related Documents, and (b) the liens and security interests created by this Mortgage on the Property. Unless prohibited by law or agreed to the contrary by Lender in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

17. **FULL PERFORMANCE.** If Grantor pays all the Indebtedness when due, terminates the credit line account, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

18. **DEFAULT.** Each of the following, at the option of Lender, shall constitute an event of default ("Event of Default") under this Mortgage: (a) Grantor commits fraud or makes a material misrepresentation at any time in connection with the credit line account. This can include, for example, a false statement about Grantor's income, assets, liabilities, or any other aspects of Grantor's financial condition. (b) Grantor does not meet the repayment terms of the credit line account. (c) Grantor's action or inaction adversely affects the collateral for the credit line account or Lender's rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a lien on the dwelling without Lender's permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

Image ID: 000003010954 Type: GEN
Page 8 of 14

BK 5606 PG 467

Page 8 of 13

**19.   GRANTOR'S RIGHT TO CURE.**   Upon the occurrence of any Event of Default (other than fraud or material misrepresentation) and prior to exercising any of the rights and remedies provided in this Mortgage or by law, Lender shall give notice as provided in the Mortgage and as required by applicable law. The notice may be combined or sent with any notice required by applicable law and shall specify: (a) the Event of Default; (b) the action required to cure the default; (c) a date not less than thirty (30) days (or any longer period as required by applicable law or elsewhere in this Mortgage) from the date the notice is given to Grantor by which the default must be cured and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Mortgage and sale of the property. The notice shall further inform Grantor of the right to reinstate after acceleration and the right to assert in a foreclosure proceeding the nonexistence of an event of default or any other defense of Grantor to acceleration and sale. However if Lender has given Grantor a right to cure with respect to a prior Event of Default which occurred within three hundred sixty-five (365) days of the present event of Default, Grantor shall not be entitled to receive the right to cure described in this paragraph.

**20.   RIGHTS AND REMEDIES ON DEFAULT.**   Upon the occurrence of any Event of Default and at any time thereafter, Lender, at its option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.**   Subject to applicable law, Lender shall have the right at its option to declare the entire Indebtedness immediately due and payable.

**Appoint Receiver.**   Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.**   Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Possession of the Property.**   For the purpose of procuring possession of the Property, Grantor hereby authorizes and empowers any attorney of any court of record in the Commonwealth of Pennsylvania or elsewhere, as attorney for Lender and all persons claiming under or through Lender, to sign an agreement for entering in any competent court an amicable action in ejectment for possession of the Property and to appear for and confess judgment against Grantor, and against all persons claiming under or through Grantor, for the recovery by Lender of possession of the Property, without any stay of execution, for which this Mortgage, or a copy of this Mortgage verified by affidavit, shall be a sufficient warrant; and thereupon a writ of possession may be issued forthwith, without any prior writ or proceeding whatsoever.

**Nonjudicial Sale.**   If permitted by applicable law, Lender may foreclose Grantor's interest in all or in any part of the Personal Property or the Real Property by non judicial sale.

**Deficiency Judgment.**   Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Tenancy at Sufferance.**   If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (a) pay a reasonable rental for the use of the Property, or (b) vacate the Property immediately upon the demand of Lender.

Page 9 of 13

Image ID: 000003010955 Type: GEN
Page 9 of 14

BK **5606** PG **468**

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Line of Credit Home Equity Agreement or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Grantor hereby waives any and all right to have the property marshaled. In exercising its rights and remedies, Lender shall be free to sell all or any pad of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender shall give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Unless otherwise required by applicable law, reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition.

**Waiver; Election of Remedies.** A waiver by any party of a breach of a provision of this Mortgage shall not constitute a waiver of or prejudice the party's rights otherwise to demand strict compliance with that provision or any other provision. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or take action to perform an obligation of Grantor under this Mortgage after failure of Grantor to perform shall not affect Lender's right to declare a default and exercise its remedies under this Mortgage.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and on any appeal. Whether or not any court action is involved, all reasonable expenses incurred by Lender that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest from the date of expenditure until repaid at the Credit Agreement rate. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

21. **GRANTOR'S RIGHT TO REINSTATE.** If Grantor meets certain conditions, Grantor shall have the right to have enforcement of this Mortgage discontinued at any time prior to the earlier of (i) five (5) days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Mortgage or (ii) entry of a judgment enforcing this Mortgage. Those conditions are that Grantor: (a) pays Lender all sums which would then be due under this Mortgage and the Credit Agreement had no acceleration occurred; (b) cures all other defaults under this Mortgage and the Credit Agreement; (c) pays all reasonable expenses incurred in enforcing this Mortgage, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Mortgage, Lender's rights in the Property and Grantor's obligation to pay the sums secured by this Mortgage shall continue unchanged. Upon reinstatement by Grantor, this Mortgage and the obligations secured hereby shall remain fully effective as if no acceleration had occurred but Lender shall not be obligated to make any more credit advances. This right to reinstate shall apply if Grantor has not previously exercised the right to reinstate under this same Mortgage.

Image ID: 000003010958 Type: GEN
Page 10 of 14

Page 10 of 13

BK 5606 PG 469

22.  **NOTICES TO GRANTOR AND OTHER PARTIES.** Unless otherwise provided by applicable law, any notice under this Mortgage shall be in writing and shall be effective when actually delivered or, if mailed, shall be deemed effective when deposited in the United States mail first class, registered mail, postage prepaid, directed to the addresses shown near the beginning of this Mortgage. Any party may change its address for notices under this Mortgage by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address.

23.  **ASSOCIATION OF UNIT OWNERS.** The following provisions apply if the Real Property has been submitted to unit ownership law or similar law for the establishment of condominiums or cooperative ownership of the Real Property:

**Power of Attorney.** Grantor grants an irrevocable power of attorney to Lender to vote in its discretion on any matter that may come before the association of unit owners. Lender shall have the right to exercise this power of attorney only after default by Grantor; however, Lender may decline to exercise this power as it sees fit.

**Insurance.** The insurance as required above may be carried by the association of unit owners on Grantor's behalf, and the proceeds of such insurance may be paid to the association of unit owners for the purpose of repairing or reconstructing the Property. If not so used by the association, such proceeds shall be paid to Lender.

**Compliance with Regulations of Association.** Grantor shall perform all of the obligations imposed on Grantor by the declaration submitting the Real Property to unit ownership, by the bylaws of the association of unit owners, or by any rules or regulations thereunder. If Grantor's interest in the Real Property is a leasehold interest and such property has been submitted to unit ownership, Grantor shall perform all of the obligations imposed on Grantor by the lease of the Real Property from its owner.

24.  **MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** This Mortgage, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Mortgage. No alteration of or amendment to this Mortgage shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Applicable Law.** This Mortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Grantor's Copy of Documents.** Lender agrees to provide Grantor with a conformed copy of both the Line of Credit Home Equity Agreement and this Mortgage at the time they are executed or within a reasonable time after this Mortgage is recorded.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Mortgage to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Mortgage in all other respects shall remain valid and enforceable.

Page 11 of 13

Image ID: 000003010957 Type: GEN
Page 11 of 14

BK **5606** PG **470**

**Successors and Assigns.** Subject to the limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their heirs, personal representatives, successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the indebtedness.

**Time Is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Waivers and Consents.** Lender shall not be deemed to have waived any rights under this Mortgage (or under the Related Documents) unless such waiver is in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by any party of a provision of this Mortgage shall not constitute a waiver of or prejudice the party's right otherwise to demand strict compliance with that provision or any other provision. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or any of Grantor's obligations as to any future transactions. Whenever consent by Lender is required in this Mortgage, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required.

Image ID: 000003010958 Type: GEN
Page 12 of 14

BK**5606** PG**471**

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND GRANTOR AGREES TO ITS TERMS.

GRANTOR:

X _____ (seal)      _____ (seal)
JONATHAN A. PATRONO           MELISA NAKAHODO PATRONO

Signed, acknowledged and delivered in the presence of:

X _____             X _____
Witness                       Witness

COMMONWEALTH OF PENNSYLVANIA, _Cumberland_ County ss.:

On this, the _8th_ day of _June_ _2011_ ~~XXXX~~ before me, the undersigned officer, personally appeared JONATHAN A. PATRONO AND MELISA NAKAHODO PATRONO

known to me (or satisfactorily proven) to be the person(s) whose name(s) _____ subscribed to the within instrument and acknowledged that _____ executed the same for the purposes herein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.
My Commission expires:

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Jody L. Travis, Notary Public
Lower Allen Twp., Cumberland County
My Commission Expires Sept. 29, 2012
Member, Pennsylvania Association of Notaries

_____
Title of Officer

### Certificate of Residence of Mortgagee

Members 1st Federal Credit Union, Mortgagee within named, hereby certifies that its residence is 5000 Louise Drive, Mechanicsburg, PA 17055.

By _____

Image ID: 000003010959 Type: GEN
Page 13 of 14
BK 5606 PG 472

Page 13 of 13

## LEGAL DESCRIPTION

Parcel Number 09F13-0010

All that certain lot or piece of ground situate in Cumberland Township, County of Adams, Commonwealth of Pennsylvania bounded and described as follows:

BEGINNING at the Southwest corner of Lot No 11 and the Northwest corner of Lot No 12 on the East side of the roadway of the West side of the Country Club; thence along the line of Lot No 11 South 60 degrees 45 minutes East 150 feet to a stake; thence along the Gettysburg Country Club Golf Course South 29 degrees 15 minutes West 200 feet to a stake; thence along the Western part of Lot No 13 North 60 degrees 45 minutes West 150 feet to the East side of said roadway; thence along said roadway North 29 degrees 15 minutes East 200 feet to the place of BEGINNING.

Subject to any restrictions, easements and/or adverses that pertain to this property.

Image ID: 000003010960 Type: GEN
Page 14 of 14

BK 5606 PG 473

# EXHIBIT I

# COMMERCIAL GUARANTY

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer<br>*** | Initials |
|---|---|---|---|---|---|---|---|
| References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations. | | | | | | | |

**Borrower:** Hauser Estate, Inc.
Hauser Family Farms LLC
28 W. Middle St
Gettysburg, PA 17325

**Lender:** Members 1st Federal Credit Union
ATTN: Business Lending
5000 Louise Drive
Mechanicsburg, PA 17055

**Guarantor:** Jane H. Patrono
98 East Broadway
Gettysburg, PA 17325

**GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower, or any one or more of them, to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, reasonable attorneys' fees, arising from any and all debts, liabilities and obligations that Borrower individually or collectively or interchangeably with others, owes or will owe Lender under the Note and Related Documents and any renewals, extensions, modifications, refinancings, consolidations and substitutions of the Note and Related Documents.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty.

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action,

either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Arbitration.** Borrower and Guarantor and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Guaranty or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Collateral shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Collateral, including any claim to rescind, reform, or otherwise modify any agreement relating to the Collateral, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Guaranty shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law.** This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the Commonwealth of Pennsylvania without regard to its conflicts of law provisions.

**Choice of Venue.** If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of Cumberland County, Commonwealth of Pennsylvania.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors,

assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Unless otherwise provided by applicable law, any notice required to be given under this Guaranty shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided by applicable law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** The terms of this Guaranty shall be binding upon Guarantor, and upon Guarantor's heirs, personal representatives, successors, and assigns, and shall be enforceable by Lender and its successors and assigns.

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Hauser Estate, Inc.; and Hauser Family Farms LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation Jane H. Patrono, and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means Members 1st Federal Credit Union, its successors and assigns.

**Note.** The word "Note" means the promissory note dated October 26, 2011, in the original principal amount of $1,475,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**CONFESSION OF JUDGMENT.** GUARANTOR HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY OR THE PROTHONOTARY OR CLERK OF ANY COURT IN THE COMMONWEALTH OF PENNSYLVANIA, OR ELSEWHERE, TO APPEAR AT ANY TIME FOR GUARANTOR AFTER THE AMOUNTS HEREUNDER BECOME DUE AND WITH OR WITHOUT COMPLAINT FILED, CONFESS OR ENTER JUDGMENT AGAINST GUARANTOR FOR THE ENTIRE PRINCIPAL BALANCE OF THIS GUARANTY AND ALL ACCRUED INTEREST, LATE CHARGES AND ANY AND ALL AMOUNTS EXPENDED OR ADVANCED BY LENDER RELATING TO ANY COLLATERAL SECURING THE INDEBTEDNESS, TOGETHER WITH COSTS OF SUIT, AND AN ATTORNEY'S COMMISSION OF TEN PERCENT (10%) OF THE UNPAID PRINCIPAL BALANCE AND ACCRUED INTEREST FOR COLLECTION, BUT IN ANY EVENT NOT LESS THAN FIVE HUNDRED DOLLARS ($500) ON WHICH JUDGMENT OR JUDGMENTS ONE OR MORE EXECUTIONS MAY ISSUE IMMEDIATELY; AND FOR SO DOING, THIS GUARANTY OR A COPY OF THIS GUARANTY VERIFIED BY AFFIDAVIT SHALL BE SUFFICIENT WARRANT. THE AUTHORITY GRANTED IN THIS GUARANTY TO CONFESS JUDGMENT AGAINST GUARANTOR SHALL NOT BE EXHAUSTED BY ANY EXERCISE OF THAT AUTHORITY, BUT SHALL CONTINUE FROM TIME TO TIME AND AT ALL TIMES UNTIL PAYMENT IN FULL OF ALL AMOUNTS DUE UNDER THIS GUARANTY. GUARANTOR HEREBY WAIVES ANY RIGHT GUARANTOR MAY HAVE TO NOTICE OR TO A HEARING IN CONNECTION WITH ANY SUCH CONFESSION OF JUDGMENT AND STATES THAT EITHER A REPRESENTATIVE OF LENDER SPECIFICALLY CALLED THIS CONFESSION OF JUDGMENT PROVISION TO GUARANTOR'S ATTENTION OR GUARANTOR HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED OCTOBER 26, 2011.

THIS GUARANTY IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS GUARANTY IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

GUARANTOR:

X _____ (Seal)
Jane H. Patrono

LASER PRO Lending, Ver. 5.57.00.004 Copr. Harland Financial Solutions, Inc. 1997, 2011. All Rights Reserved. - PA C:\COMMERCIAL\CFI\LPL\E20.FC TR-7757 PR-6

# COMMERCIAL GUARANTY

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Hauser Estate, Inc.
Hauser Family Farms LLC
28 W. Middle St
Gettysburg, PA 17325

**Lender:** Members 1st Federal Credit Union
ATTN: Business Lending
5000 Louise Drive
Mechanicsburg, PA 17055

**Guarantor:** Jonathan A. Patrono
160 Country Club Lane
Gettysburg, PA 17325

---

**GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower, or any one or more of them, to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, reasonable attorneys' fees, arising from any and all debts, liabilities and obligations that Borrower individually or collectively or interchangeably with others, owes or will owe Lender under the Note and Related Documents and any renewals, extensions, modifications, refinancings, consolidations and substitutions of the Note and Related Documents.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty.

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action,

either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS. Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR. Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

MISCELLANEOUS PROVISIONS. The following miscellaneous provisions are a part of this Guaranty:

Amendments. This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Arbitration. Borrower and Guarantor and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Guaranty or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Collateral shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Collateral, including any claim to rescind, reform, or otherwise modify any agreement relating to the Collateral, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Guaranty shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

Attorneys' Fees; Expenses. Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

Caption Headings. Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

Governing Law. This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the Commonwealth of Pennsylvania without regard to its conflicts of law provisions.

Choice of Venue. If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of Cumberland County, Commonwealth of Pennsylvania.

Integration. Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

Interpretation. In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors,

assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

Notices. Unless otherwise provided by applicable law, any notice required to be given under this Guaranty shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided by applicable law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

No Waiver by Lender. Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

Successors and Assigns. The terms of this Guaranty shall be binding upon Guarantor, and upon Guarantor's heirs, personal representatives, successors, and assigns, and shall be enforceable by Lender and its successors and assigns.

Waive Jury. Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

DEFINITIONS. The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

Borrower. The word "Borrower" means Hauser Estate, Inc.; and Hauser Family Farms LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

Guarantor. The word "Guarantor" means everyone signing this Guaranty, including without limitation Jonathan A. Patrono, and in each case, any signer's successors and assigns.

Guaranty. The word "Guaranty" means this guaranty from Guarantor to Lender.

Indebtedness. The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

Lender. The word "Lender" means Members 1st Federal Credit Union, its successors and assigns.

Note. The word "Note" means the promissory note dated October 26, 2011, in the original principal amount of $1,475,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement.

Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

CONFESSION OF JUDGMENT. GUARANTOR HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY OR THE PROTHONOTARY OR CLERK OF ANY COURT IN THE COMMONWEALTH OF PENNSYLVANIA, OR ELSEWHERE, TO APPEAR AT ANY TIME FOR GUARANTOR AFTER THE AMOUNTS HEREUNDER BECOME DUE AND WITH OR WITHOUT COMPLAINT FILED, CONFESS OR ENTER JUDGMENT AGAINST GUARANTOR FOR THE ENTIRE PRINCIPAL BALANCE OF THIS GUARANTY AND ALL ACCRUED INTEREST, LATE CHARGES AND ANY AND ALL AMOUNTS EXPENDED OR ADVANCED BY LENDER RELATING TO ANY COLLATERAL SECURING THE INDEBTEDNESS, TOGETHER WITH COSTS OF SUIT, AND AN ATTORNEY'S COMMISSION OF TEN PERCENT (10%) OF THE UNPAID PRINCIPAL BALANCE AND ACCRUED INTEREST FOR COLLECTION, BUT IN ANY EVENT NOT LESS THAN FIVE HUNDRED DOLLARS ($500) ON WHICH JUDGMENT OR JUDGMENTS ONE OR MORE EXECUTIONS MAY ISSUE IMMEDIATELY; AND FOR SO DOING, THIS GUARANTY OR A COPY OF THIS GUARANTY VERIFIED BY AFFIDAVIT SHALL BE SUFFICIENT WARRANT. THE AUTHORITY GRANTED IN THIS GUARANTY TO CONFESS JUDGMENT AGAINST GUARANTOR SHALL NOT BE EXHAUSTED BY ANY EXERCISE OF THAT AUTHORITY, BUT SHALL CONTINUE FROM TIME TO TIME AND AT ALL TIMES UNTIL PAYMENT IN FULL OF ALL AMOUNTS DUE UNDER THIS GUARANTY. GUARANTOR HEREBY WAIVES ANY RIGHT GUARANTOR MAY HAVE TO NOTICE OR TO A HEARING IN CONNECTION WITH ANY SUCH CONFESSION OF JUDGMENT AND STATES THAT EITHER A REPRESENTATIVE OF LENDER SPECIFICALLY CALLED THIS CONFESSION OF JUDGMENT PROVISION TO GUARANTOR'S ATTENTION OR GUARANTOR HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED OCTOBER 26, 2011.

THIS GUARANTY IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS GUARANTY IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

GUARANTOR:

X_____(Seal)
Jonathan A. Patrono

LASER PRO Lending, Ver. 5.57.00.004  Copr. Harland Financial Solutions, Inc. 1997, 2011.  All Rights Reserved.  - PA  C:\COMMERCIAL\CFRLPL\E20.FC  TR-2767  PR-6

# COMMERCIAL GUARANTY

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| | | | | | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Hauser Estate, Inc.
Hauser Family Farms LLC
28 W. Middle St
Gettysburg, PA 17325

**Lender:** Members 1st Federal Credit Union
ATTN: Business Lending
5000 Louise Drive
Mechanicsburg, PA 17055

**Guarantor:** Alan K. Patrono
98 East Broadway
Gettysburg, PA 17325

GUARANTEE OF PAYMENT AND PERFORMANCE. For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower, or any one or more of them, to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents.

INDEBTEDNESS. The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, reasonable attorneys' fees, arising from any and all debts, liabilities and obligations that Borrower individually or collectively or interchangeably with others, owes or will owe Lender under the Note and Related Documents and any renewals, extensions, modifications, refinancings, consolidations and substitutions of the Note and Related Documents.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

DURATION OF GUARANTY. This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty.

GUARANTOR'S AUTHORIZATION TO LENDER. Guarantor authorizes Lender, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

GUARANTOR'S REPRESENTATIONS AND WARRANTIES. Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

GUARANTOR'S WAIVERS. Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action,

either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Arbitration.** Borrower and Guarantor and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Guaranty or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Collateral shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Collateral, including any claim to rescind, reform, or otherwise modify any agreement relating to the Collateral, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Guaranty shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law.** This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the Commonwealth of Pennsylvania without regard to its conflicts of law provisions.

**Choice of Venue.** If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of Cumberland County, Commonwealth of Pennsylvania.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors,

assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

Notices. Unless otherwise provided by applicable law, any notice required to be given under this Guaranty shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided by applicable law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

No Waiver by Lender. Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

Successors and Assigns. The terms of this Guaranty shall be binding upon Guarantor, and upon Guarantor's heirs, personal representatives, successors, and assigns, and shall be enforceable by Lender and its successors and assigns.

Waive Jury. Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

DEFINITIONS. The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

Borrower. The word "Borrower" means Hauser Estate, Inc.; and Hauser Family Farms LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

Guarantor. The word "Guarantor" means everyone signing this Guaranty, including without limitation Alan K. Patrono, and in each case, any signer's successors and assigns.

Guaranty. The word "Guaranty" means this guaranty from Guarantor to Lender.

Indebtedness. The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

Lender. The word "Lender" means Members 1st Federal Credit Union, its successors and assigns.

Note. The word "Note" means the promissory note dated October 26, 2011, in the original principal amount of $1,475,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement.

Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

CONFESSION OF JUDGMENT. GUARANTOR HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY OR THE PROTHONOTARY OR CLERK OF ANY COURT IN THE COMMONWEALTH OF PENNSYLVANIA, OR ELSEWHERE, TO APPEAR AT ANY TIME FOR GUARANTOR AFTER THE AMOUNTS HEREUNDER BECOME DUE AND WITH OR WITHOUT COMPLAINT FILED, CONFESS OR ENTER JUDGMENT AGAINST GUARANTOR FOR THE ENTIRE PRINCIPAL BALANCE OF THIS GUARANTY AND ALL ACCRUED INTEREST, LATE CHARGES AND ANY AND ALL AMOUNTS EXPENDED OR ADVANCED BY LENDER RELATING TO ANY COLLATERAL SECURING THE INDEBTEDNESS, TOGETHER WITH COSTS OF SUIT, AND AN ATTORNEY'S COMMISSION OF TEN PERCENT (10%) OF THE UNPAID PRINCIPAL BALANCE AND ACCRUED INTEREST FOR COLLECTION, BUT IN ANY EVENT NOT LESS THAN FIVE HUNDRED DOLLARS ($500) ON WHICH JUDGMENT OR JUDGMENTS ONE OR MORE EXECUTIONS MAY ISSUE IMMEDIATELY; AND FOR SO DOING, THIS GUARANTY OR A COPY OF THIS GUARANTY VERIFIED BY AFFIDAVIT SHALL BE SUFFICIENT WARRANT. THE AUTHORITY GRANTED IN THIS GUARANTY TO CONFESS JUDGMENT AGAINST GUARANTOR SHALL NOT BE EXHAUSTED BY ANY EXERCISE OF THAT AUTHORITY, BUT SHALL CONTINUE FROM TIME TO TIME AND AT ALL TIMES UNTIL PAYMENT IN FULL OF ALL AMOUNTS DUE UNDER THIS GUARANTY. GUARANTOR HEREBY WAIVES ANY RIGHT GUARANTOR MAY HAVE TO NOTICE OR TO A HEARING IN CONNECTION WITH ANY SUCH CONFESSION OF JUDGMENT AND STATES THAT EITHER A REPRESENTATIVE OF LENDER SPECIFICALLY CALLED THIS CONFESSION OF JUDGMENT PROVISION TO GUARANTOR'S ATTENTION OR GUARANTOR HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED OCTOBER 26, 2011.

THIS GUARANTY IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS GUARANTY IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

GUARANTOR:

X _____(Seal)
Alan K. Patrono

LASER PRO Lending, Ver. 5.57.00.004 Copr. Harland Financial Solutions, Inc. 1997, 2011. All Rights Reserved. - PA C:\COMMERCIAL\CFI\LFL\E20.FC TR-2757 PR-8

# EXHIBIT J



Pamela M. Tobin
Direct Dial: (610) 941-2543
Direct Fax: (610) 684-2041
Email: ptobin@kaplaw.com
www.kaplaw.com

February 27, 2018

**VIA EMAIL AND FIRST CLASS MAIL**

A. Kim Patrono, Esquire
Patrono & Associates, LLC
30 West Middle Street
Gettysburg PA 17325

Jonathan A. Patrono, Esquire
President
Hauser Estate, Inc.
30 West Middle Street
Gettysburg PA 17325

RE:    <u>Hauser Estate, Inc. and Hauser Family Farms LLC</u>

Dear Messrs. Patrono:

I represent Hannah M. Hauser, Melinda Hauser Davis, and The Melinda Hauser Davis Hauser Estate Trust, stockholders ("Stockholders") of Hauser Estate, Inc. ("Corporation") and members of Hauser Family Farms LLC. The Stockholders hereby formally notify you of the claims the Corporation and/or the Stockholders have against you. As set forth in greater detail below, by this letter the Stockholders also demand that the Corporation and Hauser Family Farms LLC bring a lawsuit to prosecute the claims set forth herein.

Notwithstanding that the Stockholders owned a majority equity position in the Corporation (collectively 60%), you positioned yourself as president of the Corporation and secured a majority voting position. Although Jonathan may have held the title of president, by all accounts Jonathan has continually abrogated his responsibilities as president and transferred them, without proper authorization, to Kim, who has acted as <u>de facto</u> president. In addition, as the Corporation's longstanding counsel, you owed and continue to owe a fiduciary duty to this closely held Corporation. As a result of your multiple roles, you were able to exert complete and unfettered dominion over the Corporation to the exclusion and oppression of the Stockholders, relegating them to a minority position regarding the Corporation's operations and, as detailed below, taking steps to substantially harm their interest in the Corporation even as you cemented your own primacy.

A.     Corporation's High Prospects

The Corporation had high prospects for success. The name recognition of the Jack's Hard Cider brand is derived from the high standing and reputation of Jack Hauser as President of Musselman's Apple Sauce and within the apple industry. It was Jack Hauser's name, hard work

Kaplin Stewart Meloff Reiter & Stein, PC
Union Meeting Corporate Center
910 Harvest Drive, P.O. Box 3037
Blue Bell, PA 19422-0765
610-260-6000 tel

Offices in
Pennsylvania
New Jersey
5202686v2

and investment that created value to the brand. The Corporation also had use of the farm lands and the tasting rooms located in the beautiful pristine orchard setting. Finally, given the increasing popularity of the home-brewed beverage market, the Corporation was further positioned for success. But through your exclusive control and mismanagement of the Corporation, you squandered those prospects, plunging the Corporation into debt.

### B. Governance Agreement

It was only in late 2016 that the Stockholders first learned that the Corporation was not current on its loan obligation to Members 1st Federal Credit Union. Upon that discovery, the Stockholders, who had signed personal guaranties for the loan, promptly demanded that: (1) you cease overseeing day-to-day operations and (2) you bring in a general manager and chief financial officer to operate the company. Only at the point that the loan was in default, and after substantial pressure and threats being levied by the Stockholders, did you finally agree to the Governance Agreement, including retaining a chief financial officer.

Once on board, the chief financial officer, Steve Runkle, regularly prepared income statements for the Stockholders' review and proposed structural changes and cost-cutting measures to improve the Corporation's financial performance. You, however, rejected all of these measures. During his tenure, Mr. Runkle managed to uncover that the Corporation had: (1) racked up substantial debt; (2) failed to pay sales taxes when due, placing the Corporation's liquor license in jeopardy; (3) failed to pay federal excise taxes for years; and (4) generally mismanaged the Corporation's affairs, including, by way of example, settling a dispute over a $9,000 vendor bill for $55,000. As a consequence, Mr. Runkle declined to sign the Corporation's tax return for year 2016 and resigned by the end of 2017.

### C. Unapproved Loans

As you know, under the October 5, 2006 Agreement of Shareholders ("Agreement"), you were required to obtain unanimous approval from the board of directors before borrowing money in excess of $50,000. Any loans that you secured which exceeded that $50,000 threshold did not have unanimous approval and therefore materially breached the terms of the Agreement. Thus, all such loans are illegal and subordinate to the Stockholders' equity positions. Nor could any such loans have been secured since the Stockholders never authorized you to mortgage any of the property owned by the Hauser Family Farms LLC.

Notwithstanding the Agreement's contractual prohibition against borrowing over $50,000, you took it upon yourself to obtain additional high-interest loans from On Deck Capital and other factors. These loans, which the board never approved, caused further tightening of the Corporation's cash flow and deepening of the Corporation's financial losses.

5202686v2

### D. Harm to the Corporation and Dilution of Stockholder Equity

Your mismanagement of the Corporation was grossly negligent and caused substantial injury to the Corporation and/or Stockholders. Because of your lack of transparency and undue control, the Stockholders were not willing to invest any further monies into the Corporation unless they were given voting rights that were commensurate with their equity ownership of the Corporation. You, however, repeatedly refused, preferring to retain a lock on control of the Corporation.

Recently, you informed the Stockholders that you intended to bring in an investor and that you planned to dilute the Stockholders' equity in the Corporation to make way for that investment. Notwithstanding repeated requests, you have failed and refused to identify any of the investors you have had discussions with and you have failed to advise the Stockholders of the terms which you have provided to those potential investors. The Agreement restricts you from transferring your shares, without the Stockholders' consent, unless you first make an offer to the Stockholders and the shares are properly appraised as required under the procedures set forth in the Agreement. You therefore have no right under the Agreement to transfer shares or otherwise dilute the Stockholders' equity in the Corporation, absent their express consent.

### E. Breach of Fiduciary Duty

Furthermore, as stockholder and/or counsel, you have at all times owed and continue to owe a fiduciary obligation to the Corporation and Stockholders. *See, e.g., Retina Assocs. of Greater Phila., Ltd. v. Retinovitreous Assocs., Ltd.,* 176 A.3d 263, 276 (Pa. Super. Ct. 2017) ("stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another and may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation"). *See also In re Jones & Laughlin Steel Corp.,* 412 A.2d 1099, 1103 (Pa. 1980) ("Pennsylvania and other jurisdictions have held that a freezing out of minority holders with the purpose of continuing the business for the benefit of the majority holders is a violation of the fiduciary duty owed to minority shareholders."). Any steps that you have taken to diminish or dilute the Stockholders' equity and/or improve your own position in the Corporation in any way, are in violation of your fiduciary duty and therefore improper.

### F. Demand

Please treat this letter as a demand to the Corporation and Hauser Family Farms LLC to bring a lawsuit against you for breach of fiduciary duty; breach of the duty of due care; breach of the duty of loyalty; negligent mismanagement; waste of corporate assets; deepening of corporate insolvency; aiding and abetting; and legal malpractice. If a lawsuit is not commenced by the Corporation and Hauser Family Farms LLC within ten days of the date of this letter, the Stockholders reserve the right to commence litigation as a derivative claim and/or as of the Stockholders' right at any time and without any further notice. In addition, you should notify

A. Kim Patrono, Esquire
Jonathan A. Patrono, Esquire
February 27, 2018
Page 4

all applicable carriers of the claims asserted against you. As this letter is not intended as an exhaustive recitation of all claims, the Stockholders reserve the right to assert additional claims.

By February 24, 2018 email, you called a March 5, 2018 meeting to discuss the sale of all assets regarding the production of Jack's Hard Cider, without, however, identifying any buyer. In your email, you stated that: "Any sale shall include any liabilities associated with the production of Jacks Hard Cider." Although the Members 1st loan must be resolved, again, any other loans you claim to have taken were in breach of the Agreement, unsecure and subordinate to Stockholder equity.

While the Stockholders are willing to discuss an amicable resolution prior to commencing litigation, they insist that you make full disclosure of the Corporation's financial condition and all steps you have taken to attempt to sell assets or liquidate the Corporation. The Stockholders do not consent to you or your agents taking any unilateral steps to bring in investors, sell assets, liquidate or wind up the affairs of the Corporation without the full knowledge and prior written consent of the Stockholders. Please be guided accordingly.

Very truly yours,

Pamela M. Tobin

PMT:pjh

cc: Jack M. Hartman Esquire (via Email and First Class Mail)
Gerald K. Morrison, Esquire (via Email and First Class Mail)
Michael Hutton (via Email and First Class Mail)
David Lee Tayman, Esquire (via Email and First Class Mail)

# EXHIBIT K

Debtor name    **Hauser Estate, Inc.**

United States Bankruptcy Court for the:    MIDDLE DISTRICT OF PENNSYLVANIA

Case number (if known)    _____

☐ Check if this is an amended filing

## Official Form 206D

# Schedule D: Creditors Who Have Claims Secured by Property

12/15

Be as complete and accurate as possible.

**1. Do any creditors have claims secured by debtor's property?**

☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.

■ Yes. Fill in all of the information below.

| Part 1: | List Creditors Who Have Secured Claims |

**2. List in alphabetical order** all creditors who have secured claims. If a creditor has more than one secured claim, list the creditor separately for each claim.

| | Column A | Column B |
|---|---|---|
| | Amount of claim | Value of collateral that supports this claim |
| | Do not deduct the value of collateral. | |

---

**2.1  2012 BD Irrevocable Property Trust**
Creditor's Name

**2555 Kingston Road, Suite 180**
**York, PA 17402**
Creditor's mailing address

Creditor's email address, if known

**Date debt was incurred**
**12/1/2017**
**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**
■ No
☐ Yes. Specify each creditor, including this creditor and its relative priority.

Describe debtor's property that is subject to a lien
**Inventory and equipment**

Describe the lien
**Lien perfected by UCC-1**
Is the creditor an insider or related party?
■ No
☐ Yes
Is anyone else liable on this claim?
■ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

As of the petition filing date, the claim is:
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Amount of claim: **$82,000.00**   Value of collateral: **$1,556,085.00**

---

**2.2  H&M Holdings Group, LLC**
Creditor's Name

**210 Ridgewood Drive**
**Gettysburg, PA 17325**
Creditor's mailing address

Creditor's email address, if known

**Date debt was incurred**
**2014**
**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**

Describe debtor's property that is subject to a lien
**Secured in all corporate assets**

Describe the lien
**First lien perfected by UCC-1**
Is the creditor an insider or related party?
■ No
☐ Yes
Is anyone else liable on this claim?
☐ No
■ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

As of the petition filing date, the claim is:
Check all that apply

Amount of claim: **$1,075,532.14**   Value of collateral: **$4,950,028.00**

---

Official Form 206D    Schedule D: Creditors Who Have Claims Secured by Property    page 1 of 2

Debtor **Hauser Estate, Inc.**
Name

Case number (if know)

☑ No
☐ Yes. Specify each creditor,
including this creditor and its relative
priority.

☐ Contingent
☐ Unliquidated
☐ Disputed

| 2.3 | **H&M Holdings Group, LLC** | Describe debtor's property that is subject to a lien | $496,119.02 | $4,953,085.00 |
|---|---|---|---|---|

Creditor's Name

**Secured in all corporate assets**

**210 Ridgewood Drive
Gettysburg, PA 17325**

Creditor's mailing address

**Describe the lien**

**Second lien perfected by UCC-1**

**Is the creditor an insider or related party?**

☑ No

Creditor's email address, if known

☐ Yes

**Is anyone else liable on this claim?**

**Date debt was incurred**

☐ No

**2014**

☑ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**Last 4 digits of account number**

**Do multiple creditors have an
interest in the same property?**

**As of the petition filing date, the claim is:**
Check all that apply

☑ No

☐ Contingent

☐ Yes. Specify each creditor,
including this creditor and its relative
priority.

☐ Unliquidated

☐ Disputed

3. Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.

| $1,653,651.16 |
|---|

**Part 2:** **List Others to Be Notified for a Debt Already Listed in Part 1**

List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.

If no others need to notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|
| **Paula J. McDermott, Esquire
Post & Schell, P.C.
17 N. 2nd St., 12th Floor
Harrisburg, PA 17101** | Line 2.2 | |
| **Paula J. McDermott, Esquire
Post & Schell, P.C.
17 N. 2nd St., 12th Floor
Harrisburg, PA 17101** | Line 2.3 | |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

Debtor name      **Hauser Estate, Inc.**

United States Bankruptcy Court for the:    MIDDLE DISTRICT OF PENNSYLVANIA

Case number (if known) _____

☐ Check if this is an amended filing

## Official Form 206E/F
# Schedule E/F: Creditors Who Have Unsecured Claims                    12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims.
List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

**Part 1:    List All Creditors with PRIORITY Unsecured Claims**

1. Do any creditors have priority unsecured claims? (See 11 U.S.C. § 507).

   ☐ No. Go to Part 2.

   ■ Yes. Go to line 2.

2. List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part. If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.

|  |  | Total claim | Priority amount |
|---|---|---|---|
| **2.1** Priority creditor's name and mailing address<br>**Alcohol & Tobacco Tax Trade Bureau**<br>**1310 Green Street NW**<br>**Stop 12**<br>**Washington, DC 20005** | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | **$111,612.49** | **$111,612.49** |
| Date or dates debt was incurred<br>**2012 - 2016** | Basis for the claim:<br>**Excise tax** | | |
| Last 4 digits of account number<br>Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (8) | Is the claim subject to offset?<br>■ No<br>☐ Yes | | |

**Part 2:    List All Creditors with NONPRIORITY Unsecured Claims**

3. List in alphabetical order all of the creditors with nonpriority unsecured claims. If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

|  |  | Amount of claim |
|---|---|---|
| **3.1** Nonpriority creditor's name and mailing address<br>**Ace Funding Source, LLC**<br>**366 North Broadway Suite 410**<br>**Jericho, NY 11753** | As of the petition filing date, the claim is: *Check all that apply*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | **$52,465.00** |
| Date(s) debt was incurred **07/16/2018**<br>Last 4 digits of account number __ | Basis for the claim: **Short term loan**<br>Is the claim subject to offset? ■ No ☐ Yes | |
| **3.2** Nonpriority creditor's name and mailing address<br>**ACIC Cork and Closure**<br>**PO Box 6318**<br>**Suite 150**<br>**Napa, CA 94581** | As of the petition filing date, the claim is: *Check all that apply*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | **$5,151.49** |
| Date(s) debt was incurred **6/1/2016**<br>Last 4 digits of account number __ | Basis for the claim: **corks**<br>Is the claim subject to offset? ■ No ☐ Yes | |

Case 1:18-bk-03201-RNO    Doc 1    Filed 07/31/18    Entered 07/31/18 14:49:48    Desc
Main Document    Page 25 of 66
Case 1:26-ap-00037-HWV    Doc 1-7    Filed 04/10/26    Entered 04/10/26 11:51:56    Desc
Exhibit G    Page 179 of 228

# EXHIBIT L



Federal Building, 11th Floor
228 Walnut Street, Suite 1190        (717) 221-4515
Harrisburg, Pennsylvania 17101      FAX 221-4554

September 24, 2019

Brian W. Bisignani, Esquire
POST & SCHELL
17 North Second Street
12th Floor
Harrisburg, PA 17101-1601

> RE: Hauser Estate, Inc.
> Case No. 18-03201

Dear Mr. Bisignani:

I am writing in response to your letter of August 29, 2019, raising issues regarding the chapter 7 estate of Hauser Estate, Inc. (18-03201).

As you well know, the United States Trustee Program (USTP) is the agency charged with oversight of the bankruptcy system. The responsibilities of the United States Trustee (UST) include monitoring chapter 11 cases, and the appointment and supervision of trustees in all chapters. In the discharge of those duties, we are acutely aware of the interests of all of the stakeholders in the system, both debtors and creditors as well as the public.

When the UST appoints a trustee, whether in a chapter 11 case or to serve on the chapter 7 panel, we carefully consider the qualifications that the candidate brings to the bankruptcy process. We also look to the integrity of the trustee who will discharge those fiduciary responsibilities. And, as you know, in chapter 11 matters where the appointment of a trustee is not routine, we consult with the interested parties before reaching a decision on the candidate for appointment. I note that in this case both Debtor's counsel and you, on behalf of your clients, asked that the UST consider appointing Mr. Neblett.

Trustees are expected to exercise sound judgment in the cases they administer, and the UST is careful to exercise its oversight responsibilities without substituting its judgment for that of the appointed trustee. In many cases, including business transactions such as we have in this case, decisions on case direction can be difficult and may not be endorsed equally by all parties.

I understand that your clients wish the trustee to litigate certain claims, and have presented him with certain terms as an inducement to accept their position. It is also my understanding that the trustee, in exercising his business judgment, has reservations about the prosecution of those claims and whether the litigation can benefit the estate. The trustee is not presently aware of facts sufficient to support those causes of action and, to the extent your clients may have additional facts, they have elected to not freely share same with the trustee. Rather, they have conditioned the release of said information upon the trustee agreeing to a confidentiality agreement, which the trustee has elected not to do.

I know that Mr. Neblett has shared his analysis of the issues in this case with you and with your co-counsel in Washington. He has devoted, and continues to devote, considerable time and attention to fulfill his responsibilities as a trustee. In addition, the UST's trial attorney has also actively participated in many aspects of this case and is familiar with the issues. While your letter presents the reasons why your clients' view of the case differs from that of the trustee, neither your letter nor the information available to the UST suggests any basis to remove the trustee.

Should you have additional questions not addressed in this letter, please do not hesitate to contact me.

Sincerely,

/s/ Anne K. Fiorenza

Anne K. Fiorenza,
Assistant United States Trustee

# EXHIBIT M

Stamp #2018-047186  Consideration $1.00
Loc Butler Township                  Afft  N
CommonWealth of Pennsylvania         $0.00
Butler Township                      $0.00
Upper Adams School District          $0.00
By :JENNIFER STIFFLER Total :        $0.00

# This Indenture, made the _18_ day of _July_, 2018,

Between

JONATHAN A. PATRONO AND MELISA NAKAHODO PATRONO, husband and wife,

(hereinafter called the Grantors), of the one part, and

ALEJANDRO NAKAHODO AND ROSA NAKAHODO, husband and wife, as tenants by the entireties

(hereinafter called the Grantees), of the other part,

Witnesseth, that the said Grantors for and in consideration of the sum of one and 00/100 Dollar ($1.00) lawful money of the United States of America, unto them well and truly paid by the said Grantees, at or before the sealing and delivery hereof, the receipt whereof is hereby acknowledged, have granted, bargained and sold, released and confirmed, and by these presents do grant, bargain and sell, release and confirm unto the said Grantees.

All that certain lot or piece of ground situate in **Butler Township, County of Adams,** Commonwealth of Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a rebar at lands now or formerly of John Franklin Thomas; thence by lands of Thomas and Lisa Grim South 04 degrees 22 minutes 31 seconds West 376.47 feet to a rebar at lands now or formerly of Lisa Grim; thence by lands of Grim South 31 degrees 38 minutes 51 seconds East 176.55 feet to a rebar at lands now or formerly of John Franklin Thomas; thence by lands of Thomas South 59 degrees 53 minutes 05 seconds West 646.80 feet to a rebar at lands now or formerly of Dennis E. Reever; thence along lands of Reever North 31 degrees 27 minutes 42 seconds West 607.20 feet to a rebar at other lands of Grantor (Lot No. 1); thence along Lot No. 1 North 58 degrees 40 minutes 08 seconds East 500.00 feet to a concrete monument; thence continuing along same North 79 degrees 22 minutes 47 seconds East 392.12 feet to a rebar at lands now or formerly of Thomas, the place of BEGINNING.

The above taken from a Preliminary/Final Subdivision Plat for Jane Patrono dated October 28, 2013 by Sharrah Design Group, Inc., and recorded April 2, 2014 in the Office of the Recorder of Deeds for Adams County, Pennsylvania in Record Book 5925 at Page 743 and designated as Lot No. 2.

Image ID: 000003867178 Type: GEN
Recorded: 07/18/2018 at 03:20:07 PM
Fee Amt: $70.25 Page 1 of 4
Instr# 201800007858
Adams County, PA
Karen Heflin Register and Recorder
BK 6399 PG 361

1

BEING a part of the same premises which Jane Patrono, joined by her husband Alan K. Patrono by deed dated April 2, 2014, and recorded April 2, 2014 in the Office of the Recorder of Deeds for Adams County, Pennsylvania, in Deed Book 5925 at Page 747, granted and conveyed unto Jonathan A. Patrono and Melisa N. Patrono, the Grantors herein.

Under, Subject, and Together with a non-exclusive easement for purposes of ingress, egress and utilities as shown on the above referenced Subdivision Plat.

Together with all and singular the buildings and improvements, ways, streets, alleys, driveways, passages, waters, water-courses, rights, liberties, privileges, hereditaments and appurtenances, whatsoever unto the hereby granted premises belonging, or in anywise appertaining, and the reversions and remainders, rents, issues, and profits thereof; and all the estate, right, title, interest, property, claim and demand whatsoever of them, the said Grantors, as well at law as in equity, of, in and to the same.

To have and to hold the said lot or piece of ground described above, with the buildings and improvements thereon erected, hereditaments and premises hereby granted, or mentioned and intended so to be, with the appurtenances, unto the said Grantees, their heirs and assigns, to and for the only proper use and behoof of the said Grantees, their heirs and assigns, forever.

And the said Grantors, for themselves and their heirs, executors and administrators, do, by these presents, covenant, grant and agree, to and with the said Grantees, their heirs and assigns, that they, the said Grantors, and their heirs, all and singular the hereditaments and premises herein described and granted, or mentioned and intended so to be, with the appurtenances, unto the said Grantees, their heirs and assigns, against them, the said Grantors, and their heirs, will specially warrant and defend against the lawful claims of all persons claiming by, through or under the said Grantors but not otherwise.

**THIS IS A TRANSFER BETWEEN SON-IN-LAW AND DAUGHTER TO PARENTS AND IS THEREFORE EXEMPT FROM TRANSFER TAX.**

Image ID: 000003867179 Type: GEN
Page 2 of 4
BK 6399 PG 362

2

In Witness Whereof, the parties of the first part have hereunto set their hands and seals. Dated the day and year first above written.

Sealed and Delivered
IN THE PRESENCE OF US:

_____

_____     {SEAL}
Jonathan A. Patrono

    {SEAL}
Melisa N. Patrono

Image ID: 000003867180 Type: GEN
Page 3 of 4
BK 6399 PG 363

3

Commonwealth of Pennsylvania } ss
County of Adams

On this the 18th day of July , 2018, before me, the undersigned Notary Public, personally appeared **Jonathan A. Patrono and Melisa N. Patrono**, known to me (or satisfactorily proven) to be the persons whose names are subscribed to the within instrument, and acknowledged that they executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public
My commission expires _____

```
Commonwealth of Pennsylvania · Notary Seal
JENNIFER L KULP - Notary Public
Adams County
My Commission Expires Mar 12, 2022
Commission Number 1216355
```

The address of the above-named Grantees is:

1320 Herr's Ridge Road, Gettysburg Pt 17325

_____
On behalf of the Grantees

File No. 9789.A.NAKAHODO.DEED

Image ID: 000003887181 Type: GEN
Page 4 of 4
BK 6399 PG 364

4

# EXHIBIT N

Stamp #2018-047232 Consideration $1.00
Loc Gettysburg Borough          AM  N
CommonWealth of Pennsylvania    $0.00
Gettysburg Borough              $0.00
Gettysburg Area School District $0.00
By :LINDA BARBOUR   Total :     $0.00


Image ID: 000003866570 Type: GEN
Recorded: 07/24/2018 at 03:55:11 PM
Fee Amt: $70.25 Page 1 of 4
Instr# 201800008077
Adams County, PA
Karen Heflin Register and Recorder
BK 6401 PG 164

# This Indenture, made the 18 day of July, 2018,

Between

**ALAN K. PATRONO AND JANE H. PATRONO,** husband and wife,

(hereinafter called the Grantors), of the one part, and

**POLLY E. PATRONO,** a married woman,

(hereinafter called the Grantee), of the other part,

**Witnesseth,** that the said Grantors for and in consideration of the sum of **one and 00/100 Dollar ($1.00)** lawful money of the United States of America, unto them well and truly paid by the said Grantee, at or before the sealing and delivery hereof, the receipt whereof is hereby acknowledged, have granted, bargained and sold, released and confirmed, and by these presents do grant, bargain and sell, release and confirm unto the said Grantee.

All that certain lot or piece of land situated, lying and being on the South side of West Middle Street, in the **Borough of Gettysburg, Adams County,** Commonwealth of Pennsylvania, bounded and described as follows:

BEGINNING at a point on West Middle Street between Lots #163 and #164; thence South along line of said lots for a distance of 180 feet, more or less, to a point at a public alley; thence East along said alley for a distance of 21 feet, more or less, to a point; thence North through Lot #164, for a distance of 180 feet, more or less, to a point on West Middle Street, aforesaid; thence West by said street for a distance of 21 feet, more or less, to a point, the place of BEGINNING.

Said lot being the western portion of Lot #164 on the General Plan of the Borough.

BEING the same which Helen B. Hauser, by deed dated November 1, 1993, and recorded December 6, 1993 in the Office of the Recorder of Deeds for Adams County, Pennsylvania, in Deed Book 816 at Page 84, granted and conveyed unto Alan K. Patrono and Jane H. Patrono, the Grantors herein.

**Together with** all and singular the buildings and improvements, ways, streets, alleys, driveways, passages, waters, water-courses, rights, liberties, privileges, hereditaments and appurtenances, whatsoever unto the hereby granted premises belonging, or in anywise appertaining, and the reversions and remainders, rents, issues, and profits thereof; and all the estate, right, title, interest, property, claim and demand whatsoever of them, the said Grantors, as well at law as in equity, of, in and to the same.

1

To have and to hold the said lot or piece of ground described above, with the buildings and improvements thereon erected, hereditaments and premises hereby granted, or mentioned and intended so to be, with the appurtenances, unto the said Grantee, her heirs and assigns, to and for the only proper use and behoof of the said Grantee, her heirs and assigns, forever.

And the said Grantors, for themselves and their heirs, executors and administrators, do, by these presents, covenant, grant and agree, to and with the said Grantee, her heirs and assigns, that they, the said Grantors, and their heirs, all and singular the hereditaments and premises herein described and granted, or mentioned and intended so to be, with the appurtenances, unto the said Grantee, her heirs and assigns, against them, the said Grantors, and their heirs, will specially warrant and defend against the lawful claims of all persons claiming by, through or under the said Grantors but not otherwise.

**THIS IS A TRANSFER BETWEEN PARENTS TO DAUGHTER AND IS THEREFORE EXEMPT FROM TRANSFER TAX.**

Image ID: 000003868571 Type: GEN
Page 2 of 4
BK 6401 PG 165

2

In Witness Whereof, the parties of the first part have hereunto set their hands and seals. Dated the day and year first above written.

Sealed and Delivered
IN THE PRESENCE OF US:

_____  _____ {SEAL}
                                     Alan K. Patrono

_____  _____ {SEAL}
                                     Jane H. Patrono

Image ID: 000003868572 Type: GEN
Page 3 of 4
BK 6401 PG 166

3

Commonwealth of Pennsylvania } ss
County of Adams

On this the 18ᵀᴴ day of July, 2018, before me, the undersigned Notary Public, personally appeared **Alan K. Patrono and Jane H. Patrono**, known to me (or satisfactorily proven) to be the persons whose names are subscribed to the within instrument, and acknowledged that they executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public
My commission expires _____

Commonwealth of Pennsylvania - Notary Seal
JENNIFER L KULP - Notary Public
Adams County
My Commission Expires Mar 12, 2022
Commission Number 1216395

The address of the above-named Grantee is:

120 Montclair Rd, Gettysburg, PA 17325

Alan K Patrono by KJ
On behalf of the Grantee

File No. 9789.F.32WMIDDLESTREET.DEED

Image ID: 000003868573 Type: GEN
Page 4 of 4
BK 6401 PG 167

4

# EXHIBIT O

Stamp #2018-047234 Consideration      $1.00
Loc Gettysburg Borough      Afft N
CommonWealth of Pennsylvania      $0.00
Gettysburg Borough      $0.00
Cumberland Township      $0.00
Gettysburg Area School District      $0.00
By :LINDA BARBOUR    Total :      $0.00

Image ID: 000003868582 Type: GEN
Recorded: 07/24/2018 at 03:58:15 PM
Fee Amt: $70.25 Page 1 of 4
Instr# 201800006079
Adams County, PA
Karen Heflin Register and Recorder
BK 6401 PG 176

# This Indenture, made the 18' day of July, 2018,

Between

     **ALAN KIM PATRONO AND JANE HAUSER PATRONO,** husband and wife,

           (hereinafter called the Grantors), of the one part, and

     **POLLY E. PATRONO,** a married woman,

           (hereinafter called the Grantee), of the other part,

**Witnesseth,** that the said Grantors for and in consideration of the sum of **one and 00/100 Dollar ($1.00)** lawful money of the United States of America, unto them well and truly paid by the said Grantee, at or before the sealing and delivery hereof, the receipt whereof is hereby acknowledged, have granted, bargained and sold, released and confirmed, and by these presents do grant, bargain and sell, release and confirm unto the said Grantee.

ALL that certain tract of land situate partly in the Borough of Gettysburg, and partly in Cumberland Township, Adams County, Pennsylvania, which division being one-third in the Borough and two-thirds in the Township, more particularly bounded and described as follows:

BEGINNING at a point in the center of the State Highway leading from Gettysburg to Harrisburg at land now or formerly of Adams County Institution District and at the Northeast corner of land herein conveyed; thence in the center of State Highway South 34 degrees 45 minutes West, 132.3 feet to a point in the center of said State Highway; thence in said highway North 65 degrees 30 minutes West, 25.4 feet to point at the Western edge of said State Highway; thence along the Western edge of said State Highway, South 34 degrees 45 minutes West, 37.5 feet to a point on the Northern edge of East Broadway; thence along the Northern edge of East Broadway North 85 degrees West, 99.1 feet to a point at land formerly of Ralph E. and Rachael W. Barley; thence by same North 5 degrees East, 139.6 feet to a point at other land now or formerly of Adams County Institution District; thence by same South 85 degrees East, 208.4 feet to a point in the center of said State Highway leading from Gettysburg to Harrisburg, the place of BEGINNING.

BEING part of the same premises which J. Clair Donley, widower, by his Attorney-in-Fact Charles W. Wolf, by deed dated September 16, 1994, and recorded September 16, 1994 in the Office of the Recorder of Deeds for Adams County, Pennsylvania, in Deed Book939 at Page 300, granted and conveyed unto Alan Kim Patrono and Jane Hauser Patrono, husband and wife, as the Grantors herein.

1

Subject, Nevertheless, to the conditions and provisions more fully set out in Deed Book 231 at Page 418 and recorded in the aforesaid Recorder's Office.

Together with all and singular the buildings and improvements, ways, streets, alleys, driveways, passages, waters, water-courses, rights, liberties, privileges, hereditaments and appurtenances, whatsoever unto the hereby granted premises belonging, or in anywise appertaining, and the reversions and remainders, rents, issues, and profits thereof; and all the estate, right, title, interest, property, claim and demand whatsoever of them, the said Grantors, as well at law as in equity, of, in and to the same.

To have and to hold the said lot or piece of ground described above, with the buildings and improvements thereon erected, hereditaments and premises hereby granted, or mentioned and intended so to be, with the appurtenances, unto the said Grantee, her heirs and assigns, to and for the only proper use and behoof of the said Grantee, her heirs and assigns, forever.

And the said Grantors, for themselves and their heirs, executors and administrators, do, by these presents, covenant, grant and agree, to and with the said Grantee, her heirs and assigns, that they, the said Grantors, and their heirs, all and singular the hereditaments and premises herein described and granted, or mentioned and intended so to be, with the appurtenances, unto the said Grantee, her heirs and assigns, against them, the said Grantors, and their heirs, will specially warrant and defend against the lawful claims of all persons claiming by, through or under the said Grantors but not otherwise.

THIS IS A TRANSFER BETWEEN PARENTS TO DAUGHTER AND IS THEREFORE EXEPT FROM TRANSFER TAX.

Image ID: 000003868583 Type: GEN
Page 2 of 4
BK 6401 PG 177

2

In Witness Whereof, the parties of the first part have hereunto set their hands and seals. Dated the day and year first above written.

Sealed and Delivered
IN THE PRESENCE OF US:

_____          _____ {SEAL}
                                            Alan Kim Patrono

_____          _____ {SEAL}
                                            Jane Hauser Patrono

Image ID: 000003888584 Type: GEN
Page 3 of 4
BK 6401 PG 178

3

Commonwealth of Pennsylvania  } ss
County of Adams

     On this the 18 74 day of July , 2018, before me, the undersigned Notary Public, personally appeared **Alan Kim Patrono and Jane Hauser Patrono**, known to me (or satisfactorily proven) to be the persons whose names are subscribed to the within instrument, and acknowledged that they executed the same for the purposes therein contained.

     IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                        Notary Public
                        My commission expires _____

Commonwealth of Pennsylvania - Notary Seal
JENNIFER L KULP - Notary Public
Adams County
My Commission Expires Mar 12, 2022
Commission Number 1216355

The address of the above-named Grantee is:

120 Montclair Road, Gettysburg, PA 17325

_____
On behalf of the Grantee

File No. 9789.B.BROADWAY.DEED

Image ID: 000003868585 Type: GEN
Page 4 of 4
BK 6401 PG 179

4

# EXHIBIT P

Stamp #2018-047235 Consideration    $1.00
Loc Gettysburg Borough    Afft N
CommonWealth of Pennsylvania    $0.00
Gettysburg Borough    $0.00
Gettysburg Area School District    $0.00
By :LINDA BARBOUR   Total :    $0.00

Image ID: 000003868586 Type: GEN
Recorded: 07/24/2018 at 03:59:17 PM
Fee Amt: $70.25 Page 1 of 4
Instr# 201800008080
Adams County, PA
Karen Heflin Register and Recorder
BK 6401 PG 180

# This Indenture, made the 18 day of July, 2018,

Between

ALAN KIM PATRONO AND JANE H. PATRONO, husband and wife,

(hereinafter called the Grantors), of the one part, and

POLLY E. PATRONO, a married woman,

(hereinafter called the Grantee), of the other part,

**Witnesseth**, that the said Grantors for and in consideration of the sum of **one and 00/100** Dollar ($1.00) lawful money of the United States of America, unto them well and truly paid by the said Grantee, at or before the sealing and delivery hereof, the receipt whereof is hereby acknowledged, have granted, bargained and sold, released and confirmed, and by these presents do grant, bargain and sell, release and confirm unto the said Grantee.

All that lot of ground improved with a three-story brick dwelling or apartment and fronting on the South side of West Middle Street in the **Borough of Gettysburg**, Adams County, Commonwealth of Pennsylvania, more particularly bounded and described as follows:

BEING ALL THAT part of a lot of ground known on the general plan of the Borough of Gettysburg as Lot No. 164; BEGINNING at the Southern line of West Middle Street at corner of Lot now or formerly of Anna M. Minnigh and Luther W. Minnigh; thence Eastward along the Southern side of said West Middle Street for a distance of 37 feet, more or less, to line of lot formerly of Jennie Blocher and sold by the Executors of her Last Will unto Sarah J. and Jacob S. Snyder; thence Southward along said last mentioned lot and now or formerly of H. B. Bender for a distance of 180 feet, more or less, to a public alley; thence Westward along said public alley for a distance of 37 feet, more or less, to line of land of Anna M. Minnigh and Luther W. Minnigh aforesaid; thence Northward along said last mentioned lot for a distance of 180 feet, more or less, to West Middle Street, the place of BEGINNING.

IT BEING the same tract of land which Jacob S. Weiland, by deed dated August 14, 2006, and recorded August 29, 2006 in the Office of the Recorder of Deeds for Adams County, Pennsylvania, in Deed Book 4546 at Page 246, granted and conveyed unto Alan Kim Patrono and Jane H. Patrono, the Grantors herein.

Together with all and singular the buildings and improvements, ways, streets, alleys, driveways, passages, waters, water-courses, rights, liberties, privileges, hereditaments and appurtenances, whatsoever unto the hereby granted premises belonging, or in anywise appertaining, and the reversions and remainders, rents, issues, and profits thereof; and all the estate, right, title, interest, property, claim and demand whatsoever of them, the said Grantors, as well at law as in equity, of, in and to the same.

To have and to hold the said lot or piece of ground described above, with the buildings and improvements thereon erected, hereditaments and premises hereby granted, or mentioned and intended so to be, with the appurtenances, unto the said Grantee, her heirs and assigns, to and for the only proper use and behoof of the said Grantee, her heirs and assigns, forever.

And the said Grantors, for themselves and their heirs, executors and administrators, do, by these presents, covenant, grant and agree, to and with the said Grantee, her heirs and assigns, that they, the said Grantors, and their heirs, all and singular the hereditaments and premises herein described and granted, or mentioned and intended so to be, with the appurtenances, unto the said Grantee, her heirs and assigns, against them, the said Grantors, and their heirs, will specially warrant and defend against the lawful claims of all persons claiming by, through or under the said Grantors but not otherwise.

### THIS IS A TRANSFER BETWEEN PARENTS TO DAUGHTER AND IS THEREFORE EXEMPT FROM TRANSFER TAX.

Image ID: 000003868587 Type: GEN
Page 2 of 4

BK 6401 PG 181

2

In Witness Whereof, the parties of the first part have hereunto set their hands and seals. Dated the day and year first above written.

Sealed and Delivered
IN THE PRESENCE OF US:

_____

_____

_____ {SEAL}
Alan Kim Patrono

_____ {SEAL}
Jane H. Patrono

Image ID: 000003868588 Type: GEN
Page 3 of 4
BK 6401 PG 182

3

Commonwealth of Pennsylvania  } ss
County of Adams

On this the 18 TH day of July, 2018, before me, the undersigned Notary Public, personally appeared **Alan Kim Patrono and Jane H. Patrono**, known to me (or satisfactorily proven) to be the persons whose names are subscribed to the within instrument, and acknowledged that they executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public
My commission expires _____

Commonwealth of Pennsylvania - Notary Seal
JENNIFER L KULP - Notary Public
Adams County
My Commission Expires Mar 12, 2022
Commission Number 1216355

The address of the above-named Grantee is:

120 Montclair Road, Gettysburg, PA 17325

On behalf of the Grantee

File No. 9789.E.32WMIDDLESTREET.DEED

Image ID: 000003868589 Type: GEN
Page 4 of 4
BK 6401 PG 183

4

# EXHIBIT Q

Stamp #2018-047233 Consideration    $1.00
Loc Butler Township    Afft N
CommonWealth of Pennsylvania    $0.00
Butler Township    $0.00
Upper Adams School District    $0.00
By :LINDA BARBOUR   Total :    $0.00



Image ID: 000003868574 Type: GEN
Recorded: 07/24/2018 at 03:56:48 PM
Fee Amt: $86.25 Page 1 of 8
Instr# 201800008078
Adams County, PA
Karen Heflin Register and Recorder
BK **6401** PG **168**

Property ID No. 07F09-0037D--000

# This Indenture, made the 18th day of _July_ , 2018,

Between    JANE PATRONO, a married woman,

(hereinafter called the Grantor), of the one part, and

POLLY E. PATRONO, a married woman,

(hereinafter called the Grantee), of the other part,

Witnesseth, that the said Grantor for and in consideration of the sum of **One Dollar ($1.00)** lawful money of the United States of America, unto her well and truly paid by the said Grantee, at or before the sealing and delivery hereof, the receipt whereof is hereby acknowledged, has granted, bargained and sold, released and confirmed, and by these presents does grant, bargain and sell, release and confirm unto the said Grantee,

ALL those certain tracts of land situate, lying and being partly in Butler Township, Adams County, Commonwealth of Pennsylvania, more particularly bounded and described as set forth in Exhibit "A" attached hereto and made a part hereof.

Together with all and singular the buildings and improvements, ways, streets, alleys, driveways, passages, waters, water-courses, rights, liberties, privileges, hereditaments and appurtenances, whatsoever unto the hereby granted premises belonging, or in anywise appertaining, and the reversions and remainders, rents, issues, and profits thereof; and all the estate, right, title, interest, property, claim and demand whatsoever of them, the said Grantor, as well at law as in equity, of, in and to the same.

To have and to hold the said lots or pieces of ground described above, with the buildings and improvements thereon erected, hereditaments and premises hereby granted, or mentioned and intended so to be, with the appurtenances, unto the said Grantee, her heirs and assigns, to and for the only proper use and behoof of the said Grantee, her heirs and assigns, forever.

1

BEING the same tracts which Conewago Corporation, a Pennsylvania business corporation, by deed dated September 7, 1988 and recorded September 23, 1988 in the Office of the Recorder of Deeds in and for Adams County, Pennsylvania, in Record Book 502 at Page 322, granted and conveyed unto Jane Patrono, a married woman, the Grantor herein.

And the said Grantor, for himself and his heirs, executors and administrators, does, by these presents, covenant, grant and agree, to and with the said Grantee, her heirs and assigns, that they, the said Grantor, and his heirs, all and singular the hereditaments and premises herein described and granted, or mentioned and intended so to be, with the appurtenances, unto the said Grantee, her heirs and assigns, against her, the said Grantor, and his heirs, will specially warrant and defend against the lawful claims of all persons claiming by, through or under the said Grantor but not otherwise.

**THIS IS A TRANSFER FROM MOTHER TO DAUGHTER AND IS THEREFORE EXEMPT FROM TRANSFER TAX.**

Image ID: 000003868575 Type: GEN
Page 2 of 8
BK 6401 PG 169

2

In Witness Whereof, the parties of the first part have hereunto set her hands and seals. Dated the day and year first above written.

Sealed and Delivered
IN THE PRESENCE OF US:

_____        _____ {SEAL}
                                Jane Patrono

Image ID: 000003868576 Type: GEN
Page 3 of 8
BK 6401 PG 170

3

Commonwealth of Pennsylvania } ss
County of Adams

On this the 18 ᵗᴴ day of ____July____, 2018, before me, the undersigned Notary Public, personally appeared **Jane Patrono**, known to me (or satisfactorily proven) to be the persons whose name is subscribed to the within instrument, and acknowledged that she executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public

My commission expires _____

Commonwealth of Pennsylvania · Notary Seal
JENNIFER L KULP · Notary Public
Adams County
My Commission Expires Mar 12, 2022
Commission Number 1216355

The address of the above-named Grantee is:

120 Montclair Road, Gettysburg, PA 17325

Alan K Patrono by KH

On behalf of the Grantee

File No. 9789.D.BIGLERVILLERD.DEED

Image ID: 000003868577 Type: GEN
Page 4 of 8
BK 6401 PG 171

4

Image ID: 000003868578 Type: GEN
Page 5 of 8
BK6401 PG172

## EXHIBIT "A"

TRACT NO. 6:

ALL that tract of land situate in Butler Township, Adams County, Pennsylvania, bounded and described as follows:

BEGINNING at a post in the Gettysburg-Biglerville State Highway at corner of land of George Orner and wife; thence in said State Highway and by land formerly of David Brown and now of David March, and crossing Conewago Creek and the race running from Conewago Creek and by land of Richard H. Trone and wife North 4 1/2 degrees East 130.5 perches, more or less to a point; thence in or along said State Highway and by land of Richard H. Trone and wife North 7 1/4 degrees East, 3.6 perches, more or less, to a point; thence by same South 84 1/4 degrees West 12 perches, more or less, to a point; thence by land formerly of David Brown North 70 1/2 degrees West 36.3 perches, more or less, to a post; thence North 48 1/4 degrees East 14 perches, more or less, to a point in a road; thence in said road and by land of Cassian Andrews South 83 1/2 degrees East 9.1 perches, more or less; thence by land of the same, North 20 1/4 degrees West 33 perches, more or less, to a post; thence by land of Fred Baker South 82 degrees East 30.5 perches, more or less, to a point; thence by land of Fred C. Black and wife and by land of Harold C. Clapsaddle and wife and land now or formerly of Burnell L. Jago and wife South 5 degrees West 18.2 perches, more or less, to a point; thence by said land now or formerly of Burnell L. Jago and wife South 82 degrees East 10.9 perches, more or less, to a point in the aforesaid State Highway; thence in said State Highway North 5 degrees East 6.1 perches, more or less, to a point; thence by land of Fred C. Black and wife South 82 degrees East 12.6 perches, more or less, to a point; thence by land of the same North 5 degrees East 6.1 perches, more or less, to a point; thence by land of Pierce Melott et al, South 82 degrees East 13.5 perches, more or less, to a point; thence by land of Coffman Shenk and recrossing the aforesaid race and Conewago Creek South 4 degrees West 54.3 perches, more or less, to a maple; thence by land of the same and by land of Joseph Boyer South 81 1/4 degrees East 83.4 perches, more or less, to a stone; thence by land now or formerly of Charley Thomas and by land now or formerly of George Throne South 9 degrees West 118.4 perches, more or less, to a stone; thence by land now or formerly of George Throne South 27 1/2 degrees East 10.7 perches, more or less, to a post; thence by land of Charley Thomas South 64 3/4 degrees West 39.2 perches, more or less, to a post; thence by land of the same North 26 1/2 degrees West 36.8 perches, more or less, to a post; thence by land of the same South 19 1/2 degrees West 44.2 perches, more or less, to a stone; thence by land now or formerly of Roy Hess North 36 1/4 degrees West 43.9 perches, more or less, to a point; thence by land of George Orner North 13 1/2 degrees East 10.3 perches to a point; thence by land of the same North 82 1/2 degrees West 8.9 perches to a post, the place of BEGINNING. CONTAINING 105 acres, 109 perches, and 193 square feet.

The foregoing description was obtained from a draft prepared by P. S. Orner, County Surveyor, dated November 22, 1952.

BK 6401 PG 173

There is EXCEPTED AND EXCLUDED, HOWEVER, from the aforesaid tract of land containing 105 acres, 109 perches, and 193 square feet the following:

Excepted and excluded Portion (A):
All that portion thereof containing 133 perches and 90 square feet more particularly described in the deed from M. O. Deardorff and wife unto Charley N. Thomas, dated April 12, 1921, and recorded in Deed Book 107 at page 184, which excepted and excluded portion consists of a strip of land 22 feet in width and 1,650 feet in length, running from the Gettysburg-Biglerville State Highway through the aforesaid described tract of land to land now or formerly of Charley Thomas.

Excepted and excluded Portion (B):
The tract of land containing 7 acres and 78 perches, more or less, which was conveyed and more particularly described in the deed from John A. Hauser and wife to Cassian J. Andrew and Vivian A. Andrew, husband and wife, dated January 7, 1955, and recorded in the aforesaid Recorder's office in Deed Book 208 at page 460; such conveyance being made subject to the easements and/or rights of way as set forth at length in such deed.

Excepted and excluded Portion (C):
The tract of land containing 1 acre and 111 perches, more or less, which was conveyed and more particularly described in the deed from John A. Hauser and wife to Evers P. Rinehart and Peggy E. Rinehart, husband and wife, dated October 20, 1955, and recorded in the aforesaid Recorder's office in Deed Book 212 at page 34; such conveyance being made together with and/or subject to the easements and/or restrictions as set forth at length in such deed.

Excepted and excluded Portion (D):
The tract of land containing 4 acres and 63 perches, more or less, which was conveyed and more particularly described in the deed from John A. Hauser and wife to Daniel J. Wolff and Frieda S. Wolff, husband and wife, dated March 11, 1958, and recorded in the aforesaid Recorder's office in Deed Book 220 at page 513.

Excepted and excluded Portion (E):
The tract of land containing 2 acres and 100.3 perches, more or less, which was conveyed and more particularly described in the deed from John A. Hauser and wife to Osborn Printing Co., dated May 5, 1971, and recorded in the aforesaid Recorder's office in Deed Book 291 at page 1139; such conveyance being made subject to the reservation as set forth at length in such deed.

The real estate conveyed hereby, comprising 88.65 acres, more or less, is conveyed TOGETHER WITH all of the rights and privileges as set forth at length in the written instrument given by Joseph S. Boyer et al to John A. Hauser, dated April 29, 1954, and recorded in Miscellaneous Book Z at page 344, and in the written instrument given by J. Forrest Kanagy and wife to John A. Hauser, dated June 17, 1954, and recorded in Miscellaneous Book Z at page 443.

It being the same tract or parcel which John A. Hauser and Helen B. Hauser, his wife, by their deed dated June 7, 1973 and recorded in the office of the Recorder of Deeds of Adams County, Pennsylvania, in Deed Book 307, Page 457, granted and conveyed unto Conewago Corporation, Grantor herein.

UNDER AND SUBJECT, nevertheless, to conditions and restrictions of record.

EXCEPTING AND RESERVING THEREFROM AND THEREOUT four (4) adverse conveyances of certain portions of the hereinabove described property as described below:

Adverse Conveyance No. 1:
A conveyance of easement from Grantor to the Commonwealth of Pennsylvania, Department of Transportation by Grantor's Deed of Easement dated April 16, 1981 and recorded in the Adams County Recorder of Deeds Office at Deed Book 358, Page 162 providing the Commonwealth with a 14,157 square foot easement as therein described.

Adverse Conveyance No. 2:

A conveyance from Grantor to Terry R. Hutton and Melinda H. Hutton by Grantor's deed dated January 1, 1982 and recorded in the Adams County Recorder of Deeds Office at Deed Book 362, Page 954, to wit:

ALL that tract of land situate, lying and being in

Butler Township, Adams County, Pennsylvania, bounded and described as follows:

BEGINNING at a point in the center of Pennsylvania Route 34 from Gettysburg to Biglerville, at the northwestern corner of land now or formerly of George Bright; thence in the center of Pennsylvania Route 34, North 04 degrees 30 minutes 00 seconds East, 369.00 feet to a point in the center of said Pennsylvania Route 34, at corner of other land now or formerly of Conewago Corporation; thence by said other land of Conewago Corporation, and passing through a steel rod set back 50 feet from the last mentioned point; North 84 degrees 19 minutes 00 seconds East, 600.00 feet to a steel rod (set); thence continuing by said land of Conewago Corporation, South 04 degrees 30 minutes 00 seconds West, 369.00 feet to a steel rod (set) in or near the center of a Columbia Gas Company right of way; thence in or near the center of said right of way, and by land now or formerly of George Bright, aforesaid, and passing through a reference steel rod set back 29.04 feet from the next mentioned point, South 84 degrees 19 minutes 00 seconds West, 600.00 feet to a point in the center of Pennsylvania Route 34, the place of BEGINNING. CONTAINING 5.003 Acres.

The above description was taken from a draft of survey prepared by Adams County Surveyors, dated December 29, 1981, and intended to be recorded among the land records of Adams County, Pennsylvania.

Adverse Conveyance No. 3:

A conveyance from Grantor to Robert C. Smith and Ruth A. Smith, his wife, by Grantor's deed dated December 28, 1987 and recorded in the Adams County Recorder of Deeds Office at Deed Book 476, Page 518, to wit:

ALL that tract of land situate, lying and being in Butler Township, Adams County, Pennsylvania, bounded and described as follows:

BEGINNING at a railroad spike in the centerline of Winding Brook Road (T-377) on line of land now or formerly of Wayne Rodgers; thence by said Rodgers land and through a reference steel rod set 25 feet from the beginning of this course, North 03 degrees 58 minutes 10 seconds East, 241.44 feet to an existing pipe at corner of lands now or formerly of Russell Swearman; thence by said Swearman land and through a reference pipe set 40 feet from the end of this course, South 83

Image ID: 000003868580 Type: GEN
Page 7 of 8
BK 6401 PG 174



BK 6401 PG 175

degrees 16 minutes 50 seconds East, 179.86 feet to a point in the centerline of Pa. Route 34 at lands now or formerly of Osborn Printing Company; thence by said Osborn lands, and by land of Grantor herein (about to be conveyed to Evers Rinehart, shown as Lot 3 on the plan of lots mentioned hereafter), and continuing in the center of said Pa. Route 34, South 03 degrees 56 minutes 40 seconds West, 251.86 feet to a point at the intersection of Winding Brook Road (T-377); thence continuing in the center of said Winding Brook Road (T-377), North 79 degrees 58 minutes 50 seconds West, 180.76 feet to a railroad spike, the place of BEGINNING. CONTAINING 1.018 acres.

BEING Lot 2 on a plan of lots prepared for Conewago Corporation by Adams County Surveyors, dated October 28, 1987, and recorded in the Office of the Recorder of Deeds of Adams County, Pennsylvania, in Plat Book 48 at Page 71.

Adverse Conveyance No. 4:
A conveyance from Grantor to Evers P. Rinehart and Peggy E. Rinehart, his wife, by Grantor's deed dated December 28, 1987 and recorded in the Adams County Recorder of Deeds Office at Deed Book 476, Page 513, to wit:

ALL that tract of land situate, lying and being in Butler Township, Adams County, Pennsylvania, bounded and described as follows:

BEGINNING at a railroad spike in the centerline of Rake Factory Road (T-373) at the southeast corner of the land now or formerly of Evers Rinehart, one of the grantees herein; thence by said Rinehart land, North 03 degrees 07 minutes 15 seconds West, 257.00 feet to a 24-inch double maple; thence continuing by the same and in and along a gravel driveway, North 83 degrees 09 minutes 50 seconds West, 263.83 feet to a point in the centerline of Pa. Route 34; thence continuing along the centerline of said Pa. Route 34, North 03 degrees 56 minutes 40 seconds West, 147.48 feet to a p.k. nail at the southwest corner of land now or formerly of Osborn Printing Company; thence by said Osborn land and through a reference steel rod set 30 feet from the beginning of this course South 82 degrees 08 minutes 45 seconds East, 421.66 feet to an existing flange axle on line of land now or formerly of David Sprankle; thence by said Sprankle land and by land of Jacob Irvin and through an existing reference steel rod set 30.68 feet from the end of this course South 04 degrees 23 minutes

25 seconds West, 382.93 feet to a point in the centerline of Rake Factory Road (T-373); thence continuing along the centerline of said road, North 88 degrees 00 minutes 05 seconds West, 122.77 feet to a railroad spike, the place of BEGINNING. CONTAINING 2.183 acres.

BEING Lot 3 on a plan of lots prepared for Conewago Corporation by Adams County Surveyors, dated October 28, 1987, and recorded in the Office of the Recorder of Deeds of Adams County, Pennsylvania, in Plat Book 48, Page 71.

# EXHIBIT R



Image ID: 00C003867166 Type: GEN
Recorded: 07/18/2018 at 03:18:30 PM
Fee Amt: $102.25 Page 1 of 12
Instr# 201800007856
Adams County, PA
Karen Heflin Register and Recorder

BK **6399** PG **349**

| | |
|---|---|
| Stamp # 2018-047185  Consideration | $1.00 |
| Loc Butler Township | Affl  N |
| CommonWealth of Pennsylvania | $0.00 |
| Butler Township | $0.00 |
| Upper Adams School District | $0.00 |
| Menallen Township | $0.00 |
| By : JENNIFER STIFFLEF Total : | $0.00 |

Property ID No. 97E08-0007---000

# This Indenture, made the _18_ day of _July_ , 2018,

Between   JONATHAN ALAN PATRONO, as to a one-half (1/2) interest, in the undivided one-third (1/3) interest,

(hereinafter called the Grantor), of the one part, and

POLLY E. PATRONO-CARLSON, a married woman, in the undivided one-third (1/3) interest,

(hereinafter called the Grantee), of the other part,

Witnesseth, that the said Grantor for and in consideration of the sum of **One Dollar ($1.00)** lawful money of the United States of America, unto her well and truly paid by the said Grantee, at or before the sealing and delivery hereof, the receipt whereof is hereby acknowledged, has granted, bargained and sold, released and confirmed, and by these presents does grant, bargain and sell, release and confirm unto the said Grantee,

ALL those certain tracts of land situate, lying and being partly in Butler Township and partly in Menallen Township, Adams County, Pennsylvania, more particularly bounded and described as set forth in Exhibit "A" attached hereto and made a part hereof.

Together with all and singular the buildings and improvements, ways, streets, alleys, driveways, passages, waters, water-courses, rights, liberties, privileges, hereditaments and appurtenances, whatsoever unto the hereby granted premises belonging, or in anywise appertaining, and the reversions and remainders, rents, issues, and profits thereof; and all the estate, right, title, interest, property, claim and demand whatsoever of them, the said Grantor, as well at law as in equity, of, in and to the same.

To have and to hold the said lots or pieces of ground described above, with the buildings and improvements thereon erected, hereditaments and premises hereby granted, or mentioned and intended so to be, with the appurtenances, unto the said Grantee, her heirs and assigns, to and for the only proper use and behoof of the said Grantee, her heirs and assigns, forever.

1

BEING the same six (6) tracts which Jane Patrono, a married woman, by deed dated December 31, 2012, and recorded December 31, 2012 in the Office of the Recorder of Deeds in and for Adams County, Pennsylvania, in Record Book 5782 at Page 472, granted and conveyed unto Polly E. Patrono-Carlson and Jonathan Alan Patrono, as to one-half (1/2) interest each , as tenants in common and not with right of survivorship, in the undivided one-third (1/3) interest, as the Grantors herein.

The above tracts are LESS, HOWEVER, Lot No. 3 as set forth in a Final Plan dated April 1, 2005, by Adams County Surveyors and recorded July 28, 2006 in the Office of the Recorder of Deeds for Adams County, Pennsylvania, in Record Book 4506 at Page 21, which lot does not convey herein.

And the said Grantor, for himself and his heirs, executors and administrators, does, by these presents, covenant, grant and agree, to and with the said Grantee, her heirs and assigns, that they, the said Grantor, and his heirs, all and singular the hereditaments and premises herein described and granted, or mentioned and intended so to be, with the appurtenances, unto the said Grantee, her heirs and assigns, against her, the said Grantor, and his heirs, will specially warrant and defend against the lawful claims of all persons claiming by, through or under the said Grantor but not otherwise.

**THIS IS A TRANSFER BETWEEN SISTER AND BROTHER TO BROTHER AND IS THEREFORE EXEMPT FROM TRANSFER TAX.**

Image ID: 000003867167 Type: GEN
Page 2 of 12
BK 6399 PG 350

2

**In Witness Whereof**, the party of the first part has hereunto set his hand and seal. Dated the day and year first above written.

Sealed and Delivered
IN THE PRESENCE OF:

_____{SEAL}
Jonathan Alan Patrono

Commonwealth of Pennsylvania } ss
County of Adams

On this the 18th day of July_____, 2018, before me, the undersigned Notary Public, personally appeared JONATHAN ALAN PATRONO, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public
My commission expires _____

> Commonwealth of Pennsylvania - Notary Seal
> JENNIFER L KULP - Notary Public
> Adams County
> My Commission Expires Mar 12, 2022
> Commission Number 1216355

## CERTIFICATE OF RESIDENCE

I do hereby certify that the precise residence and complete post office address of the within names Grantees is: 120 Montclair Rd, Gettysburg, PA 17325

Attorney for Grantee
File:9789,C.HECKENLUBER,DEED

Image ID: 000003867168 Type: GEN
Page 3 of 12
BK 6399 PG 351

EXHIBIT "A"

TRACT NO. 1:

ALL that certain real estate situate partly in Butler Township and partly in Menallen Township, Adams County, Pennsylvania, bounded and described as follows:

BEGINNING at a railroad spike in the center of Township Road T-369 running from the Arendtsville-Biglerville State Highway to Brysonia at corner of Tract No. 2, formerly owned by Earl W. Mummert and wife, (said point of beginning being located in Butler Township); thence from said railroad spike North 4 degrees 32 minutes 54 seconds East 1,206.66 feet to an iron pipe; thence by Tract No. 2 North 16 degrees 33 minutes 25 seconds West 142.90 feet to a stone; thence by Tract No. 2 South 86 degrees 43 minutes 15 seconds West 245.28 feet to a point; thence by land now or formerly of Roy H. Heckenluber North 6 degrees 50 minutes 11 seconds West 715.64 feet to a point; thence by same South 76 degrees 13 minutes 57 seconds West 140.10 feet to a point; thence by same North 7 degrees 56 minutes 3 seconds West 808.19 feet to a steel pin; thence by same South 75 degrees 40 minutes 58 seconds West 252.70 feet to a steel pin at corner of land now or formerly of Roy H. Heckenluber and land now or formerly of Marshall Longenecker; thence by land now or formerly of Marshall Longenecker North 11 degrees 34 minutes 59 seconds West 627.13 feet to an iron pipe; thence North 56 degrees 4 minutes 46 seconds East 282.70 feet to a steel pin and stones; thence North 58 degrees 10 minutes 3 seconds East 304.36 feet to a steel pin; thence North 28 degrees 1 minute 10 seconds West 394.19 feet to an iron pipe; thence North 60 degrees 26 minutes 26 seconds East 100 feet to a point; thence North 26 degrees 33 minutes 27 seconds West 100 feet to a point; thence South 60 degrees 26 minutes 26 seconds West 100 feet to a point; thence North 28 degrees 16 minutes 7 seconds West 872.13 feet to a steel pin; thence North 74 degrees 52 minutes 1 second East 416.68 feet to an iron pipe; thence North 31 degrees 48 minutes 53 seconds East 470.85 feet to an iron pipe and stones; thence North 33 degrees 51 minutes 14 seconds East 336.63 feet to stones; thence North 52 degrees 8 minutes 56 seconds East 343.64 feet to an iron pipe and stones; thence North 54 degrees 18 minutes 6 seconds East 877.02 feet to stones; thence South 59 degrees 10 minutes 13 seconds East 374.60 feet to an iron pipe and stones; thence South 8 degrees 20 minutes 40 seconds East 1,008.86 feet to an iron pipe and stones; thence South 21 degrees 31 minutes 36 seconds East 1,061.03 feet to an iron pipe; thence by land now or formerly of Francis Culp South 3 degrees 52 minutes 19 seconds West 345.79 feet to an iron pipe; thence by same North 75 degrees 32 minutes 6 seconds East 135.79 feet to an iron pipe; thence by same North 54 degrees 20 minutes 46 seconds East 293.64 feet to an iron pipe; thence by land now or formerly of C. B. Shank South 17



Image ID: 000003867169 Type: GEN
Page 4 of 12

BK 6399 PG 352

degrees 55 minutes 55 seconds East 586.77 feet to an iron pipe;
thence by same South 13 degrees 3 minutes 1 second East 188.70
feet to an iron pipe; thence by same South 16 degrees 46 minutes
East 372.65 feet to an iron pipe; thence by same South 29 degrees
3 minutes 53 seconds East 349.45 feet to an iron pin at corner of
land now or formerly of C. B. Shank and land now or formerly of
Charles E. Raffensperger; thence by land now or formerly of
Charles E. Raffensperger South 57 degrees 56 minutes 58 seconds
West 205.01 feet to a steel pin; thence by same South 58 degrees
41 minutes 15 seconds West 287.03 feet to a steel pin; thence by
same South 57 degrees 59 minutes 4 seconds West 296.05 feet to a
steel pin; thence by same South 58 degrees 41 minutes 28 seconds
West 83.38 feet to a concrete monument; thence by same South 1
degree 51 minutes 33 seconds East 226.56 feet to a steel pin at
corner of land now or formerly of Charles E. Raffensperger and
land now or formerly of Clair E. Taylor; thence by land now or
formerly of Clair E. Taylor North 82 degrees 1 minute 19 seconds
West 296.77 feet to an iron pipe; thence by land now or formerly
of Clair E. Taylor South 7 degrees 38 minutes 57 seconds West
1,027.68 feet to an iron pipe; thence by same South 2 degrees 18
minutes 34 seconds West 1,059.85 feet to a point in the center of
the aforesaid Township Road T-369; thence by land now or formerly
of Clair E. Taylor South 2 degrees 1 minute 13 seconds West
1,518.34 feet to a point in State Highway Route 234 running from
Biglerville to Arendtsville; thence running in said State Highway
and running by land now or formerly of Richard Trostle and land
now or formerly of Roy H. Heckenluber South 62 degrees 58 minutes
44 seconds West 1,154.74 feet to a point; thence leaving said
State Highway and running by land now or formerly of Robert Price
North 18 degrees 52 minutes 30 seconds West 159.27 feet to an
iron pipe; thence by same South 64 degrees 3 minutes 7 seconds
West 304.42 feet to an iron pipe; thence by land now or formerly
of Roy H. Heckenluber North 30 degrees 34 minutes 29 seconds West
237.61 feet to an iron pipe; thence by same North 45 degrees 2
minutes 31 seconds East 561.30 feet to an iron pipe; thence by
land now or formerly of Richard N. Greenholt North 76 degrees 54
minutes 44 seconds East 422.36 feet to an iron pipe; thence by
same North 2 degrees 48 minutes 12 seconds East 1,368.76 feet to
point in the center of the aforesaid Township Road T-369; thence
in the center of the aforesaid Township Road T-369; thence in the
center of the aforesaid Township Road and running by land now or
formerly of Richard N. Greenholt North 88 degrees 49 minutes 25
seconds West 622.98 feet to a railroad spike, the place of
BEGINNING.  CONTAINING 274.0196 acres, more or less.  LESS,
HOWEVER, the excepted and excluded portions hereinafter referred
to, thereby reducing the acreage of Tract No. 2 to approximately
248 acres and 58 perches, more or less.

The courses and distances of the foregoing description
were obtained from draft of survey made on March 26, 1965 by J.
H. Rife, Registered Surveyor, of Hanover, Pennsylvania.

Image ID: 000003867170 Type: GEN
Page 5 of 12
BK 6399 PG 353

As noted on the aforesaid draft of survey, certain portions of the land embraced within the limits of Tract No. 2 are not owned by Grantor and therefore such portions are excepted and excluded from the within deed of conveyance. The portions so excepted and excluded have a total acreage of approximately 25 acres and 105 perches, more or less, and they are more particularly described in the deed from D. Lyda Rouzer, widow, to Donald F. Rouzer and Mary Alice Rouzer, husband and wife, dated February 4, 1953 and recorded in the office of the Recorder of Deeds of Adams County, Pennsylvania, in Deed Book 201 at page 468, and in the deed from Elsie I. Heiges, widow, to Donald R. Heiges and Harold Heiges dated November 12, 1964 and recorded in the aforesaid office in Deed Book 249 at page 530.

FURTHER EXCEPTING AND RESERVING THEREFROM AND THEREOUT the adverse conveyance from Grantor to Arendtsville Municipal Authority by Grantor's deed dated September 10, 1987 and recorded in the Recorder of Deeds Office at Deed Book 470, Page 174, to wit:

ALL that certain tract of land situate in Menallen Township, Adams County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at an iron pin at the Southernmost boundary of other land of the Arendtsville Water Company and on line of land of Conewago Corporation being retained; thence running by land of the Conewago Corporation, of which this was formerly a part, South 61 degrees 23 minutes 0 seconds West 300.00 feet to a 2-inch pipe set; thence by land of the same and crossing a private road South 1 degree 55 minutes 30 seconds East 525.00 feet to a 2-inch pipe; thence by the same North 88 degrees 4 minutes 30 seconds East 250.00 feet to a 2-inch pipe; thence by the same South 1 degree 55 minutes 30 seconds East 350.00 feet to a 2-inch pipe; thence by the same South 88 degrees 4 minutes 30 seconds West 674.00 feet to a 2-inch pipe; thence by the same and crossing a private road North 7 degrees 40 minutes 20 seconds East 1,164.6 feet to a 2-inch pipe; thence by the same North 61 degrees 23 minutes 0 seconds East 425.00 feet to a 2-inch pipe set on line of land now or formerly of the Arendtsville

Image ID: 000003867171 Type: GEN
Page 6 of 12
BK 6399 PG 354

Water Company; thence by land now or formerly of the Arendtsville Water Company and through an existing 1-3/4-inch pipe set back 47.76 feet from the end of this course South 21 degrees 39 minutes 20 seconds East 350.00 feet to a steel pin, the point and place of BEGINNING. CONTAINING 12.797 acres.

The description was taken from a draft of survey prepared by Richard W. Boyer, P.S. dated June 12, 1987. and recorded in Adams County Plat Book 48 at Page 24.

TRACT NO. 2:

ALL that tract of land situate in Butler Township, Adams County, Pennsylvania, viz:

BEGINNING at a stone in the center of Township Road T-369 running from the Arendtsville-Biglerville State Highway to Brysonia at land now or formerly of George Taylor; thence by land now or formerly of George Taylor North 6 1/4 degrees East 77.2 perches to a stone; thence by land now or formerly of George Taylor and by Tract No. 1 South 89 1/2 degrees East 40 perches to a stone; thence by Tract No. 1 South 12-3/4 degrees East 8.5 perches to a poplar; thence by same South 8-3/4 degrees West 73 perches to a stone in the aforesaid Township Road; thence North 75 1/2 degrees West 1.4 perches to a stone in said road; thence by the center of said Township Road North 85 degrees West 37.6 perches to a stone, the place of BEGINNING. CONTAINING 19.3 acres, more or less.

Tract No. 2 is conveyed TOGETHER WITH AND SUBJECT TO a right of way, easement, lease, option and privilege as set forth in an Agreement dated October 13, 1952 between Laura E. Orner and The Borough of Arendtsville, a municipal corporation, as recorded in the office of the aforesaid Recorder of Deeds in Miscellaneous Docket Y at page 199 and re-recorded in said office in Miscellaneous Docket CC at page 375.

Image ID: 000003867172 Type: GEN
Page 7 of 12
BK 6399 PG 355

EXCEPTING AND RESERVING THEREFROM AND THEREOUT FROM THE FOREGOING TWO TRACTS, the adverse conveyance of all that tract or parcel of property situate in Butler Township, Adams County, Pennsylvania as is more particularly described in a deed from Conewago Corporation, to Hannah M. Hauser, which Deed is dated September 16, 1988 and recorded September 26, 1988 in the Office of the Recorder of Deeds in and for Adams County, Pennsylvania, in Record Book 502 at Page 371, to wit:

BEGINNING at a nail in the Heckenluber Road (T-369); thence across and leaving said Heckenluber Road (T-369), and by other lands (Lot 1 depicted in and upon the below-mentioned draft of survey and subdivision plan) now or formerly of the Grantor, Conewago Corporation, North 03 degrees 35 minutes 00 seconds East 435.76 feet to a steel pin at said other lands now or formerly of the Grantor, Conewago Corporation; thence continuing along said other lands now or formerly of the Grantor, Conewago Corporation, South 84 degrees 46 minutes 40 seconds East 222.02 feet to a steel pin at said other lands now or formerly of the Grantor, Conewago Corporation; thence continuing along said other lands now or formerly of the Grantor, Conewago Corporation, South 01 degrees 35 minutes 30 seconds West 258.97 feet to a point in the center line of a stream traversing said other lands now or formerly of the Grantor, Conewago Corporation; thence continuing along said other lands now or formerly of the Grantor, Conewago Corporation, and through a steel pin set 20 feet from the beginning of this course, North 87 degrees 34 minutes 36 seconds West 139.23 feet to a steel pin at said other lands now or formerly of the Grantor, Conewago Corporation; thence continuing along said other lands now or formerly of the Grantor, Conewago Corporation, South 03 degrees 05 minutes 10 seconds West 163.87 feet to a nail in said Heckenluber Road (T-369); thence continuing in and along said Heckenluber Road (T-369), North 88 degrees 49 minutes 20 seconds West 93.23 feet to a nail in said Heckenluber Road (T-369), the point and place of BEGINNING. CONTAINING 1.724 acres, more or less.


Image ID: 000003867173 Type: GEN
Page 8 of 12
BK 6399 PG 356

The above description was taken from a draft of survey and subdivision plan, dated December 2, 1987, by Boyer Surveys, which draft of survey and subdivision plan is recorded in the Office of the Recorder of Deeds of Adams County, Pennsylvania, in Plat Book 48 at Page 74, upon which draft of survey and subdivision plan the above-described tract of land is labeled as Lot 2.

Under and subject to the rights, terms and conditions contained within said conveyance from Conewago Corporation to Hannah M. Hauser.

TRACT NO. 1:

ALL that tract of land situate in Butler Township, Adams County, Pennsylvania, bounded and described as follows:

BEGINNING at an iron pipe at corner of land now or formerly of Marshall Longenecker and other land of Conewago Corporation; thence by said other land of Conewago Corporation. North 75 degrees 40 minutes 58 seconds East 252.70 feet to a steel pin; thence by the same South 7 degrees 56 minutes 3 seconds East 808.19 feet to a point; thence by the same North 76 degrees 13 minutes 57 seconds East 140.10 feet to a point; thence by the same South 6 degrees 50 minutes 11 seconds East 715.64 feet to an iron pipe and stones; thence by the same South 88 degrees 25 minutes 29 seconds West 417.10 feet to a steel pin; thence by the same South 2 degrees 50 minutes 51 seconds West

Image ID: 000003887174 Type: GEN
Page 9 of 12
BK 6399 PG 357

1145.35 feet to a steel pin; thence North 81 degrees 25 minutes 4 seconds West 339.74 feet to a steel pin; thence by other land of Roy H. Heckenluber and wife North 3 degrees 32 minutes 58 seconds East 1439.97 feet to a steel pin; thence by the same North 87 degrees 26 minutes 23 seconds East 40.47 feet to a steel pin; thence by the same North 4 degrees 17 minutes 1 second East 717.98 feet to a steel pin in a chestnut stump; thence by land now or formerly of Marshall Longenecker North 78 degrees 24 minutes 29 seconds East 100.42 feet to a steel pin; thence by the same North 9 degrees 30 minutes 28 seconds West 349.89 feet to an iron pipe, the place of BEGINNING. CONTAINING 24.2907 acres, neat measure.

The foregoing description was obtained from a draft of a survey made by J. H. Rife, Registered Engineer, on November 25, 1968.

TRACT NO. 4:

ALL that certain parcel or tract of land situate in Menallen Township, Adams County, Pennsylvania, bounded and described as follows:

BEGINNING at a post for a corner on line of land now or formerly of George Albert; thence by the same South 38 1/2 degrees East 53.7 perches to a stump; thence by land now or formerly of John Carney South 14 1/2 degrees West, 18.2 perches to stones; thence by same South 16 1/2 degrees East, 7.1 perches; thence by land now or formerly of Howard Funt, North 81 degrees West, 6 perches to a post; thence by land now or formerly of Henry Cluck North 19 degrees West 23 perches to stones; thence by same North 44 3/4 degrees West, 46.2 perches to stones; thence by land now or formerly of J. P. Brenneman, North 55 degrees East, 19.1 perches to a post; the place of BEGINNING. CONTAINING 6 Acres and 120 Perches, neat measure.



Image ID: 000003867175 Type: GEN
Page 10 of 12

BK 6399 PG 358

TRACT NO. 5:

ALL that certain parcel or tract of land situate in Butler Township, Adams County, Pennsylvania, bounded and described as follows:

BEGINNING at a stone corner on line of land now or formerly of Peter Butler (now or formerly Albert); thence running by land of the same, South 49 degrees West, 52.3 perches to a stone; thence by land now or formerly of George Taylor (now or formerly of Howard Funt) South 17 1/2 degrees East 24.3 perches to a gum; thence by land now or formerly of John Steinour (now or formerly Levi Steinour) South 25 1/2 degrees East, 9.3 perches, to a stone in the bank of the run; thence by Lot. No. 1, land now or formerly of Samuel Hoffman, North 61 degrees East 53 perches to stones; thence by the original land now or formerly of Joseph Taylor (now or formerly of Jno. McCarney) North 15 3/4 degrees West, 20 perches to stones; thence by the same North 31 degrees West 24 perches to stones, the place of BEGINNING. CONTAINING 12 Acres and 130 Perches, neat measure.

TRACT NO. 6:

ALL that tract of land situate partly in Butler Township, and partly in Menallen Township, Adams County, Pennsylvania, bounded and described as follows:

BEGINNING at an iron pin in Township Road T-376 in Butler Township, and at line of land now or formerly of John A. H. Rether; thence by Rether and passing through a reference iron pin set back 40 feet from the beginning of this call, North 74 degrees 55 minutes 10 seconds West, 522.44 feet to an existing pipe at corner of land of Rether and Conewago Corp.; thence by Conewago Corp., South 54 degrees 13 minutes 30 seconds West, 293.18 feet to an existing pipe; thence by same South 75 degrees 24 minutes 50 seconds West, 175.88 feet to an existing pipe;

Image ID: 000003867176 Type: GEN
Page 11 of 12
BK 6399 PG 359

thence North 03 degrees 45 minutes 00 seconds East and crossing the Menallen-Butler Township line at a point approximately 318.5 feet from the beginning of this call, 345.79 feet to an iron pin; thence continuing by land now or formerly of Conewago Corp., and crossing an unimproved road leading to Legislative Route 01019 North 21 degrees 39 minutes 20 seconds West, 1,013.10 feet to an iron pin and corner of land now or formerly of Arendtsville Water Co.; thence by same North 61 degrees 23 minutes 00 seconds East, 639.55 feet to an iron pin and corner of land now or formerly of Helen B. King; thence by King South 35 degrees 39 minutes 50 seconds East, 990 feet to an iron pin in the approximate center of a road which traverses the subject tract and leads to Legislative Route 01019 to the west and becomes Township Road T-376 in Butler Township at the Menallen-Butler line; thence continuing in said road and crossing the Menallen-Butler Township line approximately 100 feet from the beginning of this call South 26 degrees 54 minutes 50 seconds East, 255.75 feet to an iron pin near the western edge of Township Road T-376; thence continuing in same South 28 degrees 54 minutes 50 seconds East, 222.75 feet to an iron pin near the southeast side of the aforesaid road; thence along and in said road South 36 degrees 50 minutes 10 seconds West, 183.15 feet to an iron pin at or near the center of Township Road T-376; thence continuing in same South 10 degrees 20 minutes 10 seconds West, 151.80 feet to an iron pin at the place BEGINNING. CONTAINING 27.234 acres.

The above description was taken from a draft of survey prepared by Boyer-Price Surveys Inc., Rodney Lee Decker, R. S., dated March 19, 1974.

LL SIX(6) TRACTS Being the same premises which Conewago Corporation, by its Deed dated September 7, 1988 and recorded September 23, 1988, in the Office of the Recorder of Deeds in and for Adams County, Pennsylvania in Record Book 502 at Page 334, granted and conveyed unto Dauphin Deposit Bank and Trust Company and A. Kim Patrono, Co-Trustees of the Marital Trust Under the Will of John A. Hauser, Deceased, the Grantor herein.

# EXHIBIT S

IN THE COURT OF COMMON PLEAS
OF CUMBERLAND COUNTY, PENNSYLVANIA

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

H&M HOLDINGS GROUP, LLC,  No. 2019-112300
assignee of MEMBERS FIRST  (Consolidated with Nos.
FEDERAL CREDIT UNION,   2019-12301 & 12302)

    Plaintiff

   vs.    CIVIL DIVISION

JONATHAN PATRONO,
    Defendant  JURY TRIAL DEMANDED
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/

   Zoom
   Deposition of: JONATHAN PATRONO

   Taken by  : Plaintiff

   Date   : January 26, 2021, 10:01 a.m.

   Before  : Ann M. Wetmore
       Reporter - Notary Public

APPEARANCES:

POST & SCHELL, P.C.
By: JAMES J. KUTZ, ESQ.
  ERIN R. KAWA, ESQ.
  BRIAN W. BISIGNANI, ESQ.
  Appearing on behalf of the Plaintiff

METTE, EVANS & WOODSIDE
By: RONALD L. FINCK, ESQ.
  Appearing on behalf of the Defendant

Case 1:26-ap-00037-HWV Doc 1-7 Filed 04/10/26 Entered 04/10/26 11:51:56 Desc
Exhibit G Page 226 of 228

Atty. Kutz - Witness Jonathan Patrono

## Page 10

that your answers are responsive to the questions I am posing.

You're represented by Mr. Finck today. And if at any time you want to chat off line with him or take a break, feel free to do that. Other than that, we're ready to go.

A. Okay.

Q. In addition to the property that is where you and your wife live, you transferred another property in July of 2018, did you not? You had interest in another property?

A. Yeah, I believe one of the farm interests, yeah.

Q. And you gave that to your sister, Polly?

A. That's correct.

Q. You gave it to her for $1.00?

A. Yes.

Q. Why did you do that?

A. Because we found out that the mortgage was bought by my aunts and I don't trust them. I don't trust my family.

Q. Okay. Is it fair to say you were afraid that your aunts would try to attach that property?

A. Sure, yes.

Q. And by giving it to your sister and she not a

## Page 11

guarantor, you felt that put the property out of the reach of your aunts. Fair statement?

A. I didn't think it would put it out of the reach of them. Maybe just slow them down.

Q. Okay. Are you currently employed, Mr. Patrono?

A. Yes.

Q. How are you employed?

A. I'm employed by Atomic Dog.

Q. And what's your position at Atomic Dog, sir?

A. I'm director of sales.

Q. And for how long have you held that position?

A. Two years about, two years and a month.

Q. Do you know who the owners of Atomic Dog are?

A. Yes.

Q. Who are they?

A. Donald Hoffman.

Q. Do you have any ownership interest?

A. No.

Q. Are you an officer of the entity?

A. No.

Q. Is Mr. Hoffman or one of the entities affiliated with them, is that the entity that bought Hauser Estate out of bankruptcy?

A. Yes.

## Page 12

Q. Is your wife a lawyer?

A. She graduated law school.

Q. Does she have a law license?

A. No.

Q. Is she employed by the Atomic Dog?

A. No.

Q. Was she ever employed with Hauser Estate?

A. Yes.

Q. In what capacity?

A. She was one of the tasting room managers.

Q. And is she working with Atomic Dog?

A. No.

Q. At some point in time was she employed with Atomic Dog?

A. She worked a few hours when the transfer first happened, but that's it.

Q. Okay. Now, there have been a number of depositions taken ahead of you, Mr. Patrono, and I'm going to use some language that Mr. Finck used and I think it works well.

This issue centers around two loans involving Members 1st. Are you aware of that?

A. Yes.

Q. Okay. And there was a loan for a little bit more than 1.4 million which Mr. Finck used as, defined

## Page 13

it as the big one. And then there was a line of credit that I think at sometime moved up to 500,000 and then became a note and we call that the little loan. If I use that terminology, does that work for you today?

A. That is fine.

Q. Okay. Now by way of background, Hauser Estate, whose idea was it to form Hauser Estate?

A. It was mine.

Q. Okay. And what was your business plan for Hauser Estate?

A. Could you define that? Could you define what you mean by that?

Q. Well, if you're forming Hauser Estate and you're going to start a business, what was the intention of the business? What was its goal? What was its focus?

A. It was started as a vineyard and winery.

Q. A what?

A. A vineyard and a winery.

Q. And at some point did its business expand?

A. Yes.

Q. And tell me about that, please, in your own words.

A. We started a hard cider company.

Q. And when you say we --

Henderson Kashmere Wetmore, LLC
(717) 214-1182

Case 1:26-ap-00037-HWV    Doc 1-7    Filed 04/10/26    Entered 04/10/26 11:51:56    Desc
Exhibit G    Page 227 of 228

70

A. Yeah. You're given one of two options. You have to check one.

Q. The property in which you had a partial interest that you conveyed to your sister, do you have any idea what the value of that parcel of land is?

A. No.

Q. No? What is it?

A. It's a farm, apple orchard.

Q. It's an apple orchard?

A. Yes.

Q. How many acres approximately?

A. 350 I think.

Q. Okay. And you transferred your interest in that to avoid your aunts or your aunts' business foreclosing on that property, correct, your interest in that property?

A. No, that's not what I said earlier. I said just to slow them down.

Q. Just to slow them down.

I'll tell you what, Mr. Patrono, let me take a break here. I think I'm close to done, if not done, but I want to chat with my team. All right?

I'm going to go offline for three or four minutes.

(Recess taken.)

71

MR. KUTZ: Mr. Finck, I have no more questions of the witness. I would ask that he do scour his files to see if there are any loan documents that he recollects supporting the loans from mom, dad and the businesses.

And then also if you would look at the nondisclosure agreements, that would be helpful. I understand you instructed him not to answer. I sure as heck hope we don't have to reconvene, and I don't know that we do.

But with those two caveats, I'm done unless you have questions.

MR. FINCK: I do not.

MR. KUTZ: And, Ann, the deposition is concluded and I thank you Mr. Patrono.

(Whereupon, the deposition concluded at 12:03 p.m.)

72

CERTIFICATE OF REPORTER
COMMONWEALTH OF PENNSYLVANIA:
COUNTY OF CUMBERLAND

I, Ann M. Wetmore, Reporter and Notary Public in and for the Commonwealth of Pennsylvania and County of Cumberland, do hereby certify that the foregoing deposition was taken before me at the time and place hereinbefore set forth, and that it is the testimony of:

JONATHAN PATRONO

I further certify that said witness was by me duly sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me stenographically, and subsequently transcribed under my direction and supervision; and that the foregoing is a full, true, and correct transcript of my original shorthand notes.

I further certify that I am not counsel for or related to any of the parties to the foregoing cause, or employed by them or their attorneys, and am not interested in the subject matter or outcome thereof.

Dated at Mechanicsburg, Pennsylvania, this 28th day of January, 2021.

Ann M. Wetmore
Reporter - Notary Public

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.

19 (Pages 70 to 72)